UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RALPH ALICEA,

                                        Plaintiff,

                                                            9:12-CV-00203
v.
                                                            (MAD/TWD)
JOHN MALY, M. TRINIDAD, E. BODISON,
S. KOBER, and JOHN/JANE DOE,

                              Defendants.
_____

APPEARANCES:                          OF COUNSEL:

RALPH ALICEA
Plaintiff *pro se*
04-A-1138
Wende Correctional Facility
Wende Road, P.O. Box 1187
Alden, New York 14004-1187

HON. ERIC T. SCHNEIDERMAN            ADRIENNE J. KERWIN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

*Pro se* Plaintiff Ralph Alicea originally brought this civil rights action under 42 U.S.C.

§ 1983 against four named defendants and a John/Jane Doe defendant.  All of the claims in

Plaintiff's Amended Complaint (Dkt. No. 14), with the exception of retaliation claims against

Defendants Shawangunk Correctional Facility ("Shawangunk") Correction Officer Marta

Trinidad ("Trinidad") and Correction Counselor Earnel Bodison ("Bodison"), were dismissed by the Hon. Mae A. D'Agostino, D.J., on the Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  (Dkt. No. 35.)  Defendants Trinidad and Bodison have now moved for summary judgment on the retaliation claims pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 50.)  Plaintiff has opposed the motion.  (Dkt. No. 54.)  For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted.

## I.      FACTUAL BACKGROUND

### A.      Correction Officer Freeman's Alleged Misconduct

In November 2008, while Plaintiff was confined at  Shawangunk, his wife visited a fellow inmate Daniel Monko ("Monko") and gave him a thirty-five pound food package.  (Dkt. No.  14 at ¶¶ 17, 26.)  According to Plaintiff, Correction Officer Freeman ("Freeman"), allegedly thinking that Plaintiff was attempting to circumvent package restrictions imposed against him in a disciplinary hearing, marked the food items in the package with an ultra violet ink stamp before the package was issued to Monko.  *Id*. at ¶ 26.  Two days later, Plaintiff's cell was searched, and Freeman reported finding some of the stamped food.  *Id*. at  ¶ 28.

Freeman filed Tier III misbehavior reports against Plaintiff and Monko.  *Id*. at ¶ 28; Dkt. No. 54-6.  At his hearing, Monko informed original Defendant John Maly ("Maly"), Deputy Superintendent of Security at Shawangunk, that all of the food items in the package from Plaintiff's wife were still in his possession at the time Plaintiff's cell was searched, and that

---

[1] Judge D'Agostino granted Plaintiff leave to amend with regard to a number of the dismissed claims.  (Dkt. No. 35 at 14.)  Plaintiff has not filed an amended complaint since the dismissal, and the time within to do so has expired.  *Id*. 14-15.

Freeman had engaged in misconduct.  (Dkt. Nos. 14, at ¶ 30; 50-3 at 13.)  Maly thereafter, on his

own accord, advised Monko that he would be contacting the Inspector General regarding the

alleged misconduct.  (Dkt. No. 50-3 at 13-14.)  Monko also wrote to the Inspector General,

purportedly at the urging of Maly, to report Freeman's alleged misconduct.  (Dkt. No. 54-5 at

116-17.)  All of the charges in the misbehavior report filed against Plaintiff by Freeman were

dismissed except for the charge for possessing gang related material.  (Dkt. No. 50-8 at 46-48.)

Plaintiff never contacted the Inspector General's Office regarding Freeman's alleged

misconduct but was questioned as a part of the investigation conducted by the Inspector General.[2]

(Dkt. Nos. 14 at ¶ 33; 50-3 at 14, 22.)  Plaintiff did file a grievance against Freeman on or about

January 22, 2009.  (Dkt. No. 54-4 at 10-11.)  Plaintiff claims that both Trinidad and Bodison

retaliated against him for his cooperation in the Freeman investigation and the grievance he filed

against Freeman.  (Dkt. Nos. 14 at ¶¶ 11, 116; 50-3 at 13.)  Plaintiff may also be claiming that

Bodison retaliated against him for filing grievances against Bodison.  (Dkt. No. 14 at ¶ 116.)

**B.      Trinidad**

Defendant Trinidad's steady post at Shawangunk during the time period relevant to

Plaintiff's claim was the package room.  (Dkt. No. 50-12 at ¶ 4.)  Among her duties as package

room officer was signing for packages and inspecting them to ensure that they were in

compliance with Department of Corrections and Community Supervision ("DOCCS") Directives

4911, 4421, and 4422.[3]  *Id*. at ¶ 5.

---

[2]  Freeman was suspended during the investigation but subsequently returned to work and
was assigned a steady officer in Plaintiff's housing block.  (Dkt. No. 50-3 at 64.)

[3]  Directive 4911 establishes the DOCCS policy concerning packages and articles sent or
brought to facilities and received through facility Package Rooms.  (Dkt. No. 54-3 at 27.)

On January 29, 2009, a sixty-two pound box addressed to Plaintiff was delivered to the

Shawangunk package room and signed for by Trinidad. *Id*. at ¶ 6; Dkt. No. 50-3 at 34-35. The

box had two different return addresses: "Office of the Appellate Defender, 45 West 45th Street,

7th Floor, New York, N.Y. 10036" and "RICHARD ALLEN, MANHATTAN MAIL ROOM,

1710 FIRST AVENUE, NEW YORK, N.Y. 10128." (Dkt. Nos. 50-6; 54-3 at 63.) According to

Trinidad, upon inspection of the contents of the box, it did not appear to be from the address on

the box. (Dkt. No. 50-12 at ¶ 7.) Trinidad, who claims to have been acting in accordance with

the DOCCS Directives, forwarded the entire box and its contents to Deputy Superintendent of

Security Maly and had no further involvement. *Id*. ¶¶ 9-10. According to Trinidad, she has

never withheld an incoming package for any reason other than those required by DOCCS

Directives. *Id*. at ¶ 11.

Plaintiff claims not to have learned that the box had arrived until a month later when his

attorney contacted him to find out why he had not confirmed receipt. (Dkt. No. 50-3 at 35.)

Plaintiff also claims that Trinidad was friends with Freeman and withheld the box in retaliation

for his cooperation in the misconduct investigation by the Inspector General and for the

grievance he filed against Freeman. (Dkt. Nos. 14 at ¶¶ 58-60; 50-3 at 16, 36.)

On or about February 27, 2009, Plaintiff filed a grievance against Trinidad and the entire

package room staff claiming that the box had arrived at Shawangunk on January 29, 2009, was

signed for by Trinidad, and that Plaintiff had not received the box or been informed that it was at

Directive 4421 contains and describes the policies and procedures governing privileged
correspondence that is entitled to a greater degree of confidentiality during processing within the
facility than that accorded general correspondence. *Id*. at 7. Directive 4422 contains and
describes the policies and procedures governing the correspondence program available to all
offenders. *Id*. at 12.

the facility. (Dkt. No. 50-5 at 6-7.) Plaintiff referred to the package room staff's actions as "clear retaliation" against him. *Id*. at 7. On or about March 20, 2009, Plaintiff filed a grievance against Maly for withholding the package and failing to inform him that the box was in his possession, thereby denying Plaintiff his right of access to the courts. *Id*. at 5. The related grievances were consolidated. (Dkt. No. 14 at ¶ 79.)

An investigative report done on the grievances indicated that the package immediately came under scrutiny as "suspect legal mail" upon receipt at the facility, that it was held, and that subsequent inquiry determined that it was not sent by the return addressee. *Id*. at 8. According to Maly, the status of the package was contraband that was attempted to be introduced in the facility by an anonymous sender, and the package was the subject of an ongoing investigation. *Id*.

The Inmate Grievance Resolution Committee ("IGRC") issued a deadlocked decision. (Dkt. Nos. 14 at ¶ 80; 50-5 at 9.) On March 25, 2009, the Superintendent at Shawangunk denied the joint grievance for the reasons set forth in the investigative report. (Dkt. No. 50-5 at 10.) The joint grievance was unanimously denied on appeal to the Central Office Review Committee ("CORC") on May 6, 2009. *Id*. at 14. In a January 31, 2011, memorandum from Maly to Plaintiff regarding the box, submitted by Plaintiff in opposition to Defendants' motion, Maly wrote that he had previously explained to Plaintiff that "it had been determined beyond a doubt that the box had not been sent by the return addressee indicated, and that subsequent investigations into [the] matter indicated that it had been sent from a mailing business in Manhattan by a woman . . . [and] that as such [the] box was considered contraband and [he] would not be receiving it." (Dkt. No. 54-3 at 67.)

**C.     Bodison**

1.     Plaintiff's Relationship with Bodison Prior to the Freeman Misconduct Investigation

Defendant was transferred to Shawangunk in or about November 2005.  (Dkt. Nos. 14 at

¶ 17; 50-7 at 32.)  Defendant Bodison became Plaintiff's Correction Counselor early in his

confinement at Shawangunk.  (Dkt. No. 50-7 at 32.)  According to Plaintiff, there were issues

with Bodison from day one which created a difficult situation.  (Dkt. No. 50-3 at 40.)  Plaintiff

described Bodison as "a hard-lined black man . . . who felt that his position [was] not to be

questioned."  *Id*.  Bodison let Plaintiff know from the beginning that he should not think he was

going to get favoritism because of the light color of his skin.  *Id*. at 41.

Plaintiff described his relationship prior to the Freeman investigation as:

> . . . very difficult.  It was very difficult.  It was very uncomfortable.
> His demeanor was always    I don't know what you want to call it.
> I guess they call it in this day in time reversed racial    I don't know
> what to tell you ma'am.  It was just not a conducive relationship.

*Id*. at 48.   Plaintiff recalled Bodison commenting once when a disciplinary finding against

Plaintiff had been expunged that he bet Plaintiff would not have been given that kind of review if

he had been an African American inmate.  *Id*. at 43.  When counsel commented during Plaintiff's

deposition that it sounded like Bodison had been a "jerk" to him the whole time and not only

after the Freeman incident, Plaintiff indicated that he liked the characterization and described

Bodison as "a very angry black man towards him."  *Id*. at 54.

According to Bodison, Plaintiff was often disrespectful and hostile to him throughout

their professional relationship.  (Dkt. No. 50-13 at ¶ 6.)  Bodison very frequently interacted with

hostile, disrespectful and defiant inmates, and it was his style not to be, or appear to be, intimidated by such conduct so as to maintain his position of authority. *Id*. at ¶¶ 9-10. Bodison has denied treating Plaintiff any differently than other inmates to whom he was assigned. *Id*. at ¶ 21.

### 2. Relationship Following the Freeman Misconduct Claim and Investigation

According to Plaintiff, after he cooperated in the Freeman misconduct investigation, his relationship with Bodison deteriorated further. (Dkt. No 50-3 at 48.) Plaintiff testified at his deposition that on the day he was transferred from Shawangunk to Upstate Correctional Facility, an unidentified correction officer told him that Bodison was out to get him    that no one was happy about the fact that Freeman had been suspended whether they liked her or not. *Id*. at 52. Bodison has stated in his Declaration that he at no time made any decision or took any action with respect to Plaintiff because Plaintiff had filed grievances against him or because Plaintiff had cooperated in the Freeman investigation. (Dkt. No. 50-13 at ¶ 11.)

### a. Targeting Plaintiff's Family for Retaliation

Plaintiff testified at his deposition that after the Freeman situation, "[he] was targeted for retaliation [by Bodison], [his] family was targeted for retaliation, comments [were] made about the [Family Reunion Program] ("FRP"), that the relationship [with Bodison] just totally deteriorated where it became non-existent where [Plaintiff] did not want to meet with him in any form or fashion." (Dkt. No. 50-3 at 55.) When Plaintiff warned members of his family about the possible consequences of having to leave their vehicles with the Shawangunk staff while attending the FRP, i.e., staff could plant something incriminating in their cars, family members other than his wife were no longer comfortable attending. *Id*. at 56, 61. According to Plaintiff,

Bodison started being "really nasty" to his family, *id.* at 48-49, and Bodison's behavior towards Plaintiff and his family was totally disrespectful and vile. *Id.* at 54.

<div align="center">b.    <u>Grievances Against Bodison</u></div>

In Grievance No. 25220-09 against Bodison, dated June 29, 2009, Plaintiff complained about an incident that had occurred on June 18, 2009, when he was summoned to Bodison's office and questioned aggressively regarding a phone number. (Dkt. No. 54-5 at 33.) Correction Counselor Kober was present with Bodison, and when Plaintiff asked why Kober was there, Bodison stated unequivocally that Kober was there because "I feel intimidated by you so I want somebody present in the office when I meet with you." *Id.* When Plaintiff asked that a staff member be present on his behalf to insure that Bodison and Kober did not conspire to fabricate any part of the conversation, Bodison called in several correction officers and told them that Plaintiff was trying to intimidate him. *Id.* Plaintiff indicated that he did not want to continue the interview with Bodison and was allowed to leave. *Id.*

Plaintiff wrote that "[d]ue to this type of relationship reported herein continuing since my arrival at S.C.F. I request that C.C. Bodison not attempt to place me on a call out so that Bodison's feeling of being intimidated while in my presence will cease to continue and I will avoid being accused of any fabricated charges by C.C. Bodison." *Id.* Plaintiff noted in the grievance that Bodison had played a part in the incident involving Freeman, and that since that time the relationship between Plaintiff and Bodison had worsened. *Id.* The IGRC was deadlocked, and both Superintendent Smith and CORC denied the grievance. *Id.* at 48-49, 52.

In Grievance No. 25477-09 against Bodison, dated October 1, 2009, Plaintiff complained that he had been required to meet with Bodison against his will on September 16, 2009. (Dkt.

<div align="center">8</div>

No. 54-5 at 56-58.)  When Plaintiff entered Bodison's office, Bodison, in a "very nasty and agitated tone" told Plaintiff to close the door and sit down.  *Id*. at 57.  Plaintiff informed Bodison that he was in his office under duress and would speak with Bodison and sign papers Bodison wanted signed only if a witness was present.  *Id*.  Bodison took Plaintiff's request as a refusal to sign.  *Id*.  Bodison called Correction Sergeant Aube ("Aube") into the room, and although Plaintiff agreed to sign the papers in Aube's presence, Bodison told Aube that the request was denied and Plaintiff was refusing.  According to Plaintiff, Bodison then stated in a very low voice and in a perverse manner that if Plaintiff continued to file grievances and continued to bring attention to him, Bodison was going to make life for Plaintiff and his family very uncomfortable.  *Id*.  57-58.  In the grievance investigation, Aube stated that he did not hear or see any threatening conduct.  *Id*. at 59.

In the Grievance, Plaintiff requested a complete investigation and a change in counselor.  *Id*. at 58.  He wrote that:

> Since the exposure of the corrupt officer back in Nov. 2008, which resulted in D.S.S. Maly being obligated to contact the Inspector General's office, C.C. Bodison's mistreatment of grievant and his family has only [illegible] N.Y.S.D.O.C.S. policy.  C.C. Bodison should not threaten to make life very uncomfortable for grievant and his family because grievant chooses to utilize the grievance process or has the intelligence to consult/write the necessary supervisors when a situation arises.  Grievant's family, especially grievant's wife should not be made to feel like if their participation in the offered F.R.P. program here at the facility will be sabotaged by members of the counseling unit in retaliation for grievant utilizing the grievance process.

*Id.* at 58.  Superintendent Smith denied the grievance with the clarification that while the grievant was required to attend call outs and/or staff direction to report to an area of the facility,

he was not required to participate in counseling activities. *Id*. at 59. CORC denied the action requested by Plaintiff, finding insufficient evidence of staff malfeasance. *Id*. at 61.

<p style="text-align:center">c.     <u>Quarterly Evaluations</u></p>

Plaintiff claims that Bodison gave him poor quarterly evaluations as a result of his cooperation in the Freeman misconduct investigation. (Dkt. No. 14 at ¶ 42.) Plaintiff was unable to offer specifics regarding the evaluations at his deposition. (Dkt. No. 50-3 at 65.) In his Declaration, Bodison indicated that not all of his evaluations of Plaintiff were unsatisfactory, and that when Plaintiff did receive unsatisfactory evaluations it was because he had exhibited unacceptable behavior and received misbehavior reports. (Dkt. No. 50-13 at ¶ 12.)

The quarterly evaluations done by Bodison, in which Plaintiff's conduct was rated as acceptable, stable, marginal, or unacceptable, support Bodison's Declaration. (Dkt. No. 50-7 at 2-24.) Prior to the Freeman misconduct investigation that began in December 2008, Plaintiff received two acceptable, one stable and one unacceptable evaluation in 2006. *Id*. at 20, 22-24. In 2007, Plaintiff received three acceptable evaluation and one marginal evaluation. *Id.* at 16-19. In 2008, Plaintiff received acceptable evaluations in February, May, and November. *Id*. at 11, 14-15.

Subsequent to his cooperation in the Freeman misconduct investigation, Plaintiff received three acceptable evaluations and one unacceptable evaluation in 2009. *Id*. at 8-10, 12. In 2010, Plaintiff received three acceptable evaluations and one unacceptable evaluation. *Id*. at 2-4, 7. Plaintiff received an unacceptable evaluation in February 2011 and a stable evaluation in May 2011. *Id*. at 5-6. In each instance in which Plaintiff received an unacceptable evaluation, misconduct reports had been issued against him during the quarter. *Id*. at 2, 6, 12, 22.

d.    Failure to Remove Expunged Disciplinary Findings

According to Plaintiff, Bodison failed to remove disciplinary findings from his guidance file after expungement in retaliation for the Freeman situation.  (Dkt. No. 14 at ¶ 42.)  In his Declaration, Bodison explained that he maintained guidance files chronologically, and when a disciplinary finding was expunged, the expungement was included in Plaintiff's file.  (Dkt. No. 50-13 at ¶¶ 16-17.)  Although Bodison did not remove mention of the guilty finding from Plaintiff's guidance file, he no longer relied upon or considered expunged records in decision making or evaluations.  *Id*.  Plaintiff conceded at his deposition that he could be wrong about references to an expunged finding being removed from guidance files.  (Dkt. No. 50-3 at 58.)

e.    Law Library Job

Plaintiff suggests in his Amended Complaint that he was passed over for a job in the law library in retaliation for cooperation in the Freeman investigation.  (Dkt. No. 14 at ¶ 39.)  At his deposition, Plaintiff testified that he believed he had completed his legal research class in 2007 and from 2008 on continuously applied for a job in the law library.  (Dkt. No. 50-3 at 38.)  According to Plaintiff, he never had a direct conversation with Bodison about the law library job but included it in his many conversations with Bodison concerning having his GED and having taken college courses, and thinking that being a porter pushing a broom all day did not fit his qualifications.  *Id.* at 41.

Plaintiff testified at his deposition that Bodison had made it clear to him that he would not get a position as law library clerk.  *Id*. at 42.  When asked why Bodison had taken that position, Plaintiff stated that he could not say why but assumed that "[number one, of my prior

history as a high ranking gang member that was he despised that, number one; number two, again, he was a difficult black man to be around who made many comments about the color of my skin and any favoritism that will be provided to, I guess, what he perceived as Caucasian inmates." *Id.* at 42-43.

Plaintiff described Bodison as never having gone above and beyond to assist him in his rehabilitation. *Id.* at 53. Bodison has stated in his Declaration that Plaintiff was never given a job in the law library because of Program Committee review and noted that it was not uncommon for inmates not to receive requested programming or jobs despite being or appearing to be qualified or eligible. (Dkt. No. 50-13 at ¶¶ 13-14.)

f. Bodison's Testimony that a Poster in Plaintiff's Cell was Gang Related

As noted above, all of the charges in the Freeman misbehavior report filed against Plaintiff by Freeman were dismissed except the charge for possessing gang related material. (Dkt. No. 50-8 at 46-48.) Bodison was called upon to testify as an expert on gang memorabilia at Plaintiff's hearing on the possession of gang related material charge. (Dkt. No. 50-9 at 19.) Bodison was called by the hearing officer over Plaintiff's objection that Bodison's position as Plaintiff's counselor and his pre-existing subjective opinion that Plaintiff was a gang member would prevent him from being objective. *Id.* at 11.

Bodison testified that the credentials which qualified him to testify as a gang memorabilia expert included his training as a DOCCS employee, along with additional training in gang related information. *Id.* at 21. Bodison confirmed in his Declaration that he continuously received updated training in gang recognition and awareness and as a matter of routine was called as a

witness by hearing officers to testify at disciplinary hearings with regard to gang recognition and gang related issues. (Dkt. No. 50-13 at ¶¶ 18-19.) According to Bodison, he never volunteered to testify at a hearing or sought out opportunities to testify at a specific inmate's hearing, including Plaintiff's hearing. *Id*. at ¶ 21.

Bodison testified that in his opinion the poster was gang related, and that the gang was the Bloods. *Id*. at 19-20. Bodison based his opinion on the red bandana going around the face and the head, the standing in blood, dripping blood, and red sneakers. *Id*. When asked by the hearing officer what he had considered in reaching that conclusion, Bodison testified that he considered only the poster in rendering his opinion and did not consider Plaintiff's past disciplinary history or anything like that. (Dkt. No. 50-9 at 21, 24.) Bodison denied having spoken with Freeman regarding the poster. (Dkt. No. 50-10 at 10.)

## II. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d

at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[4] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all

---

[4] Plaintiff's Amended Complaint was properly verified. (Dkt. No. 14 at 44.)

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III. ANALYSIS OF PLAINTIFF'S RETALIATION CLAIMS

Plaintiff claims that Defendants have retaliated against him in various ways for exercising his right to file grievance complaints and cooperating in the Freeman investigation while confined at Shawangunk. Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, correction officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *Id.* at 381-83.

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech [or conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009); *see also Pidlypchak*, 389 F.3d at 380 (quoting *Dawes v.*

---

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

*Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002)). "Adverse action" for purposes of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381.

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred.") (citation omitted); *Roseboro*, 791 F. Supp. 2d at 371.

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds*, *Swierkiewicz,* 534 U.S. 506. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes,* 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific facts; conclusory statement are not sufficient. *Flaherty*, 713 F.2d at 13. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at * 3 & n.11, 2006 U.S. Dist. LEXIS 29745, at * 14 n.11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys*, 426 F.3d at 554-55).

A.      **Trinidad**

1.      Protected Conduct and Retaliatory Action

Plaintiff claims that Defendant Trinidad retaliated against him for his cooperation in the Freeman misconduct investigation and the grievance he filed against Freeman by inspecting and turning over to Maly the sixty-two pound box of legal documents sent to him by his attorney.

(Dkt. Nos. 14 at ¶¶ 11, 16; 50-3 at 13.)

Plaintiff was questioned during his deposition about whether he claimed that Trinidad took any other retaliatory action against him. (*see, e.g.*, Dkt. No. 50-3 at 27-38.) In response, Plaintiff mentioned his numerous unsuccessful applications to work in the law library; grievances not filed in a timely manner; several mysterious cell searches; and his family being made to wait for visits. *Id.* However, Plaintiff conceded that he could not say that Trinidad was involved in any of those situations. *Id.* at 28, 30, 37. Moreover, Trinidad has specifically denied having any knowledge that Plaintiff was attempting to obtain a job in the law library, and having any involvement in the hiring of inmates for the library and the collection or delivery of grievances. (Dkt. No. 50-12 at ¶¶ 11-13.) Therefore, Plaintiff's retaliation claim is limited to the sixty-two pound box Trinidad inspected and turned over to Maly on January 29, 2009.

The filing of grievances has been found to constitute protected First Amendment conduct for purposes of a retaliation claim.[6] *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("Retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments."); *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity" for purposes of a retaliation claim).

2.      Adverse Action

Courts have held that theft, confiscation, or destruction of an inmate's legal documents can constitute an adverse action for purposes of a retaliation claim. *See, e.g., Edwards v. Horn*,

---

[6] The Court assumes for purposes of this motion that cooperation in the Freeman misconduct investigation also constitutes protected conduct.

No. 10 Civ. 6194 (RJS)(JLC), 2012 WL 473481, at *15, 2012 U.S. Dist. LEXIS 18424, at *55 (S.D.N.Y. Feb. 14, 2012) (retaliatory loss of legal documents prevented plaintiff from prosecuting action, which was dismissed for failure to prosecute); *Smith v. City of New York*, No. 03 Civ. 7576 (NRB), 2005 WL 1026551, at *3, 2005 U.S. Dist. LEXIS 7903, at *10 (S.D.N.Y. May 3, 2005) (retaliatory destruction of prisoner's legal documents appears designed to deter plaintiff's exercise of constitutional rights and constitutes adverse action for purposes of a retaliation claim).

According to Trinidad's Declaration, she was working in the Shawangunk package room when the box was delivered. (Dkt. No. 50-12 at ¶¶ 6-7.) She signed for the package; inspected the contents; concluded that it did not appear to have come from the address on the outside of the box and instead had come from an anonymous sender; forwarded the box to Maly in accordance with DOCCS Directives; and had no further involvement. *Id*. at ¶¶ 6-10.

The investigative report done on the grievances against Trinidad and Maly arising out of the confiscation of the box, filed by Plaintiff in opposition to Defendants' motion, indicates that the box immediately came under scrutiny as "suspect legal mail," was held, and that a subsequent inquiry determined that it was not sent by the return addressee. (Dkt. No. 54-3 at 55.)

In denying Plaintiff's grievances, Shawangunk Superintendent Smith wrote:

> According to DSS Maly, grievant did receive a package on 1/29/09. The package was considered "suspect legal mail" and held pending investigation. A subsequent inquiry determined that the package was not sent by the return addressee. The status of this package is that of contraband that was being attempted to be introduced into a State correctional facility by an anonymous sender.

*Id*. at 57. In his January 31, 2011, memorandum to Plaintiff, Maly wrote that it had been

"determined beyond a doubt that the box had not been sent by the return addressee indicated, and that subsequent investigations into [the] matter indicated that it had been sent from a mailing business in Manhattan by a woman . . . and was considered contraband." (Dkt. No. 54-3.)

In moving for summary judgment, Trinidad contends that her conduct with regard to the box did not constitute adverse action because the box had two address labels; the labels were inconsistent; she was not required to assume that one or the other of the labels was correct; and she was entitled to refer the matter to her superiors. (Dkt. No. 50-15 at 9.) The problem with Trinidad's argument is that in her Declaration makes no mention of there having been two different return address labels on the box or that the presence of two labels influenced her decision to forward the box to Maly . (Dkt. Nos. 50-6; 50-12 at ¶ 7) In fact, Trinidad's Declaration states that "[u]pon inspection, it was determined that the contents of the package did not appear to be from the *address* that appeared on the outside of the package." *Id*. (emphasis added).

Trinidad's Declaration does not include the address to which she refers or the contents of the box. (Dkt. No. 50-12.) Nor has Trinidad provided the reasoning behind her determination that, based upon the contents of the box, it did not appear to come from the address.[7] *Id*. In addition, while Trinidad identifies DOCCS Directives 4911, 4421, and 4422 as the Directives

---

[7] Although Plaintiff claims that the box contained legal documents from his attorney, and his attorney was made aware that the box was confiscated, Plaintiff has submitted no evidence in support of his claim. For instance, although Plaintiff references correspondence received from appellate counsel Greenberg in or about February 2009 indicating that a box of legal documents had been sent to Plaintiff, received at Shawangunk on January 29, 2009, and signed for by Trinidad, Plaintiff has not submitted the letter as evidence. (Dkt. No. 14 at ¶ 66.) Nor has Plaintiff submitted a declaration from his attorney supporting his claim regarding the identity of the sender and the contents of the box.

relevant to her inspection of packages, she fails to identify the provisions in the DOCCS Directives pursuant to which the box was inspected and forwarded to Maly. *Id*. at ¶¶ 5, 9.

In short, the evidence does not support Trinidad's argument that her actions were justified because there were two return addresses on the box. Nonetheless, because the evidence does establish that Trinidad forwarded the box to Maly and had no further involvement, and that it was Maly who conducted an investigation of the box and made the determination it was contraband, the Court finds that the evidence does not support a determination that Trinidad's actions constituted adverse action for purposes of Plaintiff's retaliation claim. The reason for the finding is that inspecting and forwarding the box to Maly would not in and of itself be likely to "deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."[8] *Pidlypchak*, 389 F.3d at 381.

### 3. Substantial and Motivating Factor

Even if the Court were to assume for purposes of this motion that Trinidad's conduct constituted adverse action, Plaintiff has failed to produce evidence sufficient to raise a question

---

[8] Plaintiff contends that Trinidad's inspection of his legal mail outside of his presence and failure to notify him his legal mail was being withheld; author a contraband receipt; file a report regarding the interception; enter his legal mail in the log book; and complete a chain of custody report violated numerous DOCCS Directives. (Dkt. Nos. 54-1 at ¶¶ 6-8; 54-2.) Failure to follow a DOCCS Directive does not give rise to a § 1983 claim. *See Cabassa v. Gummerson*, No. 9:01-CV-1039 (DNH/GHL), 2008 WL 4416411, at * 6 n. 24, 2008 U. S. Dist. LEXIS 72975, at * 8 n.24 (N.D.N.Y. Sept. 24, 2008) (violation of a DOCCS Directive does not give plaintiff a claim under 42 U.S.C. § 1983); *see also Ahlers v. Nowicki,* No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4, 2014 U.S. Dist. LEXIS 35607, at * 10 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983."). Nor, assuming *arguendo* that Plaintiff's assertion is correct, would failure to follow DOCCS Directives in the manner claimed by Plaintiff constitute adverse action for purposes of his retaliation claim under the circumstances of the case.

of fact as to whether his protected conduct was a "substantial or motivating factor" in Trinidad's actions with regard to the box. *See Holland*, 758 F.3d at 225-26 ("An inmate bears the burden of showing that the protected conduct was a substantial or motivating factor in the prison official['s action.]") (citation and internal quotation marks omitted).

Plaintiff claims that Trinidad retaliated against him for protected actions he took with respect to Freeman. As a general matter, it is difficult to establish that a defendant had cause to retaliate against a plaintiff for filing a grievance against another party. *See Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a correction officer when the only alleged basis for retaliation was a complaint about an incident involving another correction officer); *Guillory v. Ellis*, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at 18, 2014 U.S. Dist. LEXIS 120709, at * 49 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro,* 791 F. Supp. 2d at 369 (failure by plaintiff to provide any basis to believe correction counselor would retaliate for a grievance in which she was not personally named); *Ciaprazi v. Goord*, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at * 8-9, 2005 U.S. Dist. LEXIS 38232, at * 22 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicate the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary hearing).

Looking at the factors that can be considered in determining whether the requisite causal connection is present, the Court finds temporal proximity between Plaintiff's filing of his January

22, 2009, grievance against Freeman, and Trinidad inspecting the box and forwarding it to Maly on January 29, 2009. (Dkt. Nos. 50-3 at ¶ 6; 54-4 at 10-11.) However, as noted above, a showing of temporal proximity alone is not enough to survive summary judgment, and Plaintiff does not fare as well on the other factors to be considered on causation. *See Roseboro*, 791 F. Supp. 2d at 370. Plaintiff's grievance against Trinidad regarding the box was decided against him by Superintendent Smith and CORC. (Dkt. No. 50-5 at 10, 14.) Furthermore, Trinidad has stated in her Declaration that she has never withheld a package for any reason other than those required by DOCCS Directives (Dkt. No. 50-12 at ¶ 11), and there is no evidence in the record that she has made statements to the contrary.

In his Amended Complaint, Plaintiff alleged that Trinidad had a close personal relationship with Freeman, and that as he was being returned to his cell on December 11, 2008, after giving a statement as a part of the Freeman misconduct investigation, an unidentified correction officer advised him that the word was out that "[C.O.] Freeman's girl Trinidad was gunning for [him]." (Dkt. No. 14 at ¶¶ 33, 58-59.) However, at his deposition, Plaintiff conceded that the only basis for his allegations regarding a close personal relationship between Trinidad and Freeman was that he learned about the relationship "unofficially" hearing correction officers speaking among themselves or making comments to him indicating that they had a personal friendship. (Dkt. No. 50-3 at 19.) Plaintiff testified:

> Q.    . . . And the information that you had or that you learned
>         about Trinidad and Freeman being friendly, was that
>         through inmates or other officers, or something else?
>
> A.    Again, as I said earlier, officers making comments in
>         passing, conversations you overhear. You know, just it was
>         brought to my attention that they had a personal

> relationship outside of corrections, you know. I guess,
> friendships, barbeques. I don't know, I can't tell you. I'm
> just guessing. But I know definitely [they] said that's her
> girl, you know, meaning friends. I'm assuming that's what
> they meant by that.

*Id*. at 21. Plaintiff could not recall discussing the Freeman situation with Trinidad or having any

conversations with her. *Id*.

The evidence shows that Plaintiff has relied entirely upon overheard comments by

correction officers made in passing regarding a friendship between Trinidad and Freeman, and a

comment by an unidentified correction officer that Trinidad was gunning for him, in "guessing"

that the two were friends. *Id*. Plaintiff has submitted no evidence of direct knowledge of the

relationship, if any, between Trinidad and Freeman, or that Trinidad's actions with regard to the

box were motivated by their relationship. Allegations like those in Plaintiff's Amended

Complaint and the statements made by him at his deposition "that are devoid of any specifics, but

replete with conclusions, are insufficient to defeat a properly supported motion for summary

judgment." *Bickerstaff v. Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999).

Given the foregoing, the Court recommends that Defendant Trinidad be granted summary

judgment.

**B.     Bodison**

1.     <u>Protected Conduct</u>

Plaintiff claims in his Amended Complaint that Bodison retaliated against him and his

family for his cooperation in the Freeman misconduct investigation and filing of a grievance

against Freeman. (Dkt. No. 14 at ¶ 111.) Plaintiff's Amended Complaint, bolstered by his

deposition testimony, can also be liberally construed to assert a retaliation claim against Bodison

24

for grievances Plaintiff filed against him.  *Id*. at ¶ 116.  As noted above, the filing of grievances is protected conduct for purposes of retaliation claims.  *See Graham,* 89 F.3d at 80.

### 2.     Targeting Plaintiff's Family for Retaliation

Plaintiff's claim that Bodison targeted his family for retaliation because of his cooperation in the Freeman investigation and grievance against Freeman, along with the grievances Plaintiff filed against Bodison himself, is not supported by the evidence.  (Dkt. Nos. 50-3 at 55; 54-5 at 57-58.)  The evidence establishes that Plaintiff and Bodison had a very difficult relationship from day one, and that Plaintiff has attributed the difficulty in their relationship largely to racial problems.  *Id*. at 40-41, 43, 48, 54.  Although Plaintiff contends that the relationship deteriorated further as a result of his cooperation in the Freeman investigation, *id*. at 48, Plaintiff has presented no evidence of adverse action by Bodison with regard to his family sufficient to support a retaliation claim.

According to Plaintiff, after the Freeman misconduct claim was made, Bodison began making derogatory comments about Plaintiff's wife and became "really nasty" to his family totally disrespectful and vile.  *Id*. at 48-49, 54, 56.  In addition, Plaintiff claims that Bodison told him that if he kept filing grievances and continued to bring attention to Bodison, he would make life for Plaintiff and his family very uncomfortable.  (Dkt. No. 54-5 at 57-58.)  However, the only non-conclusory evidence regarding Bodison's interaction with Plaintiff's family is documentation of a May 2009, complaint from Plaintiff's mother that Bodison was very rude to her whenever she called to inquire about her son.  (Dkt. No. 50-8 at 21.)  Plaintiff testified at his deposition that after Freeman, Bodison told him that he would try to the best of his ability to prevent Plaintiff from attending FRP with his family.  (Dkt. 50-3 at 61-62.)  However, Plaintiff

25

acknowledged that he was able to continue to attend FRP with his wife, even though his family was afraid to attend, not specifically because of Bodison, but out of Plaintiff's expression to them of concern that the Clinton staff might plant something incriminating in their cars. *Id.*

"Verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 648 (W.D.N.Y. 2010) (citing *Cabassa v. Smith*, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at * 7, 2009 U.S. Dist. LEXIS 131431, at * 21 (N.D.N.Y. April 30, 2009) ("Courts addressing claims of verbal threats and harassments advanced to support First Amendment retaliation claims have uniformly held that such conduct is not sufficiently serious to meet this standard.")); *Ross v. Westchester County Jail*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at * 7, 2012 U.S. Dist. LEXIS 3502, at * 19 (S.D.N.Y. Jan. 11, 2012) ("Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim.").

Based upon the foregoing, the Court finds that there is no non-conclusory evidence in the record establishing adverse action by Bodison with regard to Plaintiff's family. Furthermore, Plaintiff has failed to provide more than conclusory evidence that Bodison's threats and hostile treatment towards Plaintiff's family were motivated by his involvement in the Freeman matter or grievances he filed against Bodison, as opposed to the "very difficult" relationship the two had from day one. *See Flaherty*, 713 F.2d at 13 (claims of retaliation must be supported by specific facts; conclusory statements are not sufficient).

### 3. Negative Quarterly Evaluations

Plaintiff claims that Bodison issued negative quarterly evaluations against him following

his cooperation in the Freeman misconduct investigation. (Dkt. No. 14 at ¶ 42.) The evidence reveals that a majority of Plaintiff's quarterly evaluations by Bodison both before and after the Freeman investigation rated his conduct as acceptable. (Dkt. No. 50-7 at 2-24.) Plaintiff received only a small number of unacceptable behavior evaluations during that time. *Id*. at 2,6,12, 22. Bodison has stated in his Declaration that when Plaintiff received an unsatisfactory evaluation, it was because he had exhibited unacceptable behavior and received misbehavior reports. (Dkt. No. 50-13 at ¶ 12.) The evaluations reveal that in each of those instances where Plaintiff's conduct was found to be unacceptable, he had been the subject of misbehavior reports during the quarter. *Id*. at 2, 6, 12, 22.

The Court finds that the record contains no evidentiary support for Plaintiff's claim that Bodison's issuance of three quarterly inmate reviews finding Plaintiff's conduct unacceptable during the three year period following the Freeman misconduct investigation constituted adverse action that was motivated by Plaintiff's cooperation in the investigation. *See Jeffreys*, 426 F.3d at 554 (party may not rely on conclusory allegations or unsubstantiated speculation to defeat summary judgment).

4.    Failure to Remove Expunged Disciplinary Findings

The undisputed evidence establishes that it was Bodison's practice to maintain guidance files in chronological order and not to remove items from the file. (Dkt. No. 50-13 at ¶ 16.) When a disciplinary finding was expunged, Bodison would include the expungement as a part of the file without clearing all mention of the guilty finding or sentence from his file. *Id*. The undisputed evidence also establishes that Bodison did not rely upon or consider expunged records in his decision making or inmate evaluations. *Id*. at ¶ 17.

There is no evidence showing that Plaintiff's cooperation in the Freeman misconduct investigation or his filing of grievances against Bodison was a substantial or motivating factor in Bodison's failure to remove expunged material from Plaintiff's file. Nor is there any evidence showing that Bodison's file keeping practices adversely affected Plaintiff.

     5.    <u>Law Library Job</u>

Even assuming for purposes of this motion that not being given a job in the library constituted adverse action, Plaintiff has failed to produce any evidence supporting his claim that Bodison acted to keep Plaintiff from being given a position in the law library in retaliation for Plaintiff's cooperation in the Freeman misconduct investigation or filing grievances against Bodison. Plaintiff received his law library certification in 2007 and concedes that he began seeking a job in the library without success in 2008, before the Freeman investigation which began in late 2008, and the grievances filed against Bodison in 2009. (Dkt. No. 50-3 at 38.) When asked why Bodison had told him he would never get a position as a law library clerk, Plaintiff testified that he assumed it was because of his history as a high ranking gang member and Bodison's negative feelings about favoritism being shown to those he perceived to be Caucasian inmates. *Id*. at 42-43. According to Bodison, Plaintiff was never given a job in the law library because of Program Committee review, and it was not uncommon for inmates not to received requested jobs. (Dkt. 50-13 at ¶¶ 13-14.)

     6.    <u>Bodison's Testimony Regarding the Poster</u>

There is no evidence in the record supporting Plaintiff's claim that Bodison testified at his hearing on the possession of gang related material charge in retaliation for Plaintiff's cooperation

in the Freeman misconduct investigation.[9]  The evidence establishes that Bodison had some expertise in gang recognition and gang related issues and was routinely called as a witness by hearing officers to testify on gang related matters at disciplinary hearings.  (Dkt. No. 50-13 at ¶¶ 18-19.)  Bodison was asked to testify at Plaintiff's hearing and based his opinion that the poster was gang related solely on the poster itself, without considering Plaintiff's past disciplinary history or anything like that.  *Id*. at ¶¶ 19-21.

### 7.  Conclusion

Based upon the foregoing, the Court concludes that there is no evidence in the record upon which a jury could reasonably find that Bodison retaliated against Plaintiff for his cooperation in the Freeman misconduct investigation or the filing grievances against Freeman or Bodison, and recommends that Bodison be granted summary judgment.

### C.  Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they would nonetheless be entitled to qualified immunity.  (Dkt. No. 50-15 at 12-14.)  Inasmuch as the Court is recommending that Defendants' motion for summary judgment be granted on other grounds, it finds it unnecessary to reach their qualified immunity argument.

**ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No.50) be **GRANTED IN ITS ENTIRETY**; and it is hereby

---

[9]  The hearing took place in late December 2008 and early January 2009, well before Plaintiff's June 29, 2009, and October 1, 2009, grievances against Bodison submitted as evidence by Plaintiff.  (Dkt. Nos. 50-9 at 1; 50-10, at 1; 50-11 at 1; 54-5.)  Therefore, Plaintiff has no claim that Bodison testified against him in retaliation for grievances filed against Bodison.

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 19, 2015
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

Slip Copy, 2014 WL 1056935 (N.D.N.Y.)
**(Cite as: 2014 WL 1056935 (N.D.N.Y.))**


Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karl AHLERS, Plaintiff,
v.
Jeffery NOWICKI, Chief of Sotp, CNYPC; Barbara
Miller, Director of Administrative Services, CNYPC;
Cynthia Comstock, Nurse Administrator, Sotp,
CNYPC, Defendants.

No. 9:12–CV–0539 (DNH/RFT).
Signed March 18, 2014.

Karl Ahlers, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Cathy Y. Sheehan, Esq.,
Ass't Attorney General, of Counsel, Albany, NY, for
Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Karl Ahlers brought this action
pursuant to 42 U . S.C. § 1983. On February 25, 2014,
the Honorable Randolph F. Treece, United States
Magistrate Judge, advised by Re-
port–Recommendation that defendants' motion for
summary judgment be granted and plaintiff's com-
plaint be dismissed. No objections to the Re-
portRecommendation were filed.

Based upon a careful review of the entire file and
the recommendations of the Magistrate Judge, the
Report–Recommendation is accepted in whole. *See* 28
U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED; and

2. The complaint is DISMISSED in its entirety.

The Clerk is directed to serve a copy of this De-
cision and Order upon plaintiff in accordance with the
Local Rules.

IT IS SO ORDERED.

### *REPORT–RECOMMENDATION and ORDER*

ROANDOLPH F. TREECE, United States Magistrate
Judge.

Plaintiff Karl Ahlers brings this civil rights ac-
tion, pursuant to 42 U.S.C. § 1983, alleging violations
of his First, Fourth, Fifth, and Fourteenth Amendment
rights as a result of a room search conducted by staff
members of the Central New York Psychiatric Center
(CNYPC), where Plaintiff is involuntarily civilly
committed. *See* Dkt. No. 1, Compl. Defendants now
move for Summary Judgment. *See* Dkt. No. 18.
Plaintiff opposes the Motion. *See* Dkt. No. 20. For the
reasons stated below, we recommend that the De-
fendants' Motion be **GRANTED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary
judgment is appropriate only where "there is no gen-
uine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." The moving
party bears the burden to demonstrate through
"pleadings, depositions, answers to interrogatories,
and admissions on file, together with [ ] affidavits, if
any," that there is no genuine issue of material fact.
*F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1056935 (N.D.N.Y.)
**(Cite as: 2014 WL 1056935 (N.D.N.Y.))**

(quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the non-moving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not

extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION
### A. Summary of Facts
Except where noted, the following facts are undisputed.

At all times relevant to the Complaint, Plaintiff was an involuntarily civilly committed resident at CNYPC. Dkt. No. 18–2, Defs.' Statement of Material Fact Pursuant to Local Rule 7.1(a)(3) ("hereinafter 7.1 Statement"), at ¶ 1. On Wednesday, February 1, 2012, members of CNYPC's security team, searched Ahler's assigned room at CNYPC. *Id.* at ¶¶ 3, 8, & 12. As a result of the search, security staff found and removed from Ahler's room "2 screws missing fluorescent light/screws loose on desk, 3 ketchup, 3 Lorna Doones [cookies], 1 gallon size plastic bags [sic], 1 quart plastic bag, 1 sandwich bag, 3 mayonnaise relish packets." *Id.* at ¶¶ 13 & 14. In violation of CNYPC's policy, Plaintiff's possessions were not returned to their original state after the search. His bedding was thrown on the floor and walked on by staff. Compl. at ¶¶ 5(g) & (s). As a result, Plaintiff had to sleep on dirty sheets, or without sheets. *Id.* at ¶ 5(h). Prior to the search, Plaintiff had verbally complained to CNYPC's business office regarding his phone bill. Dkt. No. 18–6, Karl Ahlers Dep., dated Mar. 12, 2013, at pp. 63–66.

### B. Fourth Amendment
Plaintiff alleges that, without any probable cause

Slip Copy, 2014 WL 1056935 (N.D.N.Y.)
**(Cite as: 2014 WL 1056935 (N.D.N.Y.))**

or other suitable justification, Defendant Comstock supervised an unconstitutional search of his room, and that Defendants Miller and Nowicki are liable for this search in their supervisory capacity. *See generally* Compl.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons against unreasonable searches and seizures, shall not be violated...." U.S. Const. Amend. IV. "The purpose of the fourth amendment [ ] is to protect people from arbitrary and oppressive governmental conduct." *Aiken v. Nixon,* 236 F.Supp.2d 211, 230 (N.D.N.Y. Sept.30, 2002). However, "involuntarily committed individuals do not have a right to privacy in their cells, and therefore cannot challenge a cell search under the Fourth Amendment." *See Ahlers v. Bosco,* 2012 WL 6649191, at * 3 (N.D.N.Y. Dec.20, 2012) (DNH) (citing *Lombardo v. Holanchock,* 2008 WL 2543573, at *8 (S.D.N.Y. Jun.24, 2008), and rejecting a similar claim bought by Plaintiff Karl Ahlers regarding a search of his sleeping quarters). Likewise, Plaintiff's claims that the search violated CNYPC Policy 5.15 are also insufficient to state a cause of action under § 1983. *Id.* (quoting *Sealed Plaintiff v. Sealed Defendant,* 332 F.3d 51, 57 n. 5 (2d Cir.2003) for the proposition that "[e]levating a state-mandated procedure to the status of a constitutionally protected liberty or property interest, would make process an end in itself rather than a requirement whose constitutional purpose is to protect a substantive interest in which the individual has a claim of entitlement") (further citing *Taylor v. Fischer,* 841 F.Supp.2d 734, 738 (W.D.N.Y.2012) for the proposition that "Plaintiff's allegations that defendants failed to follow New York regulations and prescribed procedures with respect to the disciplinary charges against him also fail to support his § 1983 claims. Those alleged procedural violations do not implicate plaintiff's constitutional rights.").

**\*3** Accordingly, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's Fourth Amendment claims against Defendants Comstock, Nowicki, and Miller.

### C. Retaliation

Plaintiff next argues that the search of his room was conducted in retaliation for verbal complaints he had previously made to CNYPC's business office, regarding his phone bills. *See* Ahlers Dep. at pp. 63–66.

Claims of retaliation fall within the protections of the First Amendment. Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872. To prevail on a section 1983 retaliation claim plaintiff must prove: (1) that he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 3 89 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d at 492); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

However, here, even if we accept that Plaintiff was engaged in a protected exercise,[FN1] he fails to show that there was a causal nexus between that exercise and the search of his room. Furthermore, Plaintiff's claim fails because a search of an involuntarily civilly committed persons room does not constitute an adverse action. *See Lombardo v. Holanchock,* 2008 WL 254357, at * 8 (holding that involuntarily civilly committed plaintiff's claim that his room was searched in retaliation for complaints he made cannot be the basis for a retaliation claim because involuntarily civilly committed plaintiffs do not enjoy a right to privacy in their rooms).

FN1. There is certainly support for the proposition that verbal complaints constitute

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1056935 (N.D.N.Y.)
**(Cite as: 2014 WL 1056935 (N.D.N.Y.))**

a protected exercise under the First Amendment. *See Monko v. Cusack,* 2013 WL 5441724, at *10 (N.D.N.Y. Sept.27, 2013) (citing cases for the proposition that "[a]n inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim.").

Accordingly, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's retaliation claim against Defendant Comstock.

### D. Due Process

Ahlers claims that his right to due process under the Fifth and Fourteenth Amendments were violated when, contrary to facility procedure, as set forth in § 5.15 of the CNYPC Handbook, he was not given a receipt for the items that were confiscated from his room and because his room was not put back in its original condition after the search. Ahlers Dep. at pp. 50–52.

To the extent that Plaintiff is claiming he had a due process property interest in the items confiscated from his room, such a claim must fail:

Even an intentional deprivation of an inmate's property that is random and unauthorized does not give rise to a due process claim so long as "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 ... (1984). New York law provides such a remedy in the form of an action before the New York Court of Claims.

*Ahlers v. Bosco,* 2012 WL 6649191, at *4–5 (N.D.N.Y. Dec.20, 2012) (quoting *Collins v. Goord,* 438 F.Supp.2d 399, 418–19 (S.D.N.Y.2006)); *see also Smith v. Hogan,* 2011 WL 4343978, at *9 (N.D.N.Y. Aug.1, 2011) ("This Circuit has held that 'confiscation ... [does] not constitute a Fourteenth Amendment

violation for loss of property because of the availability of state court postdeprivation remedies' in the New York Court of Claims.") (quoting *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996)).

**\*4** Moreover, claims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983. *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *see also Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (holding that violations of state procedural requirements do not give rise to section 1983 liability).

Since Ahlers's had an adequate remedy to address the confiscation of his property, and his claim that his room was not put back in order is based upon an alleged violation of CNYPC's room policy, we recommend that Defendants' Motion for Summary Judgment as to Plaintiff's Fourteenth Amendment due process claims be **GRANTED.**

Likewise, the Fifth Amendment applies only to federal actors, not state actors. *Snow v. Vill. of Chatham,* 84 F.Supp.2d 322, 326–27 (N.D.N.Y.2000). Since none of the Defendants in the instant action are federal officials, we further recommend that Defendants' Motion for Summary Judgment as to Plaintiff's Fifth Amendment due process claims be **GRANTED.**

### E. Conditions of Confinement

Although Plaintiff did not explicitly identify conditions of confinement as a cause of action in his Complaint, the Second Circuit has held that in addressing *pro se* pleadings, a court must read the plaintiff's papers liberally and interpret them to raise the strongest arguments that they suggest. *Lane v. Carpinello,* 2009 WL 3074344, at *6 (N.D.N.Y. Sept.24, 2009)). Examining Plaintiff's papers liberally, it is possible that his claim that during the search of his room, his sheets were thrown on the floor and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1056935 (N.D.N.Y.)
**(Cite as: 2014 WL 1056935 (N.D.N.Y.))**

stepped on, but not replaced with clean sheets, raises a conditions of confinement claim.

The Eighth Amendment's proscription against the cruel and unusual punishment of convicted criminals is inapplicable to involuntarily civilly confined plaintiffs. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Rather, any claims arising from the conditions under which involuntarily civilly committed persons are confined are evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. March 15, 2007). However, in practice, courts apply the same legal standards when analyzing either type of claim. *Butler v. Suffolk Cnty.,* 289 F.R.D. 80, 92 (E.D.N.Y.2013).

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). In *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

> **\*5** Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling [v. McKinney ],* 509 U.S. 25, 32 [1993] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate con-

temporary standards of decency. *Id.* at 35–36; *Rhodes [v. Chapman ],* 452 U.S. 337[,] 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 [ (2002) ].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer [v. Brennan ],* 511 U.S. [825,] 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 [ (1994) ].

*Phelps v. Kapnolas,* 308 F.3d at 185–86.

Here, Plaintiff has claimed that he was forced to sleep on dirty sheets for approximately four nights.[FN2] Compl. at ¶¶ g & h; *see also* Ahlers Dep. at pp. 30 & 53. Even if true, such a temporary and minimal deprivation is *de minimus* at best, and as such does not rise to constitutional proportions. *See Dilworth v. Goldberg,* 914 F.Supp.2d 433, 469 (S.D.N.Y.2012) (dismissing plaintiff's conditions of confinement claim where alleged conditions were too *"de minimis"* to state a claim) (alterations in original).

> FN2. Plaintiff never clarifies how long he had to wait for clean sheets. However, the search of his room occurred on Wednesday February 1 st, and Plaintiff has alleged that clean sheets were distributed every Sunday. Ahlers Dep. at p. 30. Therefore, it is reasonable to assume that Plaintiff's sheets may have remained soiled for up to four nights after the search.

Accordingly, to the extent that Plaintiff may have attempted to raise a conditions of confinement claim regarding his bedding, we recommend that such a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1056935 (N.D.N.Y.)
**(Cite as: 2014 WL 1056935 (N.D.N.Y.))**

claim be **DISMISSED.**

### F. Qualified Immunity

Defendants have argued that they are entitled to qualified immunity; however, having found no evidence of any underlying constitutional violations, we need not, and do not, discuss qualified immunity.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 18) be **GRANTED** and this action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**\*6** Filed Feb. 25, 2014.

N.D.N.Y.,2014.
Ahlers v. Nowicki
Slip Copy, 2014 WL 1056935 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Dep-
uty Commissioner, Director of Special Hous-
ing/Disciplinary Program; Anthony Graceffo, Chief
Medical Officer, Auburn Correctional Facility; Glenn
S. Goord; Hans Walker; Gary Hodges; D.W. Seitz;
Terry Halcott; Christine Coyne Nancy O'Connor; Ann
Driscoll; John McClellen; John Rourke, Captain,
Security Services at Auburn Correctional Facility;
Koors, Head Pharmacist at Auburn Correctional Fa-
cility; Robrt Mitchell, Correctional Counselor at Au-
burn Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.

No. 9:01-CV-1039.
Sept. 24, 2008.

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, David L. Fruchter, Esq., Asst.
Attorney General, of Counsel, Albany, NY, for De-
fendants.

***ORDER***
DAVID N. HURD, District Judge.
**\*1** Plaintiff, Samuel Cabassa, brought this civil
rights action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated June 30, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' second motion for

summary judgment (Docket No. 81) be granted in part
and denied in part. Objections to the Report Recom-
mendation have been filed by the parties.

Based upon a de novo review of the portions of
the Report-Recommendation to which the parties have
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in
part and DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED
in its entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED
to the extent that it asserts:

(a) Any Fourteenth Amendment procedural due
process claim whatsoever;

(b) A First Amendment access to courts claim
against defendant Hans Walker;

(c) A First Amendment retaliation claim against
defendant Hans Walker;

2. Defendants' second motion for summary
judgment is otherwise DENIED, so that, surviving
this motion is:

(a) Plaintiffs First Amendment access-to-courts
claim against defendants D.W. Seitz and Craig
Gummerson asserted in the Fourth Amended Com-

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

plaint's Fifth Cause of Action; and

(b) Plaintiffs First Amendment retaliation claim against defendants D.W. Seitz and Craig Gummerson also asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) [FN1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

> FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN3]

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN4 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN5 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN6

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004

WL 1125177, at *8 (W.D.N . Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* FN7 In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. FN8 (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.) FN9 In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. FN10 An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. FN11 Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN12

FN7. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for

example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by docu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

mentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.[FN13] In one of those actions, he was awarded $1,000 following a jury trial.[FN14] (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the

special solicitude normally afforded *pro se* litigants due to their inexperience.[FN15]

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.S.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

**\*3** Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,[FN16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, be-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

cause those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

**\*4** Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

## 1. Continuing Violation Doctrine

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[FN17] I will assume, for purposes of this

Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

FN18. *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at \*11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at \*3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision"

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

regarding, inter alia, the application of the continuing violation doctrine).

FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7 .1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4,

at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs .' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

**\*5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) FN20 Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) [FN21]

> FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf* . Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998].)

**\*6** 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

FN22. I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s

Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false.[FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.[FN24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

FN23. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) [FN25]

> FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)

**\*7** Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) [FN26]

> FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. *See Zavaro v. Coughlin,* 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

tled to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation was wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was enti-

tled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue. [FN27]

FN27. *See Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.(2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

**\*8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

> FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

> where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

> *Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004)* [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6 [23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

[Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of an express and openly espoused *policy.* Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl .].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s

Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor,* 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

**\*11** The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

FN29. *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H.U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

FN30. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at

*4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN31. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord,*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

*Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

FN33. *See* N.Y.S. DOCS Inmate Locator Service http://nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor,* 515 U.S. 472, 479, n. 4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.) FN34

FN34. *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998.FN35 For example, he received notice and a hearing; he received the oppor-

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

tunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

> FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

*12 As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) [FN36] The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [FN37]

FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First ... Amendment right[ ] to access of the courts ...."].)

FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

\*13 Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

### 1. Procedural Due Process Claim Under the Fourteenth Amendment

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown,* 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta,* 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown,* an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin'* s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock

confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt.

No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation claim,* that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson. [FN39]

FN39. *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Con-

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

stitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

**\*15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in

Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [FN40]

> **FN40.** I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

> **FN41.** "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's

access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act. [FN45]

> **FN42.** *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

> **FN43.** *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin* [*v. Connor,* 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46. *Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

**\*18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is true not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU*.... This principle is not disturbed by *Sandin* [*v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations,

thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre,* 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf. Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47. *Accord, Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. [FN48] The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

**\*19** Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady,* 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments).[FN49] In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN49. Cf. *Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199-1202 (9th

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

**FN50.** Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

**FN51.** *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to

the petitioner a copy of the judgment and written notice of its entry [FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998).[FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional access-to-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

> **FN52.** See *Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at \*11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court").

> **FN53.** (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54. N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. *See Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at \*7, 1997 U.S. Dist. LEXIS 11025, at \*23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

**\*21** In order to convert the claim raised in this allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of* ] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) FN56

FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. [FN57] Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se. See Albert v. Carovano,* 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord, Wynder v. McMahon,* 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), *Northrup v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46 (2d Cir.1997).

> FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich,* stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to

a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (*"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" [FN58] in his complaint in order to assert a retaliation claim. *See Williams v. Manternach,* 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").[FN59] Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

> FN58. *See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

18, 1995) (" 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at \*15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at \*18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at \*11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

**\*22** Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.FN60 As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

FN60. To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend

his pleading in such a way. It should be noted that Plaintiff has already amended his pleading *four* times.

FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[FN62] In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a finding, other evidence exists to the contrary.[FN63] Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground.[FN64] As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord*, Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord*, Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted].) As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Re-

port-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be **GRANTED** in part and **DENIED** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be **DISMISSED** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be **DISMISSED** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

whatsoever, (b) a First Amendment access-to-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise *DENIED*** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24 ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN65]

FN65. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff

"offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at \*18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
**(Cite as: 2008 WL 4416411 (N.D.N.Y.))**

Cir.1989] ).

N.D.N.Y.,2008.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411
(N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Roberto CIAPRAZI, Plaintiff,
v.
Glenn S. GOORD; et al. Defendants.

No. Civ.9:02CV00915(GLS/.
Dec. 22, 2005.

Roberto Ciaprazi, Clinton Correctional Facility,
Dannemora, New York, Plaintiff pro se.

Hon. Eliot Spitzer, Attorney General, State of New
York, The Capitol, Albany, New York, for the De-
fendants.

Patrick F. MacRae, Assistant Attorney General, of
counsel.

*MEMORANDUM-DECISION AND ORDER*
SHARPE, J.

### I. *Introduction*

**\*1** Plaintiff *pro se* Roberto Ciaprazi brings this
action pursuant to 42 U.S.C. § 1983. Ciaprazi alleges
that the defendants violated his First, Eighth, and
Fourteenth Amendment rights. Pending are Ciaprazi's
objections to Magistrate Judge David E. Peebles'
Report-Recommendation. Upon careful consideration
of the arguments, the relevant parts of the record, and
the applicable law, the court adopts the Re-
port-Recommendation in its entirety.[FN1]

> **FN1.** The Clerk is hereby directed to attach
> the Report-Recommendation to constitute a
> complete record of the court's decision in this

matter.

### II. *Procedural History*

Ciaprazi commenced this action on July 15, 2002.
*Dkt. No. 1.* On February 27, 2003, the defendants
moved for summary judgment. *Dkt. No. 39.* On March
14, 2004, Judge Peebles issued a Re-
port-Recommendation which recommended that the
defendants' motion for summary judgment be granted
in part, and denied in part. *Dkt. No. 47.* Ciaprazi ob-
jected. *Dkt. No. 48.* His objections are now before this
court.

### III. *Discussion* [FN2]

> **FN2.** The court adopts the factual summary
> in Magistrate Judge Peebles' Re-
> port-Recommendation and assumes famili-
> arity with the facts alleged in Ciaprazi's
> Complaint. *Dkt. Nos. 47,1.*

#### A. *Standard of Review*

When objections to a magistrate judge's Re-
port-Recommendation are lodged, the Court makes a
*"de novo* determination of those portions of the report
or specified proposed findings or recommendations to
which objection is made." *See* 28 U.S.C. § 636(b)(1).
After such a review, the court may "accept, reject, or
modify, in whole or in part, the findings or the rec-
ommendations made by the magistrate judge." *Id.*
Having reviewed the unobjected to portions of the
Report-Recommendation, the court adopts them in
their entirety because they are not clearly erroneous.

#### B. *Report-Recommendation*

Although Judge Peebles examined the merits of
the case and found that many of Ciaprazi's claims were
meritless, this court only conducts *de novo* review of
the objected to portions of the Re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

port-Recommendation. Specifically, Judge Peebles found no evidence tending to establish that the adverse actions taken against Ciaprazi were motivated by disciplinary animus, and thereby recommended dismissing Ciaprazi's First Amendment retaliation claim. *Report and Recommendation, pp. 13-23, 45, Dkt. No. 47.* He further found that Ciaprazi lacked standing to bring a cause of action challenging the Tier III disciplinary system under the Eighth Amendment. *Id. at 27.* Lastly, Judge Peebles dismissed both of Ciaprazi's claims under international law and his personal involvement claim against defendant Goord. *Id. at 41, 43-4.* [FN3]

> [FN3]. Ciaprazi also makes several procedural objections. For instance, he asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required by FRCP 11. Second, Ciaprazi objects to the defendants' alteration of the case caption. Third, Ciaprazi objects to the defendants' use of a name that did not appear in the original complaint. These arguments are without merit and this court adopts Judge Peebles articulated reasons for the their denial. *See Report Recommendation p. 10-11 n. 5, Dkt. No. 47.*

### C. *Objections*

#### 1. *First Amendment Claim*

First, Ciaprazi contends that his retaliation claim under the First Amendment should not have been dismissed because the defendants did not satisfy their initial evidentiary burden. *Pl. Objs. pp. 1-7, Dkt. No. 48.* Specifically, he argues that Judge Peebles did not properly consider the falsity of a misbehavior report as evidence of retaliation by the defendants.

The court rejects Ciaprazi's argument because as Judge Peebles noted, a prisoner does not have a right to be free from false misbehavior reports. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). As Judge Peebles further noted, the defendants have shown sufficient evidence to establish that there is no specific link between Ciaprazi's grievances and the defendants' actions. Accordingly, Ciaprazi's retaliation claim is dismissed.

#### 2. *Eighth Amendment*

**\*2** Next, Ciaprazi objects to Judge Peebles' finding that he did not have standing to challenge the disciplinary authority of the Tier III system. *Pl. Objs. p. 7, Dkt. No. 48.* This objection is without merit. As Judge Peebles noted, since the length of Ciaprazi's disciplinary confinement was within the bounds of constitutionally acceptable levels, he has no standing to sue. Second, as Judge Peebles further noted, any generalized complaints Ciaprazi has against the Tier III system are more appropriately addressed as part of his due process claims. Accordingly, Ciaprazi's claims against the Tier III system are dismissed.

#### 3. *Human Rights Claims*

Ciaprazi also objects to Judge Peebles' finding that he did not have claims under the Universal Declaration of Human Rights (UDHR) and the International Covenant on Civil and Political Rights (ICPR). Ciaprazi's contention is without merit. As Judge Peebles noted, Ciaprazi has failed to establish that these treaties provide private causes of action. *See Report Recommendation p. 41, Dkt. No. 47.* Accordingly, Ciaprazi's claims under international law are dismissed.

#### 4. *Personal Involvement*

Ciaprazi also objects to Judge Peebles' dismissal of his personal involvement claim against defendant Goord. As Judge Peebles noted, Ciaprazi merely made allegations against Goord in his supervisory capacity. Accordingly, the personal involvement claim against Goord was properly dismissed.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

IV. *Conclusion*

Having reviewed the objected-to portions of the Report and Recommendation *de novo,* the remainder under a clearly erroneous standard, and Ciaprazi's objections, this court accepts and adopts the recommendation of Judge Peebles for the reasons stated in the March 14, 2004 Report-Recommendation.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, the defendants' motion be DENIED.

IT IS SO ORDERED.

REPORT AND RECOMMENDATION

PEEBLES, Magistrate J.

Plaintiff Roberto Ciaprazi, a New York State prison inmate who by his own account has frequently lodged complaints against prison officials and been openly critical of their practices, has commenced this proceeding against the Commissioner of the New York State Department of Correctional Services ("DOCS") and several of that agency's employees pursuant to 42 U.S.C. § 1983, complaining of constitutional violations occurring during the course of his confinement. In his complaint, Ciaprazi alleges that 1) a misbehavior report was filed against him in retaliation for his having previously engaged in protected activity; 2) he was deprived of procedural due process during the course of the hearing and resulting adverse finding associated with that misbehavior report; and 3) the conditions which he faced while in disciplinary confinement, following that hearing, were cruel and

unusual. Plaintiff asserts claims pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution, as well as under certain international human rights accords.

**\*3** Currently pending before the court is a motion by the defendants seeking summary judgment dismissing plaintiff's complaint in its entirety. Having carefully reviewed the record in light of Ciaprazi's claims and defendants' arguments, I find that many of plaintiff's causes of action are devoid of merit, as a matter of law, and thus subject to dismissal. Because I find the existence of genuinely disputed issues of material fact surrounding certain of plaintiff's claims, however, including notably his due process claim against defendants Melino, Kohl, Graham, Fitzpatrick, and Rogers, I recommend denial of defendants' motion seeking dismissal of plaintiff's claims against them.

I. *BACKGROUND*

At the times relevant to his complaint, Ciaprazi was a prisoner entrusted to the custody of the DOCS. Plaintiff alleges that after having been confined within the Clinton Correctional Facility since February, 1997, he was transferred into the Coxsackie Correctional Facility in April of 1998. Complaint (Dkt. No. 1) ¶ 3. Ciaprazi asserts that while at Coxsackie he was administered more than a dozen allegedly false misbehavior reports, resulting in disciplinary cell confinement of over 200 days as well as other "deprivations" of an unspecified nature. *Id.* ¶ 3. Plaintiff contends that the issuance of those misbehavior reports was motivated by his having filed multiple complaints involving conduct of corrections workers and staff at Coxsackie.

At the heart of plaintiff's claims in this action is an incident which occurred at Coxsackie on July 31, 1999. On that date, Ciaprazi and various other prisoners were taken to an enclosed holding area to provide specimens for use in conducting drug screening urinalysis testing. As a result of an interaction occur-

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

ring during the course of that testing between the plaintiff and defendant Fitzpatrick, a corrections lieutenant at the facility, plaintiff was placed in keeplock confinement and issued a misbehavior report on the following day, charging him with creating a disturbance (Rule 104.13), interference with a prison employee (Rule 107.10), harassment (Rule 107.11), refusal to obey a direct order (Rule 106.10), and making threats (Rule 102.10). [FN1] Defendants' Motion (Dkt. No. 39) Exh. A.

> FN1. Keeplock confinement is defined by regulation to include restriction to one's prison room or cell. *See, e.g.,* 7 N.Y.C.R.R. 251-2.2.

On July 31, 1999, following the underlying events and the imposition of keeplock confinement but prior to receiving the misbehavior report, plaintiff filed a grievance regarding the incident; plaintiff followed the filing of that grievance with a request on August 3, 1999 for prehearing release from confinement. Complaint (Dkt. No. 1) ¶ 19. Plaintiff received no response to that grievance. *Id.*

A Tier III disciplinary hearing in connection with the charges stemming from the July 31, 1999 incident was conducted by defendant Melino, a corrections counselor at Coxsackie, beginning on August 4, 1999, and concluding on August 10, 1999. Defendants' Motion (Dkt. No. 39) Exh. A at 2; *id.* Exh. B at 17, 152.[FN2] Defendant Cole, who according to the plaintiff is a civilian employee working at Coxsackie, was assigned as plaintiff's inmate assistant in connection with that hearing. The evidence adduced at that hearing included the misbehavior report, as well as testimony from the plaintiff, Corrections Lieutenant Fitzpatrick, Corrections Officer Marshal, Corrections Counselor Cole, Corrections Officer Rogers, Corrections Officer Simonik, Corrections Lieutenant McDermott, and Corrections Officer Phillips. Defendants' Motion (Dkt. No. 39) Exh. B.

> FN2. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

**\*4** At the conclusion of the hearing, plaintiff was found guilty on all five counts, and a penalty of ten months of disciplinary confinement within the Coxsackie Special Housing Unit ("SHU"), with a corresponding loss of commissary, telephone and package privileges, was imposed.[FN3] Defendants' Motion (Dkt. No. 39) Exh. A at 00. Ciaprazi was not present when Hearing Officer Melino read her decision into the record, having previously been removed from the proceeding for engaging in what the hearing officer regarded as disruptive behavior. *See* Defendants' Motion (Dkt. No. 39) Exh. B at 152. Plaintiff appealed the hearing officer's decision to Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program, who on September 27, 1999 affirmed the determination. Complaint (Dkt. No. 1) ¶ 51.

> FN3. Of those sanctions, five months were suspended and deferred for a to tal of one hundred eighty days. Defendants' Motion (Dkt. No. 39) Exh. A at 00. The record is unclear regarding the amount of disciplinary confinement actually served by the plaintiff as a result of the hearing determination.

On August 20, 1999, plaintiff was transferred into

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

the Upstate Correctional Facility, where he was apparently placed in SHU confinement to serve his disciplinary sentence. Complaint (Dkt. No. 1) ¶ 52. Plaintiff asserts that during that period, as well as while in keeplock confinement at Coxsackie, he was subjected to significant deprivations, which are described in summary fashion in his complaint, until September 16, 1999 when he was transferred into Clinton and exposed to similarly unpleasant conditions. *Id.* ¶¶ 53-55; Ciaprazi Aff. (Dkt. No. 46) ¶¶ 54-57. Plaintiff describes the keeplock confinement conditions at Coxsackie as even more unpleasant than those experienced in SHU, having included the deprivation of certain personal items such as food and snacks, toiletries, musical instruments, and other similar amenities. Ciaprazi Aff. (Dkt. No. 46) ¶ 54. The deprivations experienced by the plaintiff while in keeplock confinement at Coxsackie also entailed being subjected to "loud and non-stop noise from other frustrated prisoners yelling and banging on the doors," as well as the denial of access to the law library, books and other reading materials, and various programs available to those in general population. *Id.* ¶ 55. While at Upstate, plaintiff contends that he was exposed to cell lighting between 6:00 am and 1:00 am; he was denied reading materials; his medical requests "were ignored"; and he experienced cold conditions and the inability to participate in available recreation due to the lack of warm clothing. *Id.* ¶ 57; Complaint (Dkt. No. 1) ¶ 53. Similar conditions were experienced by the plaintiff while at Clinton, including exposure to cold and lack of warm clothing and blankets, together with the deprivation of medical and mental health services. Ciaprazi Aff. (Dkt. No. 46) ¶ 57; Complaint (Dkt. No. 1) ¶ 54..

## II. *PROCEDURAL HISTORY*

The plaintiff, who is proceeding *pro se* and *in forma pauperis,* commenced this action on July 15, 2002. Dkt No. 1. Named as defendants in plaintiff's complaint are New York DOCS Commissioner Glenn S. Goord; Ellen J. Croche, Chair of the New York State Commission of Correction; Fred Lamey, a member of the New York Commission of Correction; Donald Selsky, the DOCS Director of Special Housing/Inmate Disciplinary Program; Corrections Counselor Melino, whose first name is unknown; Cole, another DOCS employee whose complete name is unknown to the plaintiff; H.D. Graham, Deputy Superintendent for Security at Coxsackie; Corrections Lieutenant Fitzpatrick; and Corrections Officer Rogers. *Id.* In his complaint, plaintiff asserts nine separate causes of action, including claims 1) against defendants Rogers and Fitzpatrick, for infringement of his First Amendment right to free speech, and due process and equal protection violations under the United States Constitution, as well as under the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"); 2) against defendant Graham, for failure to investigate plaintiff's grievance and to take actions to prevent infringement of his constitutional rights; 3) against defendant Cole, for failing to properly perform his duties as Ciaprazi's inmate assistant; 4) against defendant Melino, for deprivation of due process, based upon her conduct and bias during the disciplinary hearing; 5) of retaliation against defendant Melino, asserting that her actions were taken in response to the filing of complaints and grievances by the plaintiff; 6) against defendants Goord and Selsky, based upon their failure to overturn plaintiff's disciplinary conviction and remediate the constitutional deprivations suffered by him; 7) against defendants Goord and Selsky for retaliation, based on plaintiff's prior filing of complaints and grievances; 8) against defendants Croche, Lamey and Goord, in their supervisory capacities, for failure to properly oversee DOCS employees and enact policies to prevent such abuses; and 9) against defendants Goord, Croche and Lamey, for maintaining and fostering a policy of widespread and disportionate disciplinary punishments within the state's prison system. Complaint (Dkt. No. 1) at 14-16. Plaintiff's complaint seeks both injunctive and monetary relief. *Id.*

**\*5** Following the filing of an answer on behalf of

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

the eight defendants who have been served in the action on December 3, 2002, generally denying plaintiff's allegations and setting forth various affirmative defenses, Dkt. No. 13, and pretrial discovery, on February 27, 2004 those defendants moved seeking entry of summary judgment on various bases.[FN4] Dkt. No. 39. Aided only by plaintiff's complaint, the record related to the relevant internal disciplinary proceedings against the plaintiffs, and answers by plaintiff to defendants' interrogatories, and without the benefit of either a transcript of plaintiff's deposition or any affidavits, other than from their counsel, defendants have moved for summary judgment seeking dismissal of plaintiff's claims on various grounds. *Id.* In their motion, defendants argue that 1) plaintiff has failed to offer proof from which a reasonable factfinder could conclude that cognizable constitutional violations have occurred; 2) defendants Goord and Selsky lack the requisite personal involvement in the constitutional violations alleged; and 3) plaintiff should be denied the injunctive relief which he seeks. *Id.* Plaintiff has since submitted papers in opposition to defendants' summary judgment motion.[FN5] Dkt. No. 46. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN4. There is no indication on the docket sheet that defendant Fitzpatrick has been served in the action. While plaintiff requested and obtained the entry of that defendant's default on June 20, 2003, *see* Dkt. Nos. 20, 21, his default was subsequently vacated by order issued by District Judge David N. Hurd on January 13, 2004, based upon plaintiff's failure to prove that defendant Fitzpatrick had in fact been served. *See* Dkt. No. 35.

> FN5. In his papers in opposition to defend-

ants' summary judgment motion, plaintiff has raised several procedural objections to defendants' motion papers. In addressing those objections I am mindful of the preference that matters before the court, whenever possible, be decided on their merits rather than on the basis of technical procedural shortcomings. *See, e.g., Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.). In any event, plaintiff's procedural objections are not well-founded.

In his opposition papers, plaintiff asserts that defendants' motion is procedurally defective since none of the moving papers are signed, as required under Rule 11 of the Federal Rules of Civil Procedure. *See* Plaintiff's Memorandum (Dkt. No. 46) at 1. While not bearing signatures in the traditional sense, all of defendants' original moving papers, which were filed electronically with the court in accordance with this court's case management and electronic case filing requirements (*see* Northern District of New York Local Rule 5.1.2 and General Order No. 22), were properly signed.

Plaintiff also complains of alterations by the defendants to the caption of the case as set forth in his complaint. Specifically, Ciaprazi challenges defendants' addition of the word "unknown" in relation to defendants Melino and Cole, who are identified in plaintiff's complaint only by last names. Since it is well established that the caption of a pleading is not substantive in nature, and therefore does not control, the addition of that word does not provide a basis to reject defendants' motion papers. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Civil

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

§ 1321 (3d ed. 2004) ("Although helpful to the district court ... the caption is not determinative as to the identity of the parties to the action"); *see also Prisco v. State of New York,* 804 F.Supp. 518, 521 (S.D.N.Y.1992) (citing an earlier edition of Wright & Miller).

As plaintiff notes, defendants' Local Rule 7.1(a)(3) statement of uncontested, material facts, submitted along with the various other papers in support of their motion, indicates that it is submitted on behalf of a defendant Landry, even though there is no person by that name identified as a defendant in plaintiff's complaint. *See* Dkt. No. 39. Because this is an obvious typographical error, and the contents of the statement obviously relate to the facts of this case, I decline plaintiff's invitation to reject and treat the statement as a nullity on this basis.

I note that Ciaprazi, who appears to be well versed in the applicable requirements of the federal and local rules, himself has overlooked the important requirement that legal memoranda submitted in connection with motions to not exceed twenty-five pages in length. Northern District of New York Local Rule 7.1(a)(1). Plaintiff's memorandum, which is thirty-four pages in length, has been accepted by the court, without objection by the defendants, despite his failure to obtain prior permission to file an oversized brief. Plaintiff is admonished that in the future, just as he seeks to hold defendants to the requirements of the governing rules, he too must conform to those requirements.

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. [FN6] Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. When deciding a summary judgment motion, the court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [nonmovant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

FN6. A material fact is genuinely in dispute

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**B.** *Plaintiff's First Amendment Retaliation Claim*

**\*6** Plaintiff's complaint asserts several claims of unlawful retaliation. In his first cause of action, plaintiff asserts that the actions of defendants Rogers and Fitzpatrick in confining him to a cell and issuing, or directing the issuance of, misbehavior reports were taken in retaliation for his having filed prior grievances and complaints regarding DOCS officials, including those working at Coxsackie. Complaint (Dkt. No. 1) First Cause of Action. Plaintiff's second claim alleges that defendant Rogers' failure to investigate plaintiff's complaint regarding the allegedly false misbehavior report, and to order his release from confinement pending a disciplinary hearing, were similarly retaliatory. *Id.* Second Cause of Action. Plaintiff further alleges in his fifth cause of action that the actions of Hearing Officer Melino, including in finding him guilty on all five counts, were motivated by Ciaprazi's filing of prior grievances and complaints. *Id.* Fifth Cause of Action. Plaintiff's seventh claim similarly attributes the failure of defendants Goord and Selsky to reverse the hearing officer's determination, on appeal, to retaliation for his having engaged in protected activity. *Id.* Seventh Cause of Action. Defendants maintain that these retaliation claims are legally deficient, and that the record contains no evidence upon which a factfinder could con-

clude that unlawful retaliation occurred.

Claims of retaliation like those asserted by the plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See id.* at 81-83. Because of the relative ease with which claims of retaliation can be incanted, however, as exemplified by plaintiff's claims in this action, the courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002).

In order to state a *prima facie* claim under section 1983 for unlawful retaliation in a case such as this, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct or speech at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison offi-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

cials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492). If the plaintiff carries this burden, the defendants must then show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*7** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct and establishment of a nexus between that conduct and the adverse action ultimately taken. In making the required analysis in this case, however, the court is somewhat disadvantaged by virtue of the fact that defendants' summary judgment motion is not particularly enlightening as to the basis for their claim that the court is positioned to find, as a matter of law, that plaintiff's retaliation claims are lacking in merit.

In their motion the defendants, in the context of the now-familiar standard governing analysis of First Amendment retaliation claims, acknowledge that the plaintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity. That plaintiff has filed an unusually large number of grievances and lawsuits, and taken other steps to complain publicly about matters associated with his confinement by the DOCS, is both apparent from the record before the court, and not controverted by the defendants. Indeed, in his response to defendants' summary judgment motion, plaintiff proudly states that he has "systematically exposed, vehemently criticized, and even ridiculed the inappropriate and arbitrary policies and actions of the staff at Coxsackie, including the actions of defendant

Goord and of the Superintendent and Deputy Superintendents of Coxsackie." [FN7] Plaintiff's Affidavit (Dkt. No. 46) ¶ 32. Plaintiff has therefore established, at least for purposes of the instant motion, that he was engaged in protected activity sufficient to trigger First Amendment rights against acts taken in retribution for having voiced those types of complaints. *Graham,* 89 F.3d at 80; *Morello v. James,* 810 F.2d 344, 346-47 (2d Cir.1987).

> FN7. Plaintiff has referred to his efforts in this regard as a "blitz of grievances and complaints[.]" Plaintiff's Aff. (Dkt. No. 46) ¶ 52.

Defendants argue, however, that the record is lacking in evidence to establish the requisite connection between that protected activity and the adverse actions taken against Ciaprazi by prison officials. Defendants' legal position is advanced, in part, in an affidavit from their counsel, Patrick F. MacRae, Esq., outlining the evidence relied upon by the defendants in making their motions. [FN8] Defendants also note, in further support of their motion, the requirement that retaliation claims rest upon more than mere conclusory allegations regarding the state of mind of prison officials. *See* Dkt. No. 39 at 8-9; *e.g., Flaherty,* 713 F.2d at 13.

> FN8. The attorney's affirmation in and of itself is, of course, of no evidentiary value in determining the motion for summary judgment since none of the facts upon which such a finding would ostensibly be based are within his personal knowledge. *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011-12 (2d Cir.1986).

As plaintiff correctly notes, the applicable pleading requirements, including Rule 8 of the Federal Rules of Civil Procedure, provide for mere "notice" pleading, and do not require that complaints contain

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

every detail associated with a plaintiff's claims except in categories not applicable to this case. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-69, 113 S.Ct. 1160, 1162-63 (1993). Accordingly, the mere fact that the plaintiff's retaliation claims are pleaded in non-specific, conclusory terms does not alone entitle defendants to summary dismissal of those claims.

**\*8** In this case the defendants have satisfied their initial, modest threshold burden of establishing the lack of evidentiary support for plaintiff's retaliation claims. Though conventional wisdom might dictate the submission of affidavits from the primary actors, including notably defendants Rogers and Fitzpatrick, disavowing any retaliatory motives associated with their actions, defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's retaliation claims, including through plaintiff's responses to defendants' interrogatories as well as the proceedings associated with the underlying disciplinary matter, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims. *Celotex,* 477 U.S. at 323-34, 106 S.Ct. at 2553; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. There is no requirement under Rule 56 of the Federal Rules of Civil Procedure or otherwise that a party affidavit be submitted to support such a motion, which instead can be based upon any admissible evidence. *Id.*

To demonstrate that a reasonable factfinder could discern a nexus between plaintiff's filing of grievances and the disciplinary matters associated with the incident at issue, Ciaprazi essentially makes two arguments. First, he contends that the manifest falsity of the misbehavior report as well as testimony proffered during the disciplinary hearing give rise to an inference that the disciplinary matters were motivated toward retaliatory animus. Secondly, plaintiff argues that the sheer number of grievances and formal complaints lodged by him, including some close in tem-

poral proximity to the underlying incident, similarly gives rise to a legitimate inference of retaliatory motivation. *See* Ciaprazi Memorandum (Dkt. No. 46) at 14.

Plaintiff's argument in this regard is significantly diluted by the sheer number of complaints lodged by him over time. By his own admission, plaintiff has regularly and openly complained of prison policies and practices and during the relevant time period prior to the July 31, 1999 incident, and indeed had filed many formal complaints regarding his treatment while at Coxsackie. Yet, plaintiff has submitted no evidence that any of those complaints related to defendants Rogers or Fitzpatrick, the two principal actors in this case, nor has he pointed to any collaboration between those named in his prior complaints and Fitzpatrick and Rogers. At best, plaintiff has argued that prior to July 31, 1999 he "filed complaints and/or grievances against Lieutenants Sweeney, Armstrong, Skrocky and McDermott, all colleagues of defendant Fitzpatrick of the same rang [sic] with defendant Fitzpatrick." *Id.* ¶ 32.

In an equally tenuous attempt to link his protected activity with the issuance of a misbehavior report, plaintiff notes that on May 26, 1999 he filed a grievance for harassment against an employee named Fitzpatrick, who was assigned to assist him in connection with another Tier III disciplinary hearing, stating his naked belief, lacking in evidentiary support, that the employee named in that complaint "may be and apparently is a relative of defendant Fitzpatrick." *Id.* ¶ 33, Exh. 39. Plaintiff also notes that on July 21, 1999 he filed a grievance accusing defendant Goord of "gross abuse of power", requesting an investigation of defendant Goord by the New York State Police and federal authorities, and that five days later, on July 26, 1999, he filed a complaint with various agencies including the United States Department of Prisons complaining of mistreatment. *Id.* ¶¶ 34, 35.

**\*9** While there is some appeal to finding the req-

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

uisite fact issue to avoid the entry of summary judgment on plaintiff's retaliation claims based upon the timing of these events, that factor is undermined by the steady stream of grievances filed by him on a regular and continuing basis. Were the plaintiff someone who had rarely if ever complained about prison conditions, but shortly before being issued a misbehavior report had lodged a formal complaint against or implicating the conduct of the officer who issued the disciplinary citation, a very different set of circumstances would be presented, and summary judgment would not be warranted. In this case, however, plaintiff can point to no complaints lodged by him against or implicating the conduct of defendant Fitzpatrick, who issued the disputed misbehavior report. Accordingly, I find that the defendants have established that they are entitled to summary dismissal of plaintiff's retaliation claims based upon plaintiff's failure to establish a basis on which a reasonable factfinder could find the requisite connection between plaintiff's grievance activities and the issuance of the misbehavior report and subsequent disciplinary hearing.[FN9] *E.g., Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 389 (W.D.N.Y.1998).

> FN9. Prior to the Second Circuit's recent decision in *Gill,* defendants perhaps could have effectively argued that defendants' actions were not likely to deter, and in fact have not chilled, plaintiff's exercise of his First Amendment rights, and therefore do not give rise to a retaliation claim. *E.g., Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir.2002); *Curley v. Village of Suffern,* 268 F.3d 65, 72-73 (2d Cir.2001); *Spear v. Town of West Hartford,* 954 F.2d 63, 68 (2d Cir.1992). In its recent decision in *Gill,* however, the Second Circuit clarified that such a finding does not end the inquiry, since the critical focus is not upon the subjective element, but is instead objective, examining whether the retaliatory conduct alleged "would deter a

similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)).

### C. *Plaintiff's Eighth Amendment Cruel And Unusual Punishment Claim*

In his complaint Ciaprazi, in somewhat indiscriminate fashion, asserts that the actions taken against him by the various defendants resulted in his exposure to cruel and unusual punishment, in violation of the Eighth Amendment.[FN10] Plaintiff's cruel and unusual punishment claims appear to center upon the conditions which he faced as a result of the disciplinary proceedings against him and resulting in SHU confinement initially at Coxsackie, and later at Upstate and at Clinton. In their motion, defendants assert that these claims are similarly deficient as a matter of law.

> FN10. That amendment provides, in pertinent part, that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). The Eighth Amendment does not mandate comfortable prisons, but yet it does not tolerate inhumane ones either; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain, 103 F.Supp.2d 542, 546 (N.D.N.Y.2000)* (Kahn, J.) (citing *Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321 (1991)); Waldo v. Goord, No. 97-CV-1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998)* (Kahn, J. and Homer, M.J.); *see also, generally, Wilson, 501 U.S. 294, 111 S.Ct. 2321.* Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837, 114 S.Ct. at 1978; Leach, 103 F.Supp.2d at 546* (citing *Farmer* ); *Waldo, 1998 WL 713809, at \*2* (same).

**\*10** Plaintiff's cruel and unusual punishment claim challenges the fact that 1) he was placed in a double bunk cell at Upstate; 2) was placed in isolation and exposed to light except for five hours each night; 3) was deprived of such amenities such as writing paper and envelopes, proper access to the law library, medical care, access to newspapers, magazines and books, access to the courts, and legal papers; 4) was exposed to loud and boisterous behavior on the part of other inmates; 5) was denied essential clothing and bedding as well as personal hygiene materials, radios or headphones, books, newspapers and magazines; and 6) was exposed to cold conditions, leading him to suffer at least one case of the flu. Complaint (Dkt. No. 1) ¶¶ 52-56; *see also* Plaintiff's Affidavit (Dkt. No. 46) ¶¶ 53-57. To counter these allegations, defendants have submitted nothing to reflect the lack of a basis upon which a reasonable factfinder could conclude that plaintiff was exposed to cruel and unusual punishment while in disciplinary isolation as a result of the Tier III determination now at issue. Instead, de-

fendants' motion focuses upon a narrow aspect of plaintiff's Eighth Amendment claim, in which they assert that the lack of policies guaranteed to result in uniformity throughout the DOCS system of punishments to result in a Eighth Amendment violation.

As skeptical as perhaps one may be regarding plaintiff's ability to ultimately persuade a factfinder that the admittedly unpleasant conditions to which he was apparently exposed and the deprivations suffered while in disciplinary confinement rise to a constitutionally significant level, I am unable to state, based upon the record as currently constituted, that no reasonable factfinder could so conclude. I therefore recommend denial of defendants' motion to dismiss plaintiff's Eighth Amendment cruel and unusual punishment claim relating to the conditions of his confinement.[FN11]

> [FN11]. In their motion, defendants have not argued lack of personal involvement with regard to their Eighth Amendment claims. It therefore remains to be seen whether plaintiff can establish the defendants' participation in the Eighth Amendment violations alleged.

Included within his Eighth Amendment claim, though more appropriately grouped with his due process cause of action, is plaintiff's contention that because the Tier III hearing officer was provided the unfettered discretion, in the event of finding of guilt, to impose a penalty of whatever magnitude seen fit, the disciplinary scheme in place at the DOCS is constitutionally infirm. In plaintiff's case, however, the imposed penalty of ten months of disciplinary confinement, 180 days of which were deferred, fell comfortably within the bounds of acceptable levels under the Eighth Amendment. Consequently, whatever may be said about plaintiff's arguments regarding the discretion affording to hearing officers, he lacks standing to raise such a claim. *See Trammell v. Mantello, No. 90-CV-382, 1996 WL 863518, at \*8-\*9 (W.D.N.Y. June 10, 1996)* (Tier III regulations pass

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

constitutional muster).

D. *Plaintiff's Procedural Due Process Claim*

In their motion, defendants also challenge plaintiff's contention that he was denied procedural due process during the course of the disciplinary hearing which resulted in his disciplinary confinement for a period of five months. In support of their motion, defendants argue both that plaintiff was not deprived of a constitutionally cognizable liberty interest, and that even assuming he was, he was afforded the requisite process due under the Fourteenth Amendment in connection with that deprivation.

**\*11** To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

1. *Liberty Interest*

Addressing the first of these required showings, in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84, 115 S.Ct. at 2300; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

Defendants challenge the applicability of both of these factors. Initially, defendants question whether New York has, by statute or otherwise, created a protected liberty interest in prisoners remaining free from segregation, including for disciplinary reasons,

arguing that it has not. Defendants' Memorandum (Dkt. No. 39) at 14. The cases cited in support of that proposition, however, which relate to whether there is a constitutional or liberty interest in being assigned to a particular program, job assignment, or facility, are inapposite. *See, e.g., Klos v. Haskell,* 48 F.3d 81, 87-88 (2d Cir.1995) (involving revocation of assignment to "shock incarceration" program); *Hall v. Unknown Named Agents of N.Y. State Dept. for Corr. Servs. for APPU Unit at Clinton Prison,* 825 F.2d 642, 645-46 (2d Cir.1987) (involving assignment to Assessment Program and Preparation Unit); *see also Montayne v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547 (1976) (no constitutional right of inmate to be placed in any particular facility); *Frazer v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996) ("no protected liberty interest in a particular job assignment"). Despite defendants' assertion to the contrary, it is now firmly established that through its regulatory scheme, New York State has created a liberty interest in prisoners remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999); *see also LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, at \*6 (S.D.N .Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.).

Having rejected defendants' contention that the State has not created such an interest, I next turn to examination of whether the conditions of plaintiff's disciplinary confinement, as alleged by him, rise to the level of an atypical and significant hardship under *Sandin.* Atypicality in a *Sandin* inquiry normally presents a question of law.[FN12] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a cognizable liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329,

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary.[FN13] *Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

> FN12. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v.. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

> FN13. While not the only factor to be considered, the duration of a disciplinary keeplock confinement remains significant under *Sandin. Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n .5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure). In fact, in *Colon v. Howard* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See id.* at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

**\*12** Given that plaintiff has shown that he was subjected to disciplinary confinement for a period of five months, and has alleged his exposure to conditions beyond those normally associated with such SHU confinement, as described in the applicable regulations, at this juncture I am unable to conclude, as a matter of law, that he was not deprived of a constitutionally significant liberty interest as a result of the disciplinary proceeding at issue. I therefore recommend against summary dismissal of plaintiff's due process claims on this basis.

### 2. *Due Process*

The procedural protections to which a prison inmate is entitled before being deprived of a recognized liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988).

Plaintiff's procedural due process claim is multi-faceted. In that claim, Ciaprazi maintains that 1) he was denied meaningful assistance by defendant Cole, who refused his request to interview potential witnesses identified by the plaintiff; 2) Hearing Officer Melino effectively denied the plaintiff access to witnesses since witness waiver forms, not to plaintiff's liking in form, were allegedly presented by an unknowledgeable corrections officer to those inmates whose testimony was requested by Ciaprazi, following which those inmates apparently refused to sign the waiver forms and appear to testify on his behalf; 3) the hearing officer was biased and partial, and demonstrated open hostility toward the plaintiff; 4) the hearing officer's disciplinary determination was not supported by the evidence; and 5) the hearing officer refused plaintiff's suggestion to administer polygraph

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

tests to defendants Rogers and Fitzpatrick, as well as to Ciaprazi. Also implicit in plaintiff's due process claim is his contention that his constitutional rights were violated through the issuance of a false misbehavior report.[FN14]

> FN14. Among the due process violations alleged in plaintiff's complaint is the claim that by taking into account his prior disciplinary record when determining the appropriate punishment to be imposed based upon the finding of guilt, hearing officer Melino violated the constitutional guaranty against double jeopardy. Since it is well established that the double jeopardy clause does not apply in the prison disciplinary setting, this claim lacks merit. *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, at *13 (S .D.N.Y. Oct. 15, 1993). Plaintiff's contention that the hearing officer's actions in this regard also violated an unspecified New York regulation fares no better, since such an allegation does not automatically support a claim of civil rights violations under 42 U.S.C. § 1983. *Alnutt v. Cleary,* 913 F.Supp. 160, 168 (W.D.N.Y.1996).

Plaintiff's arguments relating to the sufficiency of evidence supporting the hearing officer's finding of guilt can be swiftly discounted. The Constitution, including its Due Process Clause, requires only that there be some evidence of guilt supporting a prison disciplinary determination. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455-56, 105 S.Ct. 2768, 2774 (1985). Having reviewed the record of plaintiff's disciplinary proceeding in light of his submissions, I find that this standard has been met.

**\*13** Plaintiff's claims regarding the allegedly false misbehavior report also lack merit. It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.[FN15] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988). The rationale supporting this general rule is that an inmate's procedural due process rights are adequately safeguarded by the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

> FN15. Unquestionably, a prisoner does enjoy a substantive due process right against the issuance of a false misbehavior report as retribution for having engaged in protected activity. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995). In light of my finding of no connection between plaintiff's complaints and the issuance by defendant Fitzpatrick of the misbehavior report, however, such a claim does not lie in this action.

As for plaintiff's contention that his due process rights were violated when polygraph tests were not administered to key corrections officials, as requested by him, plaintiff has cited no cases-nor is the court aware of any-which require the administering of polygraph tests in connection with parties and witnesses in the context of an inmate disciplinary determination. *See Hinebaugh v. Wiley,* 137 F.Supp.2d 69, 79 (N.D.N.Y.2001) ("some evidence" does not require independent examination of credibility and therefore "certainly does not require" court to order personnel to submit to polygraph to ascertain if hearing testimony was truthful). This issue, then, provides no basis for finding the existence of a procedural due process violation.

Plaintiff's allegations regarding the ineffectiveness of his assigned assistant provide a greater basis for pause. While the requirements associated with the provision of such assistance are modest, they are not non-existent. Under *Wolff,* an inmate facing a Tier III disciplinary hearing is entitled to meaningful assistance in preparing his or her defense. *Eng,* 858 F.2d at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

897-98. In this case, plaintiff asserts that while he was assigned an assistant, he was denied meaningful assistance from that individual. In support of this contention, plaintiff alleges that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing. Complaint (Dkt. No. 1) ¶¶ 20-21; Ciaprazi Aff. (Dkt. No. 46) ¶ 40. This, if true, could establish a due process violation based on the inadequacy of the inmate assistance provided to the plaintiff. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998).

In light of my inability to find, as a matter of law, that plaintiff did not suffer the deprivation of a liberty interest as a result of his five month period of disciplinary confinement, and additionally to conclude that no reasonable factfinder could find the existence of a due process violation associated with that disciplinary confinement, I recommend denial of the portion of defendants' summary judgment motion which seeks dismissal of plaintiff's due process claims.

**F.** *Equal Protection*

In his complaint plaintiff also complains of the alleged deprivation of equal protection. Defendants contend that this claim is also subject to dismissal as a matter of law.

**\*14** "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985) (citation omitted). The general rule is that a policy is presumed to be valid and will be sustained if the classification drawn by that policy is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. One exception to that rule, however, is when a policy classifies by race, alienage, or national origin-"[t]hese factors are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy-a view that those in the burdened class are not as worthy or deserving as others." *Id.* For this reason, these policies are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Id.* The essence of a cognizable equal protection claim includes a showing of "clear and intentional discrimination." *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401 (1944) (internal quotation and citations omitted).

The apparent basis for plaintiff's equal protection claim is his contention that in light of his national origin, he was treated differently than United States citizen counterparts.[FN16] In the face of defendants' summary judgment motion, it was incumbent upon the plaintiff to come forward with evidence which could support a claim that he was treated differently than other inmates, and that the difference in treatment could properly be attributed to his status as a Romanian. As such evidence, plaintiff offers only a statement made to him by defendant Fitzpatrick at one point, in substance, that plaintiff had "now ... learned to speak English." *See* Plaintiff's Memorandum (Dkt. No. 46) at 29. Beyond this slender reed, plaintiff offers no evidence to support his claim that he was treated differently than inmates not of his national origin, and indeed acknowledges mere speculation on his part as to this premise, arguing that "discrimination based on national origin *may* ... have placed [sic] a role in defendants' unlawful actions[.]" Plaintiff's Memorandum (Dkt. No. 46) at 29 (emphasis added). Instead, plaintiff's equal protection claims consist of mere surmise and speculation, and are subject to dismissal on this basis. *See, e.g., Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ( "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN16. Plaintiff is a Romanian citizen. Complaint (Dkt. No. 1) at 3.

Despite being obligated to do so at this juncture, plaintiff has failed to adduce any evidence to show either that he was treated differently than his non-Romanian counterparts, and that the difference in treatment was based upon his national origin. I therefore recommend dismissal of plaintiff's equal protection claims as a matter of law.

G. *United Nations Resolutions*

***15** Each of plaintiff's eight causes of action is based, in part, upon two international agreements, including the Universal Declaration of Human Rights ("UDHR") and the International Covenant on Civil and Political Rights ("ICCPR"). Defendants maintain that as a matter of law, those provisions do not support claims under section 1983.

Section 1983 provides, in pertinent part, for a right of action on behalf of any person deprived of "any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. Plaintiff argues that because the United States is a signatory to these two treaty-like provisions, they have the force of law and can be implemented, and individual treaty violations can give rise to recourse, under section 1983.

It is true that violation of a treaty entered into by the United States can serve as a basis for a claim for damages under section 1983, provided that the treaty allows for a private right of action to redress any alleged violations of its provisions. *Standt v. City of New York,* 153 F.Supp.2d 417, 422-30 (S.D.N.Y.2001) (finding private right of action under section 1983 for violation of the Vienna Convention on Consular Relations, 21 U.S.T. 77, 101 T.I.A .S. No. 6820, 596 U.N.T.S. 261 (April 24, 1963)). To the extent that the defendants argue otherwise, and contend that treaties-as distinct from constitutional and other types of federal statutory provisions-cannot support a claim for section 1983 liability, *see* Defendants' Memorandum (Dkt. No. 39) at 17-18, that position therefore lacks support.

As can be seen, analysis of the sufficiency of plaintiff's claims under the cited treaty provisions turns upon whether those international agreements confer individual rights of action. In order to be found deserving of enforcement under section 1983 as a "law", a treaty ratified by the Senate must either be found to be self-executing or, alternatively, must have been the subject of implementing legislation by Congress. *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287, 1298 (3d Cir.1979).

Since plaintiff has pointed to no applicable implementing legislation, nor is the court aware of any, the availability of the ICCPR to support plaintiff's section 1983 claim depends upon whether it is self-executing. The majority of the courts addressing this issue, however, including within the Second Circuit, have concluded that it is not.[FN17] *See, e.g., Poindexter v. Nash,* 333 F.3d 372, 379 (2d Cir.2003); *Murray v. Warden, FCI Raybrook,* No. 9:01-CV-255, 2002 WL 31741247, at *11 n. 10 (N.D.N.Y. Dec. 5, 2002) (Sharpe, M.J.) (citing *U.S. ex rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002) and *Reaves v. Warden,* No. Civ. A3:01-CV-1149, 2002 WL 535398, at *9 (M.D.Pa. Mar. 22, 2002). Similarly, the UDHR has been characterized by the Second Circuit as "non-binding." *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140, 167-68 (2d Cir.2003).

FN17. Even in one of the cases relied heavily upon by the plaintiff, *Maria v. McElroy,* 68 F.Supp.2d 206, 231 (E.D.N.Y.1999)-a case which has since been effectively overruled on other grounds, *see Restrepo v. McElroy,* 369 F.3d 627 (2d Cir.2004)-the court recognized that the ICCPR was not "self-executing". 68 F.Supp.2d at 231.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

**\*16** Based upon the foregoing, and without deciding whether the evidence in the record demonstrates a genuine issue of material fact as to whether those provisions were violated by defendants' alleged actions toward the plaintiff, I find that Ciaprazi's claims under the ICCPR and UDHR are legally deficient as a matter of law. I therefore recommend dismissal of plaintiff's claims which are dependent on those two international agreements.

### H. *Personal Involvement*

Defendants claim that plaintiff's claims against defendants Goord and Selsky are legally deficient, in that the record fails to establish their requisite personal involvement in the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

The basis for asserting liability against defendant Selsky arises exclusively from plaintiff's appeal from his disciplinary determination. That appeal was addressed by defendant Selsky, whose review of that appeal sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations. *See, e.g., Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994).

Plaintiff's claim against defendant Goord is far more tenuous. Plaintiff asserts that because his appeal was mailed directly to defendant Goord who, consistent with his established practice, then referred it to defendant Selsky for review, the Commissioner "presumably read [its] contents." *See* Plaintiff's Memorandum (Dkt. No. 46) at 32. This, coupled with his contention that as the ultimate supervisor of the DOCS defendant Goord was positioned to remedy the violations which he suffered, forms the sole basis for his claims against defendant Goord. These are merely claims against defendant Goord in his supervisory capacity; to sanction them would be to allow for *respondeat superior* liability. Since it is well established that such liability does not lie under section 1983, and there is no other discernible basis to conclude defendant Goord's awareness of or involvement in the matters alleged in plaintiff's complaint, I recommend that defendants' motion be granted and plaintiff's claims against defendant Goord be dismissed based upon lack of personal involvement. *Richardson,* 347 F.3d at 435 (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); "mere 'linkage in the prison chain of command' is insufficient to implicate a state

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)
**(Cite as: 2005 WL 3531464 (N.D.N.Y.))**

commissioner of corrections or a prison superintendent in a § 1983 claim"); *Scott v. Coughlin,* 78 F.Supp.2d 299, 312 (S.D.N.Y.2000) (Commissioner's act of forwarding appeals addressed to him to Selsky insufficient to establish personal involvement; citing, *inter alia, Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1991)).

## IV. *SUMMARY AND RECOMMENDATION*

**\*17** The plaintiff, an experienced and well-versed *pro se* litigant, has commenced this action asserting various claims arising out of the issuance of a disciplinary misbehavior report and the process which followed, including the punishment received. Upon examination of the record, I find no evidence tending to demonstrate that the adverse actions taken against the plaintiff were motivated by disciplinary animus, and thereby recommend the entry of summary judgment dismissing his retaliation claim. I do, however, find the existence of triable issues of fact regarding whether or not Ciaprazi was deprived of a constitutionally significant liberty interest, and whether the assistance provided to the plaintiff in anticipation of his hearing was constitutionally adequate, and therefore recommend against summary dismissal of plaintiff's procedural due process claims.

Addressing plaintiff's Eighth Amendment claims I find, particularly in view of the lack of any evidence to the contrary, that the conditions described by the plaintiff could lead a reasonable factfinder to conclude that they amounted to cruel and unusual punishment, and therefore recommend against the entry of summary judgment dismissing plaintiff's Eighth Amendment claim. I further find, however, no basis to conclude that a reasonable factfinder could find an Eighth amendment violation based on the Tier III regulatory scheme, a violation of the Equal Protection Clause of the Fourteenth Amendment, or that the international treaty provisions cited give rise to a private right of action. Accordingly, I recommend dismissal of those claims.

Finally, I recommend dismissal of plaintiff's claims against defendant Goord based upon the lack of his personal involvement, but against dismissal of plaintiff's claims against defendant Selsky on this basis. It is therefore hereby

RECOMMENDED that defendants' summary judgment motion (Dkt. No. 39) be GRANTED in part, and that all of plaintiff's claims against defendant Goord, and all of plaintiff's claims against the remaining defendants except his procedural due process and Eighth Amendment conditions of confinement causes of action, be DISMISSED, but that to the extent of those claims, with respect to which triable issues of fact exist, I recommend that defendants' motion be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have TEN days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Fed.R.Civ.P. 6(a), 6(e), 72; 28 U.S.C. § 636(b)(1); *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citations omitted); and it is further hereby

ORDERED that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

N.D.N.Y.,2005.
Ciaprazi v. Goord
Not Reported in F.Supp.2d, 2005 WL 3531464 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green Haven
Correctional Facility, R. Pflueger, A. Glemmon, Sgt.
Stevens, Lt. Haubert, Capt. W.M. Watford, Capt. T.
Healey, and John Doe # 1–5, all as individuals, De-
fendants.

No. 93 Civ. 5981(WHP) JCF.
Oct. 28, 1999.

Mr. Craig Cole, Bare Hill Correctional Facility,
Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, New York, for Defendant.

### MEMORANDUM & ORDER
PAULEY, J.

**\*1** The remaining defendant in this action, Cor-
rection Officer Richard Pflueger, having moved for an
order, pursuant to Fed.R.Civ.P. 56, granting him
summary judgment and dismissing the amended
complaint, and United States Magistrate Judge James
C. Francis IV having issued a report and recommen-
dation, dated August 20, 1999, recommending that the
motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff
does "not contest the dismissal of this action", it is

ORDERED that the attached report and recom-
mendation of United States Magistrate Judge James C.

Francis IV, dated August 20, 1999, is adopted in its
entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

### REPORT AND RECOMMENDATION
FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green
Haven Correctional Facility, brings this action pur-
suant to 42 U.S.C. § 1983. Mr. Cole alleges that the
defendant Richard Pflueger, a corrections officer,
violated his First Amendment rights by refusing to
allow him to attend religious services. The defendant
now moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the de-
fendant's motion be granted.

### Background

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at
the Green Haven Correctional Facility. (First
Amended Complaint ("Am.Compl.") ¶ 3). From June
21, 1993 to July 15, 1993, the plaintiff was in keeplock
because of an altercation with prison guards.
(Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony An-
nucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS
policy, inmates in keeplock must apply for written
permission to attend regularly scheduled religious
services. (Reply Affidavit of George Schneider in
Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.")

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Or-

der dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International,*

*Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se's*] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)
**(Cite as: 1999 WL 983876 (S.D.N.Y.))**

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[FN1]

> FN1. In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

S.D.N.Y.,1999.
Cole v. Artuz
Not Reported in F.Supp.2d, 1999 WL 983876 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William EDWARDS, Plaintiff,
v.
Martin HORN, et al., Defendants.

No. 10 Civ. 6194(RJS)(JLC).
Feb. 14, 2012.

*REPORT & RECOMMENDATION*
JAMES L. COTT, United States Magistrate Judge.

**\*1 To The Honorable Richard J. Sullivan, United States District Judge:**

Plaintiff William Edwards, proceeding *pro se,* brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 alleging that Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration in various facilities on Rikers Island. Edwards also alleges that he was discriminated against in violation of the Americans with Disabilities Act. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that the motion to dismiss be granted except as to Edwards' retaliatory termination claim against Defendant Rosa.

**I. BACKGROUND**
**A. Factual Background**
The following facts are taken from the Complaint and are accepted as true for purposes of this motion. (*See* Complaint, dated June 23, 2010 ("Compl.") (Dkt. No. 2)). Edwards brings this suit pursuant to 42 U.S.C.

§§ 1983, 1985, and 1986 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.,* against 44 current and former New York City employees and two John Doe Defendants: Commissioner Martin Horn, Warden Bailey, Warden J. Davis, Warden E. Duffy, Warden Michael Hourihan, Warden Riordan, Warden Robert Shaw, Correctional Officer ("CO.") Dinolfo, CO. Grima, CO. Hernandez, CO. Holmes, CO. Lagos, CO. Lewis, CO. Maynard, CO. Morales, CO. Noon, CO. Reyes, CO. Richardson, CO. Rosa, CO. Smalls, CO. Smith, CO. Sumpter, Captain Alleyve, Captain Bethacourt, Captain Calle, Captain G. Davis, Captain Polak, Marybeth Campfield, Ms. Carrera, Mrs. M. Cattafesta, Mr. K. Guerrant, Cook Hannah, Deputy Hill, Florence Hunter, Ms. Jenkins, Ms. K. Johnson [FN1], Ms. G. Lee, Ms. P. Mimms, Mr. R. Mulvena, Ms. B. Musmacher, Ms. R. Padmore, Karen Powell, James Robinson, and Ms. Steven (together, "Defendants"). (*See* Compl. at 1–5).[FN2]

> FN1. In the case caption on the first page of the Complaint, Edwards mistakenly identifies Defendant Johnson as "Ms. K. Jonhson." (Compl. at 1).

> FN2. In Section I.b of the Complaint, Edwards lists 38 Defendants. Six additional Defendants—Carrera, Cattafesta, Duffy, Grima, Powell, and Steven—do not appear on this list, but are named in the case caption on the first page of the Complaint.

Edwards alleges that Defendants deprived him of his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at several facilities on Rikers Island: the Anna M. Kross Center ("AMKC"), the Eric M. Taylor Center ("EMTC"), the George Motchan Detention Center ("GMDC"), the George R. Vierno Center ("GRVC"), and the Robert N. Davoren Com-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
(Cite as: 2012 WL 473481 (S.D.N.Y.))

plex ("RNDC"). At the time he filed his Complaint, Edwards was an inmate at the Clinton Correctional Facility, and he is currently on parole. (*See* Letter, dated Dec. 11, 2011 (Dkt. No. 135)).

Throughout his roughly 100 paragraph, single-spaced, 25–page Complaint, Edwards does not present his allegations by cause of action, nor does he clearly articulate exactly what causes of action he is asserting, as many allegations appear to overlap and lack clarity.[FN3] Several of Edwards' allegations deal with Defendants' actions in relation to a separate lawsuit Edwards brought in the Northern District of New York, *Edwards v. Selsky,* No. 04 Civ. 493(FJS)(DRH), 2008 WL 190385 (N.D.N.Y. Jan. 22, 2008) (*"Selsky"* or the "NDNY action"), which was dismissed for failure to prosecute. The Court has made every effort to identify and address all possible claims asserted in the Complaint.[FN4] The Court is able to identify 12 potential causes of action spanning separate dates from July 25, 2007 to April 5, 2010. Specifically, Edwards asserts the following claims: (1) verbal harassment; (2) deprivation of access to free telephone calls; (3) deprivation of access to legal services; (4) mail tampering; (5) denial of required food portions; (6) unconstitutional strip search; (7) violation of due process rights within the prison's disciplinary and grievance system; (8) excessive force and denial of medical treatment; (9) deprivation of access to the prison's grievance system; (10) retaliation; (11) conspiracy; and (12) disability discrimination under the ADA. Edwards seeks $75,000,000 in damages, attorneys' fees, a reimbursement of penalties incurred due to two allegedly false infractions, injunctive relief in the form of expunging those false infractions, injunctive relief terminating Defendants from their positions in the New York City Department of Correction ("DOC") and permanently enjoining them from city, state, or federal employment, and a permanent restraining order to prevent Defendants from committing any future similar violations. (Compl.¶ V). Edwards does not present these allegations in a narrative fashion, but instead describes

dozens of grievance letters that he has submitted to DOC staff at the various Rikers Island facilities over the course of nearly three years. To avoid repetition, the Court will describe the factual background relating to Edwards' specific allegations in the context of the relevant legal discussion below.

FN3. Accordingly, while Defendants do not argue as much, the Complaint could also be dismissed under Rule 8(a)(2), which requires a pleading to contain "a short and plain statement" of the claims.

FN4. Edwards has attached more than 300 pages of documents to his Complaint, consisting of grievance letters, notices of infraction, and inmate grievance committee decisions. These materials can be properly considered in deciding Defendants' motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). However, while the Court will consider these materials in support of the claims asserted in the Complaint—indeed, nearly every paragraph advises the reader to "see attached exhibit" but fails to cite to a specific page—the Court will not attempt to identify the potentially innumerable causes of action that could be construed from the hundreds of allegations contained solely in the attachments.

## B. Procedural Background

*2 Edwards filed the Complaint on August 18, 2010. (Dkt. No. 2). On October 29, 2010, the United States Marshals executed service of the Summons and Complaint on 32 of the 44 named defendants.[FN5] Over the course of the next several months, with the assistance of the Office of Corporation Counsel, the United States Marshals, and the Court, Edwards has attempted to serve the remaining 12 named defendants. (*See* Dkt. Nos. 56, 62, 69, 70, 75, 119, 120, 129). To date, Edwards has successfully served nine additional Defendants and appears to have served a number of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

Defendants twice.[FN6] Accordingly, there are three named Defendants who have not been served—Bethacourt, Davis, and Johnson—and two John Doe Defendants who have not been identified.[FN7]

> **FN5.** This set of defendants consists of Sumpter (Dkt. No. 11), Horn (Dkt. No. 12), Cattafesta (Dkt. No. 13), Hunter (Dkt. No. 15), Guerrant (Dkt. No. 17), Lagos (Dkt. No. 18), Shaw (Dkt. No. 19), Campfield (Dkt. No. 20), Reyes (Dkt. No. 21), Davis (Dkt. No. 22), Hernandez (Dkt. No. 23), Holmes (Dkt. No. 24), Rosa (Dkt. No. 25), Smith (Dkt. No. 26), Mulvena (Dkt. No. 27), Polak (Dkt. No. 28), Noon (Dkt. No. 29), Duffy (Dkt. No. 31), Dinolfo (Dkt. No. 32), Mimms (Dkt. No. 34), Bailey (Dkt. No. 35), Lewis (Dkt. No. 36), Alleyve (Dkt. No. 37), Calle (Dkt. No. 39), Hannah (Dkt. No. 41), Hourihan (Dkt. No. 43), Jenkins (Dkt. No. 44), Maynard (Dkt. No. 45), Padmore (Dkt. No. 48), Richardson (Dkt. No. 49), Riordan (Dkt. No. 50), and Smalls (Dkt. No. 51).

> **FN6.** Since October 29, 2010, Edwards has served the following Defendants: Lee (service executed on Dec. 2, 2010 (Dkt. No. 61)); Powell (service executed on Mar. 29, 2011 (Dkt. No. 98)); Steven (service executed on Feb. 24, 2011 (Dkt. No. 110); service executed on Mar. 31, 2011 (Dkt. No. 99)); Grima (service executed on Mar. 2, 2011 (Dkt. No. 107); service executed on Mar. 14, 2011 (Dkt. No. 100)); Robinson (service executed on Mar. 29, 2011 (Dkt. No. 101)); Musmacher (service executed on Mar. 14, 2011 (Dkt. No. 102)); Hill (service executed on Feb. 24, 2011 (Dkt. No. 112); service executed on Mar. 14, 2011 (Dkt. No. 103)); Horn (service executed on Mar. 31, 2011 (Dkt. No. 97)); and Carrera (service executed on Oct. 6, 2011 (Dkt. No. 131)).

> **FN7.** As to Defendant Bethacourt, the Office of Corporation Counsel advised the Court by letter dated June 8, 2011 that it is unable to locate records that would assist in identifying Bethacourt. Accordingly, as stated in the Court's Order dated June 9, 2011 (Dkt. No. 120), it does not appear that any further action can be taken to identify this Defendant. As to Defendant Davis, the Office of Corporation Counsel advised the Court by letter dated February 16, 2011 that the Legal Bureau of the DOC would accept service on his behalf. By Order dated September 1, 2011, the Court directed Edwards to serve Davis by September 26, 2011 (Dkt. No. 129), but the docket sheet does not reflect any attempt to effect service. Lastly, on October 31, 2011, Edwards attempted to serve Defendant Johnson but was unsuccessful because she was not located at the address provided by the Office of Corporation Counsel. (*See* Order, dated Dec. 12, 2011 (Dkt. No. 134), at 1). Edwards was directed to again attempt to serve Johnson by January 27, 2012 (*Id.*), but no proof of service has been filed.

During the pendency of his lawsuit, Edwards has submitted several requests to the Court. By Order dated November 1, 2010, the Court denied Edwards' request for an order prohibiting certain employees at the Southport Correctional Facility, where Edwards was incarcerated at the time, from tampering with his legal and personal mail. (Dkt. No. 8). By Orders dated November 30, 2010 and April 14, 2011, the Court denied Edwards' motions for default judgment against certain Defendants (Dkt.Nos.56, 92), and Edwards' interlocutory appeal of the November 30 Order was denied by the Second Circuit on May 26, 2011. (Dkt. No. 118). By Orders dated February 9, 2011, I declined Edwards' request that I disqualify myself from this action and also denied his motion for the appointment of counsel. (Dkt.Nos.73–74). Lastly, on March 8, 2011, I denied Edwards' request for sanc-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

tions in connection with Corporation Counsel's providing Edwards with service addresses for Defendants. (Dkt. No. 81).

On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss, dated Apr. 4, 2011 ("Def.Mem.") (Dkt. No. 89)).[FN8] Defendants assert that Edwards has failed to state a claim as to his verbal harassment, deprivation of telephone access, unconstitutional strip search, mail tampering, denial of food, denial of legal services, due process, grievance processing and protocol, excessive force and medical treatment, conspiracy, and retaliation causes of action. (Def. Mem. at 16–45). In addition, Defendants argue that Edwards' claims against Defendants Bailey, Cattafesta, Davis, Hill, Horn, Hourihan, Powell, and Riordan fail for lack of personal involvement, all defendants are entitled to qualified immunity, and Edwards' claims are barred by the Prison Litigation Reform Act (the "PLRA").[FN9] (*Id.* at 14–16, 45–48). Pursuant to the Court's Order dated March 3, 2011, Edwards' deadline to submit an opposition to Defendants' motion was May 4, 2011. (Dkt. No. 80). However, despite receiving several extensions—first to May 18 (Dkt. No. 90) then to June 8 (Dkt. No. 116) and June 29 (Dkt. No. 122)—Edwards has not submitted any opposition. Accordingly, the Court considers Defendants' motion fully submitted.

> FN8. Although the motion to dismiss was not filed on behalf of any of the unserved Defendants (*see* Def. Mem. at 2–3 n. 2), Counsel has stated that the arguments raised apply equally to all Defendants. Accordingly, in light of my recommendation to dismiss all claims against all Defendants except the retaliatory termination claim against Defendant Rosa, *see infra* Section ILK, the Court should *sua sponte* dismiss the Complaint as to Defendants Bethacourt, Davis, John Doe # 1,

John Doe # 2, and Johnson.

> FN9. Defendants have not moved to dismiss any of Edwards' claims on the ground that he has failed to exhaust his administrative remedies, as he is required to have done under the PLRA. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). While exhaustion under Section 1997e(a) is mandatory, *see Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), non-exhaustion "is an affirmative defense that is waivable." *Handberry v. Thompson,* 446 F.3d 335, 342 (2d Cir.2006) (citations, alterations, and quotation marks omitted); *see also Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Here, because Defendants have not argued that Edwards failed to exhaust his administrative remedies, the non-exhaustion defense has been waived. *See, e.g., Ortiz v. Dep't of Corr. of the City of N.Y.,* No. 08 Civ. 2195(RJS)(HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011) (defendant's failure to raise non-exhaustion constitutes waiver) (Report and Recommendation), *adopted,* 2011 WL 2638140 (S.D.N.Y. Jul.5, 2011); *Hobson v. Fischer,* No. 10 Civ. 5512(SAS), 2011 WL 891314, at *2 n. 22 (S.D.N.Y. Mar.14, 2011) (finding waiver even where grievance "appears not to have been fully exhausted" under PLRA).

## II. *DISCUSSION*
### A. Applicable Legal Standards
**\*3** A plaintiff's failure to oppose a 12(b)(6) motion does not by itself merit dismissal of a complaint.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

*See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Id.* Consequently, as with all Rule 12(b)(6) motions, in deciding an unopposed motion to dismiss, a court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" according to the principles below. *Id.* at 322.

A complaint will not survive a 12(b)(6) motion to dismiss if it "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Although "a complaint attacked by a 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks and citations omitted). "To survive a motion to dismiss, the complaint must set out only enough facts to state a claim to relief that is plausible on its face." *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 32 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950 (citation omitted). A complaint thus may only survive a 12(b)(6) motion to dismiss if it has "facial plausibility" and pleads enough facts to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Given that Edwards is proceeding *pro se,* the Court must "construe [his Amended Complaint] broadly and interpret it to raise the strongest arguments it suggests." *Sharpe v. Conole,* 386 F.3d 482, 484 (2d Cir.2004) (citation omitted). Furthermore, "when the plaintiff proceeds *pro se* ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (citation omitted). Nevertheless, "a *pro se* litigant [is] bound by the same rules of law ... as those [litigants] represented by counsel." *Fertig v. HRA Med. Assistance Program,* No. 10 Civ. 8191(RPP), 2011 WL 1795235, at *4 (S.D.N.Y. May 6, 2011) (quotation marks and citation omitted).

**B. Verbal Harassment**

Edwards asserts that several Defendants, in violation of Section 1983, used harassing, threatening, and profane language towards him on 17 separate occasions taking place between July 25, 2007 and September 1, 2008. (Compl.¶¶ III, 2, 6, 8, 17, 19, 22, 24, 30, 33, 37, 38, 53, 55, 61, 83, 91(b)). In separate allegations, he claims that Defendants Campfield, Dinolfo, Grima, Hannah, Hernandez, Holmes, Lewis, Maynard, Morales, Noon, Reyes, Richardson, Smalls, and Smith, called him a "snitch" in front of other inmates, mocked his disability, falsely informed him that he had a visitor when in fact he did not have a visitor, and directed racial slurs and profane language toward him. (*Id.*). These claims should be dismissed. The Eighth Amendment prohibits the imposition of cruel and unusual punishment, *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but its protection does not extend to verbal harassment of an inmate by correction officers without any resulting "appreciable injury." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 373 (S.D.N.Y.2011) (quoting *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)).

**\*4** Verbal harassment, by itself, is not a constitutional violation. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010) ("[v]erbal harassment itself does not rise to the level of a constitu-

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
(Cite as: 2012 WL 473481 (S.D.N.Y.))

tional violation [,]" and "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations") (quotation marks and citation omitted); *Davidson v. Bartholome,* 460 F.Supp.2d 436, 446 (S.D.N.Y.2006) (no relief to inmate "simply because [an officer] made a hostile or derogatory comment"); *Lunney v. Brureton,* No. 04 Civ. 2438(LAK)(GWG), 2005 WL 121720, at *11 (S.D.N.Y. Jan. 21, 2005) (no claim because merely "insulting" or "disrespectful" comments "do not give rise to a constitutional violation") (quotation marks and citations omitted) (Report and Recommendation), *adopted,* 2005 WL 433285 (S.D.N.Y. Feb.23, 2005). Absent any appreciable injury, courts routinely dismiss claims of verbal harassment brought under *Section 1983. See, e.g., Felder v. Filion,* 368 F. App'x 253, 256 (2d Cir.2010) (verbal harassment did not violate Eighth Amendment where plaintiff did not present evidence of resulting injury); *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a [Section] 1983 claim if no specific injury is alleged"). Because Edwards does not allege any injury whatsoever, let alone one that could be considered "appreciable," Defendants' alleged threats, verbal harassment, or profane language do not give rise to constitutional violations and should therefore be dismissed.

## C. Denial of Required Telephone Calls

Edwards alleges that since his incarceration began on January 23, 2008, he has not been provided with a free telephone call as required by the "DOC Telephone System." (Compl.¶ 46).[FN10] Edwards further alleges that he submitted a grievance on June 3, 2008 regarding his deprivation of free telephone calls. (*Id.*). However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (citing cases) (Report and Recommendation), *adopted,* 2011 WL 5006831 (S.D.N.Y. Oct.20, 2011). Because inmates "have no right to

unlimited telephone calls[,]" *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1998) (citation omitted), Edwards must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights. *See, e.g., Paulino v. Menifee,* No. 00 Civ. 5719(RCC)(KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction restoring phone privileges where inmate did not allege that alternate means of communication were inadequate). Edwards' claim regarding the denial of free telephone calls should therefore be dismissed.

> FN10. In the context of his claim for the denial of free telephone calls, Edwards provides different dates for the start of his incarceration, stating January 23, 2008 in his Complaint and January 24, 2008 in an attached exhibit. (Compl. ¶ 46; Dkt. No. 2–3 at 4). These cited dates, however, appear to be inconsistent with the commencement of Edwards' incarceration, as his earliest allegation in this lawsuit takes place on July 25, 2007 while he was housed at the AMKC. (*Id.* ¶ III). In any event, regardless of whether Edwards has been denied free telephone calls since July 2007 or January 2008, his cause of action should be dismissed because he has failed to state an actionable claim.

## D. Deprivation of Access to Legal Services

**\*5** Edwards alleges numerous deprivations of access to legal services by Defendants Campfield, Musmacher, and Smalls. As to Campfield, Edwards alleges that in March 2008 she denied him a legal manila envelope, lost his legal documents pertaining to the NDNY action, and denied him legal services. (Compl. ¶¶ 31, 36). As to Musmacher, Edwards asserts that she denied him legal services for more than a month around August 2008 and discriminated against him by providing legal services to Latino detainees when Edwards was "next ... on line" to receive such services. (*Id.* ¶¶ 56–57). As to Smalls, Edwards claims

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

that she denied him extra time in the prison facility's law library in August 2008. (*Id.* ¶ 61). Each of these claims should be dismissed.

The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Accordingly, for a defendant's conduct to provide a basis for an inmate to invoke his right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09 Civ. 3722(SHS)(DF), 2010 WL 5480756, at *21 (S.D.N.Y. Sept. 1, 2010) (citations and quotation marks omitted) (Report and Recommendation), *adopted,* 2011 WL 9398 (S.D.N.Y. Jan.3, 2011).

Here, Edwards does not state sufficient facts to constitute any injury or material prejudice. He does not claim any injury suffered because of Defendants' alleged denials of legal services, legal supplies, extra time in the law library, or alleged discrimination in favor of Latino detainees. While he asserts that Campfield's losing his legal documents in connection with the NDNY action prevented him from "prosecuting" that action (Compl.¶ 36), he fails to provide any specifics as to his purported inability to prosecute. He does not elaborate on, for example, what documents he believes were lost and what actions he was prevented from taking in his litigation, which is especially relevant since Edwards appears to have participated in the NDNY lawsuit in some capacity, but failed to keep the court apprised of his mailing address. *See Selsky,* 2008 WL 190385, at *1–3. Accordingly, because Edwards has not identified any injury or material prejudice as a result of his alleged deprivation of access to legal services, these claims

should be dismissed.

**E. Mail Tampering**

Edwards' mail tampering claims are based on allegations of interference with his outgoing non-legal mail and his incoming and outgoing legal mail at the EMTC and AMKC. Specifically, Edwards first alleges that on November 1, 2007 he wrote a letter to Michael Caruso at the DOC that was never sent from the EMTC. (Compl.¶ 16). Second, Edwards alleges that his "legal mail" addressed to Caruso never left the EMTC and was returned to him on November 27, 2007. (*Id.* ¶ 27). Next, Edwards submitted a grievance on September 8, 2008 alleging that his "personal and legal mail" addressed to a co-defendant never left the AMKC because it was returned for insufficient postage despite being marked with a postage stamp. (*Id.* ¶ 70). Edwards' fourth claim of mail tampering relates to the NDNY action. He asserts that Defendant Davis failed to forward his incoming legal mail to the correct address, despite Edwards' instruction for him to do so, and that as a result, his NDNY lawsuit was dismissed. (*Id.* ¶ 47). Lastly, Edwards alludes to an allegation of tampering with his outgoing "legal and personal mail" against unnamed AMKC staff, which he documented in a November 18, 2008 grievance letter. (*Id.* ¶ 94). None of these claims should withstand a motion to dismiss.

**\*6** Both legal and non-legal mail are protected by the First Amendment's "right to the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at *5 (S.D.N.Y. Mar.29, 2001) (citation omitted). In addition, "the Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quoting

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

*Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

With these principles in mind, Edwards' allegations as to outgoing non-legal mail-non-legal mail being afforded less protection than legal mail, *Davis,* 320 F.3d at 351—fail to state a claim because he does not assert that Defendants actually tampered with his mail, only that his mail never left the facility. Moreover, instead of establishing plausible mail tampering claims for his outgoing non-legal mail, Edwards' alleged facts make mail tampering an unlikely possibility. For example, Edwards' allegation that his November 1, 2007 letter to Michael Caruso never left the EMTC is based solely on the fact that Caruso never answered the letter. (Compl.¶ 16). Caruso's failure to respond to Edwards' letter, of course, does not necessarily suggest that it was never sent by EMTC staff. Absent any allegations that Defendants opened the letter, withheld it from being sent, or otherwise took any adverse action to make it plausible that EMTC staff tampered with Edwards' outgoing mail, Edwards' claim is merely speculative. Similarly, Edwards' allegation in his September 8, 2008 grievance that a letter to a co-defendant was returned to him for insufficient postage despite having a postage stamp does not suggest mail tampering, but rather that Edwards had failed to affix sufficient postage. ( *Id.* ¶ 70). In any event, an isolated failure to mail an inmate's letter does not state a constitutional violation. *See, e.g., Battice v. Phillip,* No. 04 Civ. 669(FB)(LB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) (defendant's failure to deliver plaintiff's mail, even if intentional, is "simply *de minimis* and therefore outside the ambit of constitutional protection") (citation and quotation marks omitted). Finally, Edwards' claim regarding mail tampering in November 2008 is devoid of any facts that could state a cause of action. (Compl.¶ 94).

As to Edwards' claims regarding interference with his incoming and outgoing legal mail, the Court notes that such interference "implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351. To survive a motion to dismiss, a plaintiff must allege that correction officers "regularly and unjustifiably" interfered with his mail, depriving him of his constitutional rights. *Shepherd v. Fisher,* No. 08 Civ. 9297(LTS)(RLE), 2011 WL 3278966, at *2 (S.D.N.Y. July 27, 2011) (citations and quotation marks omitted). To assert such a claim, a prisoner must allege that the defendant's actions (1) were "deliberate and malicious" and (2) "resulted in actual injury" to the plaintiff. *Cancel,* 2001 WL 303713, at *4 (quoted in *Davis,* 320 F.3d at 351). Actual injury exists where interference with legal mail results in "the dismissal of an otherwise meritorious legal claim." *Id.* However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* at 352 (citations and quotation marks omitted).

**\*7** None of Edwards' claims of interference with his legal mail—both those related to incoming and outgoing mail—sufficiently states an actual injury. Edwards fails to allege that he suffered any injury in connection with DOC staff's alleged failure to send his outgoing legal mail on November 27, 2007, September 8, 2008, or November 18, 2008, assuming that Edwards' "legal mail" is in fact legal mail. (Compl.¶¶ 27, 70, 94). For the same reason, Edwards' claim pertaining to incoming mail from the NDNY does not state a constitutional violation. This claim is based on Defendant Davis' alleged failure to adhere to Edwards' request to have his mail sent to a forwarding address. For support, Edwards appears to rely on language in Judge Scullin's order that the magistrate judge's report and recommendation was returned to the Court marked "unable to forward." (Compl.¶ 47). The NDNY action, however, was not dismissed solely because certain documents were returned to the Court. Rather, the case was dismissed for Edwards' failure, for more than one year, to prosecute the action, which included his failure to keep the court and defendants apprised of his address, appear for a deposition, or pay

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

a sanction, despite being aware of the pending litigation. *See Selsky,* 2008 WL 190385, at *1–3. Even if Davis had complied with Edwards' forwarding request, the court's decision to dismiss the complaint for Edwards' "continued and ongoing failures to fulfill his obligations to notify the [c]ourt and counsel of his address and to cooperate in discovery" would likely have remained unchanged. *Id.* at *3. The alleged failure to forward did not, therefore, cause "the dismissal of an otherwise meritorious legal claim." *Cancel,* 2001 WL 303713, at *4 (citation omitted).

Moreover, Edwards does not plead that Defendants blocked his outgoing legal mail in connection with the NDNY action. Indeed, Edwards could not assert such an argument, since, as Judge Scullin noted, he had previously mailed documents to the court during the pendency of his lawsuit. *See Selsky,* 2008 WL 190385, at *l–2. Accordingly, Edwards cannot establish the requisite injury needed to state a cause of action for the deprivation of his constitutional right of access to the courts. Edwards' mail tampering claims should therefore be dismissed.

**F. Denial of Required Food Portions**

Edwards alleges that on several occasions Defendants Lagos, Lewis, and Richardson deprived him of required food portions, including "prescribed therapeutic diet 'soy milk' " on April 19, 2008 (Compl.¶ 38), a second chicken patty on or around May 2008 (*Id.* ¶ 43), a "morning meal" on July 31, 2008 (*Id.* ¶ 53), and an "afternoon meal" on or around October 2008. (*Id.* ¶ 90). Each of these claims should be dismissed. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (per curiam) (quotation marks and citation omitted). Courts have found the Eighth Amendment to be implicated only where a prisoner's allegations involve a serious and continued deprivation of nutritionally

adequate food. *See, e.g., Reeder v. Artus,* No. 09 Civ. 575(DNH)(DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (seven out of twelve days without meals constituted sufficient deprivation to survive motion to dismiss) (Report and Recommendation), *adopted,* 2010 WL 3636132 (N.D.N.Y. Sept.9, 2010).

**\*8** Edwards does not allege that the alleged denials of food placed his health and well being in any immediate danger. *See, e.g. Martinez v. Lape,* No. 09 Civ. 0665(TJM)(RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) (Report and Recommendation), *adopted,* 2011 WL 4528980 (N.D.N.Y. Sept.28, 2011) (no Eighth Amendment claim where inmate failed to allege how expired food and juice posed an immediate risk to health); *Bee v. Krupp,* No. 08 Civ. 10141(SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) ("visible globs of spit" in food did not violate Eighth Amendment). Nor do the allegations, which are alleged to have taken place on four separate dates over a span of six months, suggest that Edwards was in any danger. Accordingly, Edwards' claims regarding deprivation of meals should be dismissed.

**G. Unconstitutional Strip Search**

Edwards alleges that an unspecified officer subjected him to an "institutional" strip search on an unspecified date in violation of the Fourth Amendment. (Compl.¶ 13). Edwards argues that this strip search was unconstitutional because he was convicted of a misdemeanor and not a felony. (*Id.*). While the Fourth Amendment prohibits "unreasonable searches," *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citation omitted), it is not unreasonable for prison officials to perform routine random strip searches on prison inmates. *See N.G. v. Connecticut,* 382 F.3d 225, 230–32 (2d Cir.2004). Edwards' reliance on the distinction between inmates convicted of misdemeanors and those convicted of felonies is misplaced, as that distinction is only relevant as to pre-trial detainees. *See Shain v. Ellison,* 356

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

F.3d 211, 214 (2d Cir.2004) ("clearly established Fourth Amendment precedent ... preclude[s] jails from strip searching misdemeanor arrestees absent a reasonable suspicion that weapons or other contraband were concealed"); Walsh v. Franco, 849 F.2d 66, 70 (2d Cir.1988) ("indiscriminate strip-searching of misdemeanor arrestees is unconstitutional"). Here, Edwards admits that he was convicted at the time of his strip search. (Compl.¶ 13). See, e.g., Castro–Sanchez v. N.Y. State Dep't of Corr. Servs., No. 10 Civ. 8314(DLC), 2011 WL 6057837, at *8 (S.D.N.Y. Dec.6, 2011) (strip search claim dismissed because routine random searches of inmates are constitutional). Accordingly, Edwards' claim should be dismissed.

## H. Deprivation of Due Process Rights Within Prison's Disciplinary System

Edwards alleges that he was denied certain rights during two disciplinary proceedings heard by Defendant Davis on September 30, 2008, which can be broadly construed as a claim asserting a deprivation of procedural due process under the Fourteenth Amendment. (Compl.¶¶ 86, 87b, 89, 95, 97–99). The disciplinary hearings appear to relate to Edwards' alleged violations of "numerous [ ] rules within the inmate misbehavior rule book" on September 20, 2008 and September 24, 2008. (Id. ¶¶ 86, 87). Edwards takes issue with several aspects of the disciplinary hearings, including that: (1) Davis found him guilty of the infraction without conducting an investigation into Edwards' claim that he never received a copy of the rule book (Id. ¶ 86); (2) Davis failed to provide him with certain documentary evidence that "could have help [ed]" Edwards defend himself, including Edwards' "orange detention card," his "injury report," and a video tape of the alleged infraction (Id. ¶¶ 86, 87b); (3) no witnesses to Edwards' violations "endor[s]e[d]" the infraction against him (Id. ¶ 87); and (4) Edwards never received responses to notices of appeal and letters submitted to Horn, Hourihan, Hunter, and Robinson regarding his fine and punitive segregation. (Id. ¶¶ 86, 87b, 89, 94–99). In addition, Edwards appears to challenge his resulting discipline,

which included a $25.00 "surcharge" and 30 days of punitive segregation. (Id. ¶¶ 87, 87b).

**\*9** Edwards' cause of action for deprivation of his procedural due process rights fails because he does not allege sufficient facts to state an actionable claim. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Perry v. McDonald, 280 F.3d 159, 173 (2d Cir.2001) (citation and quotation marks omitted). Prisoners subject to disciplinary proceedings can show a liberty interest only where "an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " Luna v. Pico, 356 F.3d 481, 487 n. 3 (2d Cir.2004) (quoting Sandin v. Connor, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In determining whether an inmate endured atypical and significant hardship during punitive segregation, the Second Circuit instructs courts to consider both the duration and conditions of the confinement. See Palmer v. Richards, 364 F.3d 60, 64 (2d Cir.2004) ("[f]actors relevant to determining" whether inmate endured atypical hardship include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement") (quotation marks and citation omitted).

The Second Circuit has expressly declined to provide a bright-line rule as to what length of time in punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. See id. Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." Bunting v. Nagy, 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir.1999)); Colon v. Howard, 215 F.3d 227, 231 (2d Cir.2000). By contrast, 305 days or more of confinement has been deemed an atypical and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

a significant hardship. *Id.* at 231–32. Even if an inmate is segregated for fewer than 101 days, a violation of his liberty interest may be implicated if "the conditions were more severe than the normal [punitive segregation] conditions ... or a more fully developed record showed that even relatively brief confinements under normal [punitive segregation] conditions were, in fact, atypical." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Palmer,* 364 F.3d at 65); *see also Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004). Indeed, " 'the conditions of confinement are a distinct and equally important consideration' in determining whether the prisoner has suffered a due process violation." *Sales v. Barizone,* No. 03 Civ. 6691(RJH), 2004 WL 2781752, at *6 (S.D.N.Y. Dec.2, 2004) (quoting *Palmer,* 364 F.3d at 64–65).

Here, Edwards claims that he was confined to punitive segregation for 30 days. Several courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin. See, e.g., Sandin,* 515 U.S. at 486 (30 days' disciplinary segregation not atypical and significant hardship); *Duncan v. Keane,* No. 95 Civ. 1090(SHS), 1997 WL 328070, at *2 (S.D.N.Y. June 13, 1997) (30 days in keeplock not atypical or significant hardship) (citation omitted); *Harris v. Keane,* 962 F.Supp. 397, 404 (S.D.N.Y.1997) (23 days in keeplock not atypical or significant hardship as "[t]he Second Circuit's post-*Sandin* decisions are unanimous that keeplock of 60 days or less in New York prisons is not an atypical hardship") (quotation marks and citations omitted); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1108 (S.D.N.Y.1995) (60 days in confinement does not implicate liberty interest). Given the duration of his segregation and Edwards' failure to allege that the conditions of his confinement were atypical and significant, Edwards' punishment does not implicate a liberty interest. Similarly, Edwards' $25.00 "surcharge" was not an atypical hardship. *See, e.g., Byrd v. Cornell Corr., Inc,* 60 F. App'x 191, 193–94 (10th Cir.2003) ( $50 fine and 30 days' segregation not atypical and significant hardship). Thus, neither Ed-

wards' punitive segregation nor his $25 fine implicates the requisite liberty interest to state a due process claim.[FN11] Because of the absence of any protected liberty interest—and because Edwards' allegations cannot be construed to allege a protected property interest—any failures by the hearing officer to conduct a thorough investigation of Edwards' claims, including the provision of certain documentary evidence and witnesses, do not support a cause of action for the denial of due process. *See, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003) (inmate cannot claim due process violations at hearing where 12–day disciplinary confinement did not implicate protected liberty interest). Edwards' procedural due process claims should therefore be dismissed.

FN11. Edwards also alleges a claim for the deprivation of his procedural due process rights in connection with a September 24, 2008 disciplinary hearing. This claim fails because Edwards cannot establish the requisite liberty interest, as he does not allege that he was subject to any discipline as a result of Davis' finding him guilty on September 24, 2008. (Compl.¶ 86).

Even if Edwards had alleged disciplinary confinement resulting from the September 28 hearing, and assuming that that confinement implicated a liberty interest under the Fourteenth Amendment, Edwards still cannot state a claim for deprivation of due process. Citing to the Notice of Disciplinary Disposition Form # 6500D attached to the Complaint (Dkt. No. 2–7 at 1), Edwards alleges that he was "never called down" for the hearing and that the hearing officer, Defendant Davis, was biased in favor of finding him guilty of the underlying infraction. (Compl.¶ 86). While an inmate "has a right to a fair and impartial hearing officer [,]" *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
(Cite as: 2012 WL 473481 (S.D.N.Y.))

omitted), and one who "does not prejudge the evidence[,]" *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990), Edwards fails to plead any specific facts, beyond his conclusory allegation of bias, to suggest that Davis was predisposed to finding him guilty. Moreover, despite Edwards' claim that he was never called down for a disciplinary hearing, Edwards' signature appears next to a notation on the Form # 6500D that the hearing was adjourned by Edwards himself.

## I. Excessive Force and Denial of Required Medical Treatment

**\*10** Edwards asserts two allegations of physical injury, which the Court construes as excessive force claims, and a related allegation that he was denied medical treatment. (Compl.¶¶ 91, 91b). Edwards asserts that on November 1, 2008, Defendant Grima hit him in the head with a "pushdraw" and then refused Edwards' request for medical treatment. (*Id.* ¶ 91). He also argues that Grima inflicted "personal physical harm" upon him after Grima pressed the "emergency personal alarm device." (*Id.* ¶ 91b). Neither of these claims should survive Defendants' motion to dismiss.

The constitutional basis for Edwards' excessive force and deliberate indifference to medical needs claims is the Eighth Amendment's ban on cruel and unusual punishment. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam). Any actionable claim under the Eighth Amendment consists of a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect. *See, e.g., Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness ..." *Id.* (citations and quotation marks omitted). In the excessive force

context, this means "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In the medical needs context, the defendant must act with a "sufficiently culpable state of mind[,]" *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), which means that he must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment's objective component "focuses on the harm done, in light of contemporary standards of decency" and whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (citations and quotation marks omitted). For deliberate indifference claims, "the alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citations and quotation marks omitted).

Edwards' allegations of excessive force and denial of medical treatment fail to meet either the subjective or objective components under the Eighth Amendment. Both claims of excessive force are devoid of any specific information regarding the extent of a temporary or permanent injury, if any, and the level of pain that Edwards endured. The entirety of Edwards' first allegation of excessive force is that Grima "hit [him] in [the] head with the pushdraw that's part of the officers [sic] station" (Compl.¶ 91), which falls far short of what is needed to state a claim of excessive force. As to his second allegation, Edwards states only that Grima "caused [him] personal physical harm" after Grima pressed his "emergency personal alarm device[,]" but he fails to elaborate on what exactly Grima did, how and where it harmed Edwards,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

and what injury Edwards suffered. (*Id.* ¶ 91b). Edwards' medical treatment claims are similarly deficient, as he alleges only that Grima "said 'no' " after Edwards requested medical assistance and then sent Edwards away to pack up his belongings. (*Id.* ¶ 91). These allegations do not shed light on whether any injury that Edwards suffered was sufficiently serious to warrant medical attention, whether Grima knew of and disregarded an excessive risk to Edwards' health, or even whether there was any risk to Edwards' health. Accordingly, Edwards has failed to state claims for excessive force and denial of medical treatment, and those claims should be dismissed.

**J. Deprivation of Access to Prison Grievance System**

**\*11** Throughout the Complaint, Edwards claims that he submitted several grievance letters and complaints to numerous Defendants, who he alleges denied, ignored, never answered, and/or improperly processed his grievances on various dates from July 2007 through February 2009. (Compl.¶¶ 1–15, 17–20, 21–33, 36–39, 41–45, 48–51, 54–85, 88, 90, 91b, 92–94, 96). As one example, Edwards states that on September 18, 2007, he wrote a complaint letter to Defendant Horn about Defendant Rosa's use of her cellular phone while on duty, which caused a "security breach." (*Id.* ¶ 7). Edwards alleges that he was denied access to the grievance system because Defendant Mulvena failed to file that grievance (or any of his other grievances) and Defendant Horn did not follow up regarding the complaint. (*Id.*).

While a plaintiff has a right "to meaningful access to the court and to petition the government for the redress of grievances" under the First Amendment, *Shell v. Brezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (citation omitted), the failure to process a grievance does not rise to the level of a constitutional violation. *See, e.g., id.* at 370 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures

does not give rise to a cognizable [Section] 1983 claim") (citation omitted); *Torres,* 246 F.Supp.2d at 342 ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.") (citations omitted); *Cancel,* 2001 WL 303713, at \*3–4 (violation of grievance procedures does not give rise to claim under First Amendment). Courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures. *See, e.g., id.; Muhammad v. McMickens,* No. 86 Civ. 7376(SWK), 1988 WL 7789, at \*3 (S.D.N.Y. Jan.25, 1998). Accordingly, because Edwards' claims for alleged violations of the inmate grievance process have no constitutional basis, those claims should be dismissed.[FN12]

FN12. Related to the allegations about the grievance system, Defendants also assert that Edwards' failure to allege personal involvement for Defendants Bailey (*Id.* ¶¶ 37, 41, 48, 52), Caruso (*Id.* ¶¶ 16, 27), Cattafesta (*Id.* ¶ 80), Davis (*Id.* ¶¶ 13, 26, 47), Hill (*Id.* ¶ 63), Horn (Compl.¶¶ 7, 9, 10, 12, 14–16, 21, 23, 25, 28, 29, 32–35, 39, 41–43, 45, 52, 59, 79, 97), Hourihan (*Id.* ¶¶ 50, 61, 66, 68, 77, 95, 98), Powell (*Id.* ¶¶ 57, 78), and Riordan (*Id.* ¶ 6) provide an independent basis for dismissal. (Def. Mem. at 14–16). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation and quotation marks omitted). An official's failure to respond to a prisoner's letter of protest and request for an investigation, as Edwards is alleging in his Complaint, "is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citation and quotation marks omitted). Accordingly, Edwards' claims against these Defendants

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

should be dismissed on this ground as well.

## K. Retaliation

Edwards alleges that on 17 separate occasions between July 2007 and November 2008, Defendants Campfield, Grima, Hannah, Holmes, John Doe # 1, John Doe # 2, Lagos, Lee, Maynard, Polak, Richardson, Rosa, Shaw, Smalls, and Sumpter retaliated against him in response to his submitting, or informing Defendants that he intended to submit, grievance letters. Edwards' allegations of retaliation include the use of verbal threats or harassment, issuance of infractions, transfers between prison facilities, denials of meals, loss of legal documents, and termination from part-time employment he had while on Rikers Island.

To prove a First Amendment retaliation claim under Section 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). For a retaliation claim to survive a motion to dismiss, it must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (citation and quotation marks omitted). An "unsupported, speculative, and conclusory" allegation of retaliatory conduct may be dismissed on the pleadings. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citations and quotation marks omitted).

**\*12** In reviewing Edwards' retaliation claims, the Court is mindful that "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Indeed, while the "First Amendment protects prisoners from retaliation for filing grievances[,]" *Quezada v. Ercole,* No. 09 Civ. 2832(DLC),

2011 WL 3251811, at *5 (S.D.N.Y. Jul.29, 2011) (citations omitted), the Court recognizes "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 13). Moreover, courts should carefully scrutinize an inmate's claims of retaliation because such allegations "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Hodges v. Wright,* No. 10 Civ. 0531(GLS)(GHL), 2011 WL 5554866, at *9 (N.D.N.Y. Sept. 29, 2011) (quoting *Dawes,* 239 F.3d at 491) (citations omitted) (Report and Recommendation), *adopted,* 2011 WL 5554880 (N.D.N.Y. Nov.15, 2011). Therefore, courts reviewing an inmate's retaliation claims should do so "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted).

Edwards' allegations, in chronological order, are as follows: (1) in retaliation for submitting a grievance against Defendant Morales on July 25, 2007, Morales called Edwards' housing unit on August 1, 2007 and informed other officers that Edwards had a visitor, when in fact he did not, which caused him to wait in the inmate visitor process area for two hours (*Id.* ¶¶ 2, 4); (2) in retaliation for an incident where Defendant Hannah said she was made to apologize to Edwards for "making fun of [his] phsical [sic] disability/and deformity[,]" Hannah threatened Edwards on September 5, 2007 by saying "I'm going to get you back for that" ( *Id.* ¶ 6); (3) in retaliation for filing a grievance against Defendant Rosa on September 18, 2007, Rosa fired Edwards from his job as a Suicide Prevention Aide and issued an infraction against him on October 31, 2007 (*Id.* ¶¶ 14–16); (4) on or around November 1, 2007, after Edwards informed Defendant Holmes that he intended to submit a grievance against her, Holmes caused Edwards to be transferred to another housing facility ( *Id.* ¶ 17); (5) in retaliation for filing a grievance against Holmes on November 2, 2007, Holmes came to Edwards' housing unit and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

verbally abused him by "ridicul[ing] and mak[ing] fun of [his] physical disability and deformity" ( *Id.* ¶ 19); (6) on or around November 15, 2007, in retaliation for filing a grievance against Rosa, Rosa informed John Doe officers that Edwards "like[s] to utilize the grievance mechanism against staff [,]" subsequent to which Edwards was subjected to an unauthorized transfer from "6–Lower" to "7–Lower" in the EMTC ( *Id.* ¶ 20); (7) on or around November 25, 2007, in retaliation for Edwards' filing a grievance against Rosa, Defendants Hernandez and Smith retaliated against Edwards by informing another inmate that Edwards was a "snitch," which "cause[d] [Edwards] physical harm by other inmate's [sic] within [the] housing unit" (*Id.* ¶¶ 24, 26); (8) in retaliation for submitting a grievance against Defendants Campfield and Reyes on or around March 22, 2008, Defendant Shaw had Edwards transferred out of the GRVC on March 25, 2008 ( *Id.* ¶ 34); (9) on or around April 1, 2008, in retaliation for submitting a grievance against her, Campfield intentionally lost Edwards' legal documents relating to the NDNY action ( *Id.* ¶ 36); (10) after filing a grievance on June 27, 2008, Edwards was transferred out of the GMDC that same day, which he says was approved by Defendant Bailey (*Id.* ¶¶ 48, 52); (11) after Edwards informed Defendant Richardson that he planned to file a grievance against her because she refused to turn off the lights in his jail cell on July 30, 2008, Richardson retaliated by denying Edwards his "morning meal" on July 31, 2008 ( *Id.* ¶ 53); (12) in retaliation for filing a grievance against him, Richardson put a "hit out" by offering 20 boxes of Frosted Flakes cereal to any inmate that physically assaulted Edwards, for which Edwards filed a grievance on August 7, 2008 ( *Id.* ¶ 55); (13) on August 18, 2008, in retaliation for informing a supervisor that Defendant Smalls was "only providing certain detainees with options on the hour every hour" in the law library, Smalls verbally abused Edwards (*Id.* ¶ 61); (14) on or around August 25, 2008, in retaliation for Edwards' use of the grievance mechanism against her, Defendant Smalls retaliated against Edwards through verbal abuse, threatening to have Ed-

wards transferred, and informing other inmates that Edwards uses the grievance process ( *Id.* ¶ 66); (15) on or around September 24, 2008, in retaliation for filing numerous grievances against them, Defendants Maynard and Musmacher conspired to retaliate against Edwards by threatening physical violence and issuing an infraction, which resulted in a disciplinary hearing on September 30, 2008 (*Id.* ¶¶ 83, 87, 87b); (16) after Edwards informed Defendant Lagos on October 17, 2008 that he planned to file a grievance against her because of alleged racial discrimination, Lagos retaliated by denying Edwards his "afternoon meal" on October 18, 2008 ( *Id.* ¶ 90); and (17) after Edwards informed Defendant Grima that he intended to submit a grievance about his alleged physical assault with a "pushdraw" on November 1, 2008, Grima retaliated by threatening physical harm, pressing his "emergency personal alarm device," issuing an infraction, and causing Edwards to be transferred to a new housing unit (*Id.* ¶¶ 91, 91b).

### 1. Protected Activity

**\*13** It is well-established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances" and is therefore actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citation omitted); *see, e.g., Mateo v. Fischer,* 682 F.Supp.2d 423, 433–34 (S.D.N.Y.2010) (filing of a grievance is a protected activity). However, expressing an intent to engage in a constitutionally protected activity—in this case, filing a grievance—is not protected activity. *See Henry v. Dinelle,* No. 09 Civ. 0456(GTS)(DEP), 2011 WL 5975027, at \*7 n. 12 (citing cases) & n. 13 (N.D.N.Y. Nov. 29, 2011) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.") (citing *McKinnie v. Heisz,* No. 09 Civ. 0188(BBC), 2009 WL 1455489, at \*11 (W.D.Wis. May 7, 2009)). In light of these principles, Edwards' allegations of retaliation in response to his submitting grievance letters constitute protected

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

activities. However, Edwards' allegations of retaliatory conduct arising from his expressing an intent to file a grievance—those allegations occurring on or about November 1, 2007 (Compl.¶ 17), July 31, 2008 ( *Id.* ¶ 53), October 18, 2008 ( *Id.* ¶ 90), and November 1, 2008 (*Id.* ¶¶ 91, 91b)—are not protected activities and therefore cannot form the basis of a claim for retaliation.[FN13]

> FN13. Moreover, of the four allegations of retaliation that are not based on protected activities, two cannot be considered adverse actions—concerning Defendant Richardson on July 31, 2008 (Compl.¶ 53) and Defendant Lagos on October 18, 2008 ( *Id.* ¶ 90)—because both of these allege that these Defendants retaliated against Edwards by denying him a meal. The denial of meals on two occasions, separated by more than three months, is *de minimis* and not actionable. *See, e.g., Snyder v. McGinnis,* No. 03 Civ. 0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004)* (denial of food to plaintiff two times would not chill First Amendment activity).

**2. Adverse Actions**

Having determined that four of Edwards' allegations of retaliation fail because he was not engaged in a constitutionally protected activity, the Court now considers whether the remaining 13 allegations meet the adverse action requirement. "[I]n the prison context [the Second Circuit has] defined 'adverse action' objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations and quotation marks omitted). An inmate can meet this requirement by "alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation." *Smith v. Maypes–Rhynders,* No. 07 Civ.

11241(PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493 (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. In applying this objective test to determine whether conduct is *de minimis,* the Court must consider that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation and quotation marks omitted).

**a. Retaliatory Verbal Abuse**

**\*14** Several of Edwards' allegations of retaliation are based on verbal harassment, abuse, or threats. (*See* Compl. ¶¶ 2, 4, 6 ("I'm going to get you back for that."), 19, 24 (calling Edwards a "snitch"), 26, 55 (putting a "hit out" on Edwards to any inmate that "fucks Edwards up"), 61 (calling Edwards a "crackhead" and "one arm faggot", 66). While "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action[,]" *Mateo,* 682 F.Supp.2d at 434 (citations omitted), "[n]on-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937(DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan.11, 2012). "[V]erbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Hofelich v. Ercole,* No. 06 Civ. 13697(PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr.8, 2010) (citation and quotation marks omitted).

Here, Edwards' claims of retaliatory verbal abuse do not include any allegations of harm, nor are they alleged with any specificity to suggest that they would deter others from exercising their constitutional rights. Several of his claims allege only that Edwards was

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

forced to endure verbal abuse, but do not explain what was said and why that abuse was in any way adverse. And where Edwards has detailed the nature of the verbal abuse, his allegations are either *de minimis*—for example, in the case of being told he had a visitor when he in fact did not—amount to name-calling, or are insufficiently direct or specific to be adverse. *See, e.g., Dawes,* 239 F.3d at 492–93 (referring to plaintiff as an "informant" and "rat" in presence of other inmates not an adverse action); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (referring to transsexual inmate as "he/she" was "rudeness and name-calling" but not a constitutional violation); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (name-calling, without any appreciable injury, not a constitutional violation); *Kemp v. LeClaire,* No. 03 Civ. 844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar.12, 2007) (threats of "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions); *Battice,* 2006 WL 2190565, at *6–7 (defendant's making fun of plaintiff s disability does not constitute adverse action). Accordingly, Edwards' charges of retaliation that allege only retaliatory verbal abuse—on August 1, 2007 (Compl.¶¶ 2, 4), September 5, 2007 ( *Id.* ¶ 6), November 2, 2007 ( *Id.* ¶ 19), November 25, 2007 (*Id.* ¶¶ 24, 26), August 7, 2008 (*Id* . ¶ 55), August 18, 2008 ( *Id.* ¶ 61), and August 25, 2008 ( *Id.* ¶ 66)—should be dismissed.

**b. Retaliatory Loss of Legal Documents**

**\*15** Courts have held that theft, confiscation, or destruction of an inmate's legal documents may constitute an adverse action. *See, e .g., Smith,* 2009 WL 874439, at *5 (theft of legal papers is adverse action). However, "mere delays in the transfer of [an inmate's] legal papers, even if motivated by retaliation, is not the type of adverse action required to support a retaliation claim." *Ford v. Fischer,* No. 09 Civ. 723(DNH)(ATB), 2011 WL 856416, at *8 (N.D.N .Y. Jan. 31, 2011); *see, e.g., Rivera v. Pataki,* No. 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb.7, 2005) (several temporary incidents of inter-

ference with plaintiff's legal documents not an adverse action). Here, because Edwards has pled an injury in connection with this allegation—Defendant Campfield's allegedly retaliatory loss of his legal documents prevented him from prosecuting the NDNY action (Compl.¶ 36), which was subsequently dismissed for failure to prosecute, *see Selsky,* 2008 WL 190385, at *1—it contains sufficient facts to constitute an adverse action.

**c. Retaliatory Filing of Infractions**

Edwards alleges that Defendants Maynard, Musmacher, and Rosa issued false infractions against him on or about October 31, 2007 (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18) and September 24, 2008 (*Id.* ¶¶ 83, 87, 87b) in retaliation for filing grievances. While an "inmate has no general constitutional right to be free from being falsely accused in a misbehavior report[,]" *Boddie,* 105 F.3d at 862, a misbehavior report issued in retaliation for an inmate's exercise of a protected activity may constitute an adverse action. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under [Section] 1983.") (citation omitted); *see, e. g., Gill,* 389 F.3d at 384 (false misbehavior report and placement in keeplock constitutes adverse action); *Mateo,* 682 F.Supp.2d at 434 (false misbehavior report constitutes adverse action). Accordingly, Edwards' allegations that these Defendants filed false retaliatory infractions against him are sufficient to plead an adverse action.

**d. Retaliatory Transfers**

Edwards' allegations that Defendants Bailey, Bethacourt, Hannah, John Doe # 1, John Doe # 2, Rosa, and Shaw transferred Edwards between prison facilities in retaliation for submitting grievances are also sufficient to establish an adverse action at the motion to dismiss stage. (*See* Compl. ¶¶ 20, 34, 48, 52). While a "prisoner has no liberty interest in remaining at a particular correctional facility ... prison

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

authorities may not transfer [him] in retaliation for the exercise of constitutionally protected rights." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted); *see, e.g., Soto v. Iacavino,* No. 01 Civ. 5850(JSM), 2003 WL 21281762, at \*2 (S.D.N.Y. June 4, 2003) (prison housing transfer is adverse action for retaliation claim).

**e. Retaliatory Termination**

**\*16** Finally, Edwards' allegation that Defendant Rosa fired him from his position as a Suicide Prevention Aide states sufficient facts to constitute an adverse action. (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18). "[A] claim for relief may be stated under [S]ection 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citation omitted). More specifically, an inmate can bring a claim under Section 1983 for termination of employment in retaliation for his exercise of constitutionally protected rights. *See, e.g., Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990). The termination of Edwards' job, if found to be retaliatory, could serve to "chill a person of ordinary firmness from continuing to engage" in a protected activity. *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (quoted in *Davis,* 320 F.3d at 353).

**3. Causal Connection**

Of his six allegations of retaliation that meet the adverse action requirement—those dated October 31, 2007, November 15, 2007, March 25, 2008, April 1, 2008, June 27, 2008, and September 24, 2008—all but one should be dismissed. Edwards has not alleged any facts, as he must, that his filing of grievances was a "substantial or motivating factor" for Defendants' actions. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). In addressing the causal connection requirement, a court may consider: (1) the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior disciplinary record, (3) vindication at a hearing on the matter, and (4) any statements by the defendants regarding their motives. *See Colon,* 58 F.3d at 872–73. However, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13.

With the exception of his claim arising on October 31, 2007, Edwards' allegations of retaliation are wholly conclusory. Edwards does not set forth any specific facts, other than his repeated use of the word "retaliation," to support his suspicion of retaliation or to suggest that Defendants were motivated in any way by Edwards' filing grievance letters. On several occasions, Edwards appears to rely on the mere fact that the purported adverse actions took place after he filed a grievance. To infer causation from the very fact that one activity preceded another, however, is insufficient here to adequately plead retaliatory intent. Temporal proximity may serve as circumstantial evidence of retaliation, *see, e.g., Colon,* 58 F.3d at 872, and the Second Circuit has found that such proximity can establish causality. *See Espinal v. Goord,* 558 F.3d 119, 129–30 (2d Cir.2009) (causal connection present where six months passed between protected activity and retaliatory beating); *but see Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at \*14 (S.D.N.Y. Oct.31, 2006) (temporal proximity insufficient by itself to prove causation) (citations omitted); *Nunez v. Goord,* 172 F.Supp.2d 417, 431–32 (S.D.N.Y.2001) (same). But in this case, Edwards' reliance on temporal proximity does not make his claims plausible, as he fails to differentiate between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate any nexus between a specific grievance and a specific adverse action. *See, e.g., Andino v. Fischer,* 698 F.Supp.2d 362, 385 (S.D.N.Y.2010) (proximity between complaints and adverse actions the result of large number of grievances in short period of time).

**\*17** In addition to Edwards' failure to plead any facts suggesting retaliation, the facts that Edwards chose to include in the Complaint suggest a relation-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

ship between protected activity and adverse action that is too attenuated to plausibly constitute causation. For example, Edwards theorizes that on November 15, 2007 he was transferred by Defendant John Doe # 2 in retaliation for filing a grievance against Rosa, after Rosa informed John Doe # 1, who then informed John Doe # 2, of Edwards' use of the grievance mechanism. (Compl.¶ 20). However, absent any additional information, such as corroborating statements from other officers or inmates, it is simply not plausible to impute a retaliatory motive to John Doe # 2 by way of John Doe # 1 and Rosa. Edwards' allegations of March 25, 2008 suffer the same deficiency, as he aims to pin a retaliatory motive not on the target of his protected activity, but on an entirely different Defendant. ( *Id.* ¶ 34). Apart from any apparent temporal proximity, therefore, Edwards' allegations are wholly conclusory and should be dismissed. *See, e .g., Sioleski v. McGrain,* No. 10 Civ. 0665S (WMS), 2012 WL 32423, at *4 (W.D.N.Y. Jan.5, 2012); *Douglas v. Smith,* No. 05 Civ. 1000(LEK)(DRH), 2008 WL 434605, at *15 (N.D.N.Y. Feb. 14, 2008).

By contrast, Edwards is able to state an actionable claim of retaliatory termination against Rosa based on his allegations of October 31, 2007. Edwards states that on September 18, 2007, he submitted a grievance letter regarding Defendant Rosa's alleged use of her personal cell phone while on duty, which Edwards contends is a "security breach." (Compl.¶ 7). Then, on October 31, 2007, while he was working as a Suicide Prevention Aide, Edwards alleges that Rosa stated, "Watch your mouth boy before I write you. You like writing anyway." (Dkt. No. 2–6 at 18). Edwards asked another officer for a grievance form, intending to submit another grievance against Rosa, at which point Rosa stated: "What lies are you going to write on me now stupid nigger. The cellphone lie didn't work nigger. All you are nigger is a snitch don't worry, you're going to get yours. I'm going to make sure you get fuck up nigger." (*Id.*). Moments later, Rosa returned and asked for Edwards' identification card, stating, "I'm writing you up nigger. Two can play that game and also nigger you're fired. Morales get this nigger out of here now." (*Id.*).

These statements clearly suggest a retaliatory animus. *See, e.g., Baskerville v. Blot,* 224 F.Supp.2d 723, 732–33 (S.D.N.Y.2002) (defendant's comments during assault point to retaliatory animus). In mentioning the "cellphone lie," which likely refers to Edwards' September 18 grievance about Rosa's use of her personal cell phone, Rosa's comments establish a clear causal link between Edwards' protected activity and Rosa's decision to terminate Edwards from his job and issue an infraction against him. *See, e.g., Headley v. Fisher,* No. 06 Civ. 6331(PAC)(KNF), 2008 WL 1990771, at *18 (S.D.N.Y. May 7, 2008) (causal connection exists where officer referred to protected activity during retaliatory assault). Accordingly, Edwards has stated a plausible claim of retaliatory termination against Rosa, and Defendants' motion to dismiss that claim should be denied.

**L. Conspiracy**

**\*18** Edwards alleges four conspiracy claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, specifically that (1) on October 31 and November 1, 2007, Rosa and Polak conspired to fire Edwards from his job as a Suicide Prevention Aide and issue an infraction against him (Compl.¶¶ 14–16); (2) as described in a complaint letter dated July 10, 2008, Defendant Johnson conspired with "the security staff" to violate Edwards' constitutional rights by not filing his grievances (*Id.* ¶ 50); (3) as described in a complaint letter dated August 28, 2008, Defendants Johnson and Sumpter conspired to deny Edwards access to the prison's grievance system (*Id.* ¶ 69); and (4) as described in a September 24, 2008 grievance letter, Defendants Maynard and Musmacher conspired to issue threats of physical violence and submit a false infraction against Edwards. (*Id.* ¶ 83).

**1. Conspiracy Under Section 1983**

To state a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between [two or

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

more state actors or] a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[A] plaintiff must show that defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts.' *Bussev v. Phillips,* 419 F.Supp.2d 569, 586–87 (S.D.N.Y.2006) (quotation marks and citations omitted). "[C]omplaints containing only conclusory, vague, or general allegations [of conspiracy] ... are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello,* 292 F.3d at 325 (citation and quotation marks omitted). Finally, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (citation omitted). If a plaintiff fails to show an underlying constitutional violation on which to base a Section 1983 conspiracy claim, the conspiracy claim fails as a matter of law. *See, e.g., AK Tournament Play, Inc. v. Town of Wallkill,* No. 09 Civ. 10579(LAP), 2011 WL 197216, at *3–4 (S.D.N.Y. Jan.19, 2011), *aff'd,* 444 F. App'x 475 (2d Cir.2011).

Each of Edwards' conspiracy claims should be dismissed because he has failed to state any underlying constitutional violations, with the exception of his retaliatory termination claim against Rosa. Moreover, even if the Court could were to find that Edwards could state plausible constitutional claims as a predicate for conspiracy, he fails to state any non-conclusory allegations pertaining to the existence of a conspiracy, a meeting of the minds to support a conspiracy claim, or any overt acts which would suggest the existence of a conspiracy. Edwards' statements that certain Defendants "conspired" with others is not, by itself, sufficient to state an actionable claim for conspiracy.

*See Nealy v. Berger,* No. 08 Civ. 1322(JFB)(AKT), 2009 WL 704804, at *5 (E.D.N .Y. Mar. 16, 2009) ("The mere use of the term 'conspiracy' ... is clearly insufficient to satisfy Rule 12(b)(6) in connection with a Section 1983 conspiracy claim.") (citation omitted). The only claim for which Edwards alleges any facts is that Rosa and Polak conspired to retaliate against him. However, the statements that he attributes to Polak—"my girl said you are fired" and "you are not getting your job back" (Compl.¶ 15)—do not suggest any understanding, agreement, or meeting of the minds between these two Defendants. Polak's reinforcement of Rosa's decision to fire Edwards, at best, suggests only that Polak sided with Rosa's decision, but it is not sufficient to state a conspiracy claim. Absent any actionable allegations of a conspiratorial understanding between Polak and Rosa, Edwards' conspiracy claims fail.

**2. Conspiracy Under Section 1985**

**\*19** 42 U.S.C. § 1985(2) and (3) also provide relief for claims of conspiracy. To plead a claim under Section 1985(2), a plaintiff must show "(1) a conspiracy (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of New York,* No. 05 Civ. 10682(PKC)(FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008) (citing 42 U.S.C. § 1985(2)). The elements of a claim under Section 1985(3) are: " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States.' " *Id.* (quoting *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000)).

As with Section 1983 conspiracy claims, Section

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
(Cite as: 2012 WL 473481 (S.D.N.Y.))

1985 claims require a showing of an underlying constitutional violation. *See, e.g., Okoh v. Sullivan,* No. 10 Civ. 2547(SAS), 2011 WL 672420, at *4 (S.D.N.Y. Feb.24, 2011), *aff'd,* 441 F. App'x 813 (2d Cir.2011); *Bishop v. Best Buy, Co.,* No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *13 (S.D.N.Y. Oct.13, 2010). Because Edwards has not set forth sufficient facts to state any constitutional violations, with the exception of his retaliatory termination claim against Rosa, his Section 1985 claims should be dismissed as well. Even if the Court were to find any underlying constitutional violations, including the surviving retaliation claim, the Section 1985 claims should be dismissed because Edwards has failed to allege any facts, as he must, that Defendants' conspiracies were motivated not by any personal malice of the conspirators toward him, but rather by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' animus.' " *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (citation omitted); *accord Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam); *Okoh,* 2011 WL 672420, at *6.

**3. Conspiracy Under Section 1986**

To state a claim under Section 1986, a plaintiff must state a valid claim under Section 1985. "Section 1986 imposes liability on individuals who have knowledge of a conspiracy under [Section] 1985, but fail to take action to prevent them." *Jenkins v. N.Y. City Dep't of Educ.,* No. 10 Civ. 6159(BSJ)(THK), 2011 WL 5451711, at *5 (S.D.N.Y. Nov. 9, 2011) (citing 42 U.S.C. § 1986). A Section 1986 claim "must be predicated upon a valid [Section] 1985 claim." *Brown,* 221 F.3d at 341 (citation and quotation marks omitted). Because Edwards fails to state a claim under Section 1985 and otherwise fails to make any allegations that certain Defendants had knowledge of a conspiracy but failed to prevent it, the Court should also dismiss his Section 1986 claim.

**M. Disability Discrimination Claim**

*20 Edwards asserts that on five occasions he was discriminated against on the basis of an alleged disability in violation of Title II of the ADA. (Compl. ¶¶ 6, 17, 19, 30, 61). To state a claim under Title II, which applies to inmates in state prisons, *see United States v. Georgia* 546 U.S. 151, 153, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a prisoner must show: (1) "he is a 'qualified individual' with a disability"; (2) "he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity"; and (3) "such exclusion or discrimination was due to his disability." *Phelan v. Thomas,* 439 F. App'x 48, 50 (2d Cir.2011) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)); *see* 42 U.S.C. § 12132.

Although Defendants have moved to dismiss the Complaint in its "entirety" (Def. Mem. at 49), they have failed to offer any specific arguments to dismiss Edwards' ADA claims. (*See* Def. Mem. at 3). Nevertheless, these claims should be dismissed. It appears from the Complaint that Edwards' alleged disability is that one of his arms is significantly shorter than the other, and his discrimination claims arise from Defendants' comments allegedly mocking this deformity. Leaving aside the question of whether Edwards' deformity falls under the ADA's definition of disability, Edwards fails to state that Defendants excluded him from participating in, or denied him the benefit of, any particular activity as a result of his alleged disability. Edwards' allegations of objectionable language are not sufficient to state a claim under the ADA.

**N. Edwards' Potential Recovery Is Limited to Nominal or Punitive Damages From Rosa**

In his Complaint, Edwards seeks both money damages and injunctive relief. (Compl.¶ V). However, because of qualified immunity, Edwards can only obtain monetary damages from Defendant Rosa and, because of the PLRA, that recovery is limited to nominal or punitive damages. In addition, Edwards' request for injunctive relief is moot because he is no

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

longer in prison.

**1. Qualified Immunity Precludes Money Damages, Except From Rosa**

Qualified immunity provides a basis to preclude monetary damages, but not injunctive relief. *See Morse v. Frederick,* 551 U.S. 393, 432, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (citation omitted). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ——— U.S. ———, ———, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A state actor is afforded qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (citations and quotation marks omitted). Because Edwards has failed to plead facts showing that Defendants violated any constitutional right, with the exception of his claim for retaliatory termination against Rosa, Defendants are entitled to qualified immunity for each of Edwards' claims.

**\*21** However, as to Edwards' surviving retaliation claim, Defendant Rosa is not entitled to qualified immunity. Courts have long recognized, well before the time of Edwards' allegations, that inmates have a constitutional right to seek redress of grievances without suffering retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see, e.g., Baskerville,* 224 F.Supp.2d at 737–38 (no qualified immunity for retaliation claim because right to file grievances without retaliation is well-established); *Wells v. Wade,* 36 F.Supp.2d 154, 160 (S.D.N.Y.1999) (same). Here, Edwards has alleged intentional conduct by Rosa in response to a protected activity, adequately stating a cause of action for retaliation. Moreover, Defendants

have offered no argument that Rosa's conduct was objectively reasonable. Accordingly, at the pleading stage, Rosa is not entitled to qualified immunity from monetary damages on Edwards' retaliatory termination claim against her.

**2. Any Money Damages from Rosa Are Limited to Nominal or Punitive Damages**

In light of the qualified immunity finding above, Edwards' recovery of monetary damages, if any, is limited to Rosa. Because of the PLRA's physical injury requirement, however, that recovery from Rosa cannot include compensatory damages. Defendants argue that all of Edwards' claims are barred by the PLRA because he does not allege that he has suffered any physical injury. (Def. Mem. at 46–48). Section 1997e(e) of the PLRA provides that " '[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' " *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting 42 U.S.C. § 1997e(e)). The term "physical injury" is not statutorily defined; however, the injury complained of must be more than *de minimis* to meet the requirements of § 1997e(e). *See Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). Therefore, in the absence of a showing of physical injury, a prisoner cannot recover compensatory damages for mental or emotional injury. *Thompson,* 284 F.3d at 417. To recover punitive or nominal damages, however, a prisoner need not allege that he has sustained a physical injury. *Id.* at 418; *see also Abreu v. Nicholls,* No. 04 Civ. 7778(DAB)(GWG), 2011 WL 1044373, at \*4 (S.D.N.Y. Mar. 22, 2011) (Report and Recommendation); *Walker v. Shaw,* No. 08 Civ. 10043(CM), 2010 WL 2541711, at \*15 (S.D.N.Y. June 23, 2010) (citing *Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998)).

Edwards does not allege that he has suffered any physical injury as a result of his alleged constitutional violations, including his allegation of excessive force,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

which does not mention any temporary or permanent physical injury as a result of Defendants' actions. *See supra* Section II.I. The only injuries that Edwards complains about are the "loss of amenity" and "limited liberty" as a result of his segregated confinement, and emotional distress arising from the "embarrass[ment]" caused by Defendants' ridiculing his physical deformity. (Compl.¶ V). Neither of these injuries constitutes a physical injury under the PLRA. *See, e.g., Henry,* 2011 WL 3295986, at *4 (no physical injury where inmate complained of embarrassment); *Wilson v. Phoenix House,* No. 10 Civ. 7364(DLC), 2011 WL 3273179, at *3 (S.D.N.Y. Aug.1, 2011) (confinement not enough, by itself, to fulfill physical injury requirement). Accordingly, in the absence of any allegations of physical injury, Edwards' claims against Defendants (including his surviving retaliation claim against Rosa) should be dismissed insofar as he seeks compensatory damages, and he should be limited to seeking nominal or punitive damages from Rosa. *See, e.g., Brummell v. Stewart,* No. 09 Civ. 10326(PAC)(FM), 2011 WL 1306170, at *4 (S.D.N.Y. Mar. 24, 2011) (Report and Recommendation) (claims seeking compensatory damages dismissed because no allegation of physical injury suffered); *Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *10 (S.D.N.Y. Jan.18, 2011) (request for compensatory damages for emotional injuries stricken from complaint).

### 3. Edwards' Request for Injunctive Relief Is Moot

**\*22** By letter dated December 11, 2011, Edwards informed the Court that he has been released from prison. (Dkt. No. 135). This factual development renders moot Edwards' request for injunctive relief. "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under that principle, an inmate's request for injunctive and declaratory relief against correctional staff at a particular correctional institution becomes moot when the inmate is discharged. *See Muhammad v. City of N.Y. Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997); *see, e.g., Khalil v. Laird,* 353 F. App'x 620, 621 (2d Cir.2009) (injunctive and declaratory relief moot because inmate released from prison); *Sheppard v. Lee,* No. 10 Civ. 6696(GBD)(JLC), 2011 WL 5314450, at *4 n. 6 (S.D.N.Y. Nov. 7, 2011) (declaratory and injunctive relief claims moot because inmate no longer incarcerated) (Report and Recommendation), *adopted,* 2011 WL 6399516 (S.D.N.Y. Dec.20, 2011). Accordingly, because Edwards has been released from prison, his claims for injunctive relief should be dismissed.[FN14]

> [FN14]. In addition, Edwards cannot establish a likelihood of success on the merits or the possibility of irreparable injury as required for any injunctive relief. Even assuming he could however, and to the extent Edwards' claims for injunctive relief are not moot, the PLRA extends prospective relief "no further than necessary to correct the violation of the Federal right of a particular plaintiff[,]" *18 U.S.C. § 3626(a)(1)(A),* and the relief Edwards seeks—terminating Defendants from their positions and enjoining them from future government employment—is not "narrowly drawn." *Id.; see also Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y.2011) (proposed order directing installation of security cameras beyond narrow scope permitted by PLRA); *Easter v. CDC,* 694 F.Supp.2d 1177, 1188–90 (S.D.Cal.2010) (inmate not entitled to injunctive relief preventing officials from future supervision or control over him when inmate no longer in facility where attack took place, and no indication of imminent injury).

### III. *CONCLUSION*

For the foregoing reasons, I recommend that Defendants' motion to dismiss be granted as to Edwards' claims for verbal harassment, deprivation of access to free telephone calls, deprivation of access to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)
**(Cite as: 2012 WL 473481 (S.D.N.Y.))**

legal services, mail tampering, denial of required food portions, unconstitutional strip search, violation of due process rights within the prison's disciplinary and grievance system, excessive force and denial of medical treatment, deprivation of access to the prison's grievance system, retaliation (against all Defendants except Rosa for Edwards' termination), conspiracy, and disability discrimination under the ADA. I further recommend that the motion to dismiss be denied only as to Edwards' retaliatory termination claim against Defendant Rosa to the extent Edwards seeks nominal or punitive damages against her.

### *PROCEDURE FOR FILING OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. If Plaintiff does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Defendants' counsel. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

S.D.N.Y.,2012.
Edwards v. Horn
Not Reported in F.Supp.2d, 2012 WL 473481 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Patrick GUILLORY, Plaintiff,
v.
Kurt ELLIS, et al, Defendants.

No. 9:11–CV–600 (MAD/ATB).
Signed Aug. 29, 2014.

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York State Attorney General, The Capitol, Gregory J. Rodriguez, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**
MAE A. D'AGOSTINO, District Judge.
**I. INTRODUCTION**
  **\*1** Plaintiff, an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action, pursuant to 42 U.S.C. § 1983, on May 31, 2011. See Dkt. No. 1. The remaining claims are that Defendants violated Plaintiff's constitutional rights under the First Amendment's Free Exercise Clause, as well as his rights under the Religious Land Use and Institutionalized Person's Act ("RLUIPA"), and subsequently retaliated against him for attempting to exercise these rights by destroying Plaintiff's mail and thus denying him access to the courts. See Dkt. Nos. 1, 210.

  In a very thorough Report–Recommendation dated July 23, 2014, Magistrate Judge Baxter recommended that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's complaint in its entirety. See Dkt. No. 210. Specifically, Magistrate Judge Baxter first found that in relation to the December 7, 2010 incident, Defendant Ready acted within the bounds of his employment and according to the documentation before him and thus, his inadvertent denial that caused Plaintiff to miss one religious service did not substantially burden Plaintiff's free exercise of his religion. See id. at 14. With regards to the March 20, 2011 incident, Magistrate Judge Baxter found that Defendant Ellis was not responsible for the shortened duration of the Purim celebration, and that while the delay may have been an inconvenience, Plaintiff was still able to participate in the service, thus satisfying the requirements of the First Amendment and RLUIPA. See id. at 19–20. Magistrate Judge Baxter also found that neither Defendant Ellis, nor Defendant Ready engaged in the conduct mentioned above as a way to retaliate against Plaintiff for any grievances that he had previously filed either against them or any other correctional officer. See id. at 39–40. Moreover, Magistrate Judge Baxter found that Defendant Kupiec did not interfere with Plaintiff's mail as a means to either retaliate against him or to deny him access to the courts. See id. 35–36. Finally, Magistrate Judge Baxter found that Plaintiff failed to establish that he suffered an adverse action as a result of Defendant Kupiec's alleged conduct. On August 4, 2014, the Court received objections to the Report–Recommendation from Plaintiff. See Dkt. No. 211.

**II. DISCUSSION**
**A. Plaintiff's objections**
  In his objection to Magistrate Judge Baxter's Report–Recommendation, Plaintiff states that he objects to the Report in its entirety. See id. Plaintiff relays his astonishment at Magistrate Judge Baxter's choice to "excuse Def [endant] Kupiec's conduct" and at his finding that Plaintiff's position is "unfounded."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

*See id.* Plaintiff further objects to Magistrate Judge Baxter's Report on the grounds that he looked outside the pleadings and "only to the Defendants Affidavits" when making his determination to grant Defendants' motion for summary judgment. *See id.*

**B. Standard of review**

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b) (1).

**C. Application**

**\*3** In the present matter, although Plaintiff has filed objections to Magistrate Judge Baxter's Re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

port–Recommendation, the objections that are given are mostly conclusory and "merely recite the same arguments" that were originally presented to Magistrate Judge Baxter. See *O'Diah, 2011 WL 933846, at *1*; *see generally* Dkt. No. 211. Moreover, some of the objections that Plaintiff makes are of an accusatory nature, in that he charges Magistrate Judge Baxter with excusing the behavior of Defendant Kupiec based on her race, and supporting "the Defendants [r]eckless lies." *See* Dkt. No. 211 at 1 ("I'm sure if Kupiec was black you would have treated her like all of the blacks who appear before you who are 'ignorant of the law' "). Nearly all of Plaintiff's "objections" lack the specificity needed to make a *de novo* determination. In light of his *pro se* status, however, the Court will address the arguments raised.

Plaintiff argues that Magistrate Judge Baxter improperly considered disputed facts in rendering his recommendation. *See* Dkt. No. 211 at 3. Having reviewed the Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly relied only on undisputed facts in rendering his determination or construed any disputed facts in Plaintiff's favor in finding that Plaintiff's allegations were insufficient as a matter of law to support his claims. *See, e.g.,* Dkt. No. 210 at 39 (finding that "neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an 'adverse action' under the case law"). Further, contrary to Plaintiff's allegations, Defendants' motion for summary judgment was properly supported by the record, including affidavits and deposition transcripts.

Finally, contrary to Plaintiff's assertions, Magistrate Judge Baxter correctly determined that Defendant Boll was not personally involved in the alleged conduct. The letter to which Plaintiff refers clearly establishes that Defendant Boll did not conduct an investigation into the underlying subject of Plaintiff's grievance, but was merely conducting an "investigation" into the status of Plaintiff's grievance and a reminder that the "Inmate Grievance Program was in-

stituted to handle issues such as yours." Dkt. No. 202–6 at Exhibit "A." Defendant Boll then stated that "[t]he CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is pending, it is recommended that you await the decision." *Id.* Magistrate Judge Baxter correctly determined that Defendant Boll's response to Plaintiff was insufficient to establish her personal involvement. *See Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

The Court has thoroughly reviewed the parties' submissions and Magistrate Judge Baxter's comprehensive Report–Recommendation and finds that Magistrate Judge Baxter correctly recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

### III. CONCLUSION

**\*4** After carefully reviewing Magistrate Judge Baxter's Report–Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 210) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 202) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants subjected him to religious discrimination, denial of access to courts, and retaliation for the exercise of his First Amendment Rights, while he was incarcerated at Mid–State Correctional Facility. (Compl.; Dkt. 1). Plaintiff seeks monetary and injunctive relief.

**I. *Procedural History***

This case has had a long and complicated procedural history, complete with an appeal of the denial of a preliminary injunction to the Second Circuit, which dismissed plaintiff's appeal as lacking an arguable basis in law or fact. [FN1] (Dkt. No. 133). The court will attempt to briefly state the important aspects of the docket and outline the remaining issues. On October 31, 2012, defendants made a motion for judgment on the pleadings. (Dkt. No. 123). Plaintiff responded in opposition to that motion, but then also made a variety of other motions relating to venue, recusal, and discovery. (Dkt. Nos.119, 139, 140, 144, 145, 149).

> FN1. Plaintiff then attempted to appeal the Second Circuit decision to the United States Supreme Court. (Dkt. No. 130) (Notice of Appeal).

On April 3, 2013, I issued an Order and Report–Recommendation, denying some of plaintiff's non-dispositive motions and recommending dismissal of some of his substantive claims on the pleadings. (Dkt. No. 148). On May 15, 2013, Judge D'Agostino affirmed my order and approved my recommendation. (Dkt. No. 155). Judge D'Agostino's order also dis-

posed of plaintiff's Motion Requesting the Court to Take Judicial Notice of Plaintiff's State Court Decision (Dkt. No. 149), his "Motion for Reconsideration," (Dkt. No. 122), and ordered a response to plaintiff's discovery motion (Dkt. No. 119). (Dkt. No. 155).

After Judge D'Agostino's Order, plaintiff filed additional motions: another Motion to Compel (Dkt. No. 159) and a Motion for Sanctions (Dkt. No. 160). On July 2, 2013, I held a telephonic conference with the parties regarding the outstanding motions, denying in part and granting in part, plaintiff's motions to compel (Dkt.Nos.119, 159); denying his motion for sanctions (Dkt.Nos.160); and finding that no action was necessary on other letters submitted by plaintiff. (Dkt.Nos.161–62). On September 13, 2013, plaintiff made a motion to "stop transfer" and requested that his deposition be held at his current facility, Wyoming Correctional Facility. (Dkt.Nos.173, 175). Plaintiff's transfer to Greene Correctional Facility rendered that motion moot, and it was denied on that basis. (Dkt. No. 178).

**\*5** On October 10, 2013, plaintiff made a motion for injunctive relief and appointment of counsel, which plaintiff later clarified was only a motion for appointment of counsel. (Dkt.Nos.182, 187). This court denied the motion on October 31, 2013, and plaintiff then sent the court a letter stating that he did not wish to be appointed counsel at the time of trial. (Dkt.Nos.189, 190). On January 7, 2014, plaintiff stipulated to the dismissal of all claims against defendants Fischer and Marlenga, which was "so ordered" by Judge D'Agostino on January 8, 2014. (Dkt.Nos.196–97). Defendants filed this summary judgment motion on February 4, 2014. (Dkt. No. 202). Plaintiff responded in opposition to the motion, and requested oral argument. (Dkt. Nos.205, 207). I denied plaintiff's motion for oral argument on April 18, 2014. (Dkt. No. 208).

Presently pending before me is the remaining

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

defendants' motion for summary judgment, together with plaintiff's response in opposition. (Dkt.Nos.202, 205). Based upon Judge D'Agostino's order approving my recommendation on May 15, 2013 (Dkt. No. 155) and the parties' stipulation to dismiss all claims against defendants Fischer and Marlenga, the following defendants and claims remain:

1. A First Amendment Free Exercise Clause claim against defendants Ready and Ellis. (Compl.¶¶ 37–47, 65).

2. A Religious Land Use and Institutionalized Persons Act ("RLUIPA"), claim against defendants Ready and Ellis. (*Id.*)

3. A retaliation claim against defendants Ready and Ellis relating to the above First Amendment and RLUIPA issues.

4. First Amendment retaliation claims against defendant Kupiec relating to the opening, loss, or destruction of plaintiff's mail in retaliation for grievances filed against Kupiec and defendant Ready. (Compl.¶¶ 58–64).

5. A First Amendment denial of access to courts claim against defendant Kupiec. (Compl.¶¶ 67).

## II. *Facts*

Rather than engage in a lengthy discussion of the facts at the outset, the court will discuss the facts associated with each of plaintiff's claim within the relevant sections below.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56; Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might af-

fect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## IV. *Religion Claims*

### A. Legal Standards

### 1. First Amendment

**\*6** Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). The analysis of a free exercise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

claim is governed by the framework set forth in
*O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and
*Turner v. Safely,* 482 U.S. 78, 84 (1987). This
framework is one of reasonableness and is less re-
strictive than the standard ordinarily applied to the
alleged infringements of fundamental constitutional
rights. *Ford,* 352 F.3d at 588.

In *O'Lone,* the Supreme Court held that a regula-
tion that burdens a protected right withstands a con-
stitutional challenge if that regulation is reasonably
related to legitimate penological interests. 482 U.S. at
349 (quoting *Turner,* 482 U.S. at 89). An individual-
ized decision to deny an inmate the ability to engage in
a religious exercise is analyzed under the same
standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4
(2d Cir.2006) (citations omitted). In *Farid v. Smith,*
850 F.2d 917, 926 (2d Cir.1988), the Second Circuit
held that to assess a free exercise claim, the court must
determine "(1) whether the practice asserted is reli-
gious in the person's scheme of beliefs and whether the
belief is sincerely held; (2) whether the challenged
practice of prison officials infringes upon the religious
belief; and (3) whether the challenged practice of the
prison officials furthers some legitimate penological
interest."

The court must examine whether the challenged
action has a legitimate, rational connection to the
governmental objective; whether prisoners have al-
ternative means of exercising the burdened right; the
impact on guards, inmates, and prison resources of
accommodating that right; and the existence of alter-
native means of facilitating the exercise of that right
that have only a *de minimis* adverse effect on the valid
penological interests. *See King v. Bennett,* No.
02–CV–349, 2007 WL 1017102, at *4 (W.D.N.Y.
March 30, 2007) (citing *Salahuddin,* 467 F.3d at 274).
Finally, once prison officials state a legitimate peno-
logical interest to justify their actions, the burden
shifts to plaintiffs to show that the defendants' con-
cerns are "irrational." *Ford,* 352 F.3d at 595.

**2. Religious Land Use and Institutionalized Per-
sons Act**

RLUIPA provides that

No government shall impose a substantial burden on
the religious exercise of a person residing in or
confined to an institution ... even if the burden re-
sults from a rule of general applicability, unless the
government demonstrates that imposition of the
burden on that person—

(A) is in furtherance of a compelling governmental
interest; and

(B) is the least restrictive means of furthering that
compelling governmental interest.

**\*7** 42 U.S.C. § 2000cc–1(a). Under RLUIPA, the
plaintiff bears the burden of showing that his religious
exercise has been burdened and that the burden is
substantial. *Marria v. Broaddus,* 200 F.Supp.2d 280,
297 (S.D.N.Y.2002) (citing 42 U.S.C. § 2000cc–2(b)).
The burden then shifts to the government to show that
the burden furthers a compelling governmental inter-
est **and** that it is the **least restrictive** means of
achieving that interest. *Id* . The act defines "religious
exercise" to include "any exercise of religion, whether
or not compelled by, or central to, a system of reli-
gious belief." 42 U.S.C. § 2000cc–5(7)(A).

A "substantial burden" is one that places "sub-
stantial pressure on an adherent to modify his behavior
and to violate his beliefs." *Singh v. Goord,* 520
F.Supp.2d 487, 498 (S.D.N.Y.2007) (citing, *inter alia,*
*Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)).
Inconvenience alone is insufficient to establish a sub-
stantial burden. *Id.* (citing *Westchester Day School v.
Village of Mamaroneck,* 379 F.Supp.2d 550, 557
(S.D.N.Y.2005)). Furthermore, the substantial evi-
dence test presupposes that some inconveniences may
be so minor that they do not amount to a violation. *See
McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Cir.2004) (discussing in a footnote the applicability of the "time-honored maxim *'de minimis non curat lex'* " ). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis,* 352 F.3d 582, 593–94 (2d Cir.2003) (discussing First Amendment protections).

**B. Application**

**1. December 7, 2010 Incident:**

Plaintiff alleges that defendant Ready denied plaintiff the right to attend Jewish Services for Lubavitch on December 7, 2010, even though he was on the call-out list for the service, and while making disparaging remarks about plaintiff's religion. (Compl.¶¶ 37–47). This court originally recommended denying defendant's motion for judgment on the pleadings, notwithstanding defendants' argument that one interference with plaintiff's religious services would not rise to the level of a constitutional violation. I found, instead, that plaintiff claimed that Ready intentionally denied plaintiff the opportunity to attend this religious service, and that this action was also in retaliation for plaintiff filing a successful grievance against defendants Johnston and Ellis. (Dkt. No. 148 at 13). Based only on the facts as stated by plaintiff, and with a very liberal review by the court, this court recommended denying the motion for judgment on the pleadings.[FN2] (*Id.* at 14) (this court also noted that it was "unclear" how plaintiff's claims would fare after a well-supported summary judgment motion).

FN2. Plaintiff's response seems to take issue with the fact that defendants have now filed a motion for summary judgment because the case survived a prior motion for summary judgment, filed by plaintiff and a motion for judgment on the pleadings, filed by defendants. (Pl.'s Mem. at ¶ ¶ 1–7) (Dkt. No.

205–1). Plaintiff faults the court for allowing defendants to respond to plaintiff's motion for summary judgment with a letter. (*Id.* ¶ 5). The court would point out that the lack of a "formal" response from the defendants did not prejudice plaintiff. The defendants did not, as plaintiff put it, "[get] away" with anything. *See* Pl.'s Mem. at 5. I noted in the Report–Recommendation that defendants had not formally responded to the motion for summary judgment. (Dkt. No. 54 at 8–9). The standard for summary judgment places the burden on the party moving for summary judgment to show that no question of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. at 323; Fed.R.Civ.P. 56(a). Unless that initial burden is met, the non-moving party need not make any showing. *See Salahuddin v. Goord,* 467 F.3d at 272–73. Only if the moving party satisfies its burden, is the non-moving party required to move forward with specific facts showing that there is a genuine issue for trial. *Id.* The fact that the court found, based upon the documents submitted by plaintiff, that a genuine issue of fact existed does not preclude a subsequent motion for *summary judgment* by defendants. The defendants' interim motion for judgment on the pleadings was denied because, based upon the facts stated in the complaint, plaintiff's claims had been stated. The summary judgment motion contains additional facts in the form of affidavits and deposition testimony. *See* Fed.R.Civ.P. 56(c). Even if the defendants had made a prior motion for summary judgment, the court has the discretion to consider multiple motions for summary judgment if the successive motion is supported by new material. *Robinson v. Henschel,* No. 10 Civ. 6212, 2014 WL 1257287, at *8 (S.D.N.Y. March 26, 2014) (citing inter alia *Wechsler v. Hunt Health Sys., Ltd.,* 198 F.Supp.2d 508, 514

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

(S.D.N.Y.2002)). *See also Rodriguez v. It's Just Lunch, Internat'l,* No. 07 Civ. 9227, 2013 WL 1749590, at *1 (S.D.N.Y. April 23, 2013) (considering cross-motions for summary judgment "[f]ollowing discovery proceedings and multiple motions to dismiss.")

Defendant Ready has submitted a declaration in support of summary judgment. He states that he has been a corrections officer ("CO") at Mid–State since September of 2010. (Ready Decl. ¶ 2) (Dkt. No. 202–3). On December 7, 2010, he was working on Unit 7–2. (*Id.* ¶ 5). His duties included running the desk at the entrance door of Building 7—the Program Building, ensuring that inmates were where they were scheduled to be, and permitting movement as necessary pursuant to "call-out sheets." (*Id.*) When an inmate is listed on a call-out sheet, defendant Ready requires the inmate to sign out from his program, and then he is allowed to go to the "call-out." (*Id.* ¶ 6).

***8** Defendant Ready states that on December 7, 2010, plaintiff came to him and stated that he had to leave his program for a "call-out." However, plaintiff's name was not listed on the call-out sheets that defendant Ready was given for that day. (*Id.* ¶ 8). If an inmate's name is not on the sheet, he is not permitted to go to the "call-out," so defendant Ready informed plaintiff that he had to return to his program because his name was not on the sheet. (*Id.* ¶ 1). Defendant Ready states that he never made any comment about plaintiff's religion. (*Id.* at 11). Plaintiff did not seem upset or angry, did not ask to see a sergeant or supervisor, and "merely complied with [defendant Ready's] instructions and returned to class." (*Id.* ¶ 12).

Defendant Ready states that the only reason that he prevented plaintiff from going to the call-out (religious service) was because his name was not on any of the call-out sheets that he had been given, and defendant Ready was not authorized to allow plaintiff to attend the call-out. (*Id.* ¶¶ 10, 14). Finally, defendant Ready points out that he had just transferred to

Mid–State in September of 2010, thus, he was not aware of plaintiff's September 2010 grievance when Ready did not allow plaintiff to attend the religious service on December 7, 2010. (*Id.* ¶ 13).

As Exhibit I to plaintiff's complaint, he attaches a copy of the "call-out" for Tuesday, December 7, 2010. Plaintiff's name clearly appears on that call-out. (Compl.Ex. I). Father Robert Weber [FN3] has filed a declaration in support of defendants' motion for summary judgment, stating that in December 2010, he was the Coordinating Chaplain at Mid–State. (Weber Decl. ¶ 3) (Dkt. No. 202–7). Father Weber states that when he arrived at work on December 7, 2010, he realized that there was no call-out for the Lubavitch Youth Organization, members of which were visiting the Jewish inmates for Chanukah. (*Id.* ¶ 6). In an attempt to rectify this error, Father Weber "caused a callout to be generated with the names of those inmates who regularly attend Jewish Services ." (*Id.* at 7). Although Father Weber states that a copy of the call-out is attached to his declaration as Exhibit A, no such copy is attached. The court will assume that the call-out to which Father Weber refers is the one that is attached to plaintiff's complaint as Exhibit I. (Dkt. No. 1 at 46). Plaintiff's name is on that call-out.

FN3. Father Weber is not a defendant in this action.

Father Weber then states that, after Deputy Superintendent for Programs ("DSP") Phillips approved the call-out, it was "hand-delivered to the Housing Units within the correctional facility." (Weber Decl. ¶ 8). "Inadvertently, the callout was not added to the daily callout packet nor was it delivered to the program areas that day." (*Id.* ¶ 9). Although plaintiff's name certainly appears on the call-out, unfortunately defendant Ready, who was at the Program Building that day, did not have that call-out in front of him when plaintiff approached to ask about going to services, and defendant Ready was justified in refusing to let plaintiff attend the services. The Superintendent's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

investigation of plaintiff's grievance resulted in the same finding:

>**\*9** The facility investigation revealed that the Jewish Services call-out was not submitted with the other scheduled inmate call-outs on the day before (12/6/10), which is normal procedure; therefore, it was not included with 12/7/10 facility call-out packet. The inmate call-out packets are normally distributed to all program areas, housing units as well as other staff/inmate areas the day before the call-outs are scheduled. On the morning of the posted call-out (12/7/10), this error was brought to the attention of the Coordinating Chaplain, who then had the Jewish Services call-out hand delivered to the housing units but not to the program areas. Although the 7–2 officer [Ready] and the grievant's general business instructor [Gruen] reviewed the p.m. call-outs to verify/confirm the grievant's statements, neither staff member would have been aware the grievant was listed on the 12/7/10 Jewish Services call-out scheduled for 2:00 p.m. nor would they have been aware that there was an addition to the original call-out packet because it was never delivered to their program area.

(Compl.Ex. L) (Dkt. No. 1 at 50).[FN4] This document, attached as an exhibit to plaintiff's complaint, corroborates defendant Ready's and Father Weber's version of the events. Defendant Ready did not intentionally deny plaintiff the opportunity to attend the service on December 7, 2010 because although plaintiff's name was on the call-out list, defendant Ready did not have that list in front of him,[FN5] and he would not even have been aware that the list existed because it was not delivered to the program area. This one, clearly inadvertent incident, does not rise to the level of a constitutional violation committed by defendant Ready.[FN6]

>[FN4]. Unless otherwise specified, the pages associated with a docket number will be the pages assigned to the document by the court's

electronic filing system. (CM/ECF).

>[FN5]. Plaintiff was deposed on October 8, 2013, and a copy of his deposition transcript has been included in defendants' summary judgment motion. (Dkt. No. 202–2). During his deposition, plaintiff testified that defendant Ready "had the call-out on his desk." (Dkt. No. 202–2 at 22). While defendant Ready may have had a call-out or call-outs on his desk, he did not have one with the plaintiff's name on it.

>[FN6]. Plaintiff has also alleged a retaliation claim based on this incident, and the court will discuss that claim below.

In his response to defendants' motion for summary judgment, plaintiff states that the defendants are lying, and that the call-out was delivered to *"all"* program areas. (Pl.'s Mem. ¶ 10) (Dkt. No. 205–1 at 9). Plaintiff states that he reaches this sweeping *conclusion* because "[t]he location where the Jewish Services [are] held (Building # 101) is *a Program Area,"* and security staff in that area must have had the call-out because they would not have let the thirteen other Jewish inmates in the building. (*Id.*) (emphasis added). If one program area had the call-out, then all the program "areas" must have had the call-out. However, plaintiff's argument misses the point. Defendant Ready was not in Building # 101. He was in Unit 7–2 in Building 7,[FN7] and the fact that the building in which the religious services were actually held had the call-out,[FN8] does not "prove" or even raise a question of fact regarding whether the call-out had been sent to the other program areas, in the face of Father Weber's sworn statement that he did not send the call-out to the program areas. Although plaintiff states that Building # 101 is "a" program area, it is not "the" Program Building.[FN9]

>[FN7]. (Ready Decl. ¶¶ 5).

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

FN8. This court makes no such finding.

FN9. Plaintiff's own exhibits confirm this finding. (Pl.'s Ex. G) (Dkt. No. 205–3 at 26). In his grievance documents, plaintiff states that "I signed out of Mr. Gruen's class and informed him that I had a call-out per DSP Phillips to **report to Bldg # 101** to attend Jewish Services. I subsequently attempted to sign out @ the 7–2 security desk whereby Correctional Officer Ready ... asked me where I was going." (*Id.*) Clearly, Building # 101 is not the same as Building # 7. Thus, whether an officer in Building # 101 has a document does not prove that someone in Building # 7 was given the same document.

In my prior report, I recommended denying defendants' motion to dismiss on the pleadings, notwithstanding case law holding that missing one religious service does not constitute a substantial burden on the inmate's right to the free exercise of his religion under either under the First Amendment or under RLUIPA. (Dkt. No. 148 at 13) (citing inter alia *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *15 (S.D.N.Y. Oct. 15, 1999)). In granting **summary judgment,** the court in *Troy* stated that "courts in the Second Circuit have held that an inmate's right to practice his religion is not substantially burdened if an inmate missed one religious service for *a valid reason." Id.* (emphasis added). I did not rely on *Troy* in my prior report, because the defendants in this case brought a motion for judgment on the pleadings, and this court was bound by the facts as stated in plaintiff's complaint. Now that defendants have moved for summary judgment, the court may consider material outside the complaint, such as sworn declarations, in determining that, while plaintiff missed one religious service through the actions of defendant Ready, this inadvertent denial did not substantially burden the plaintiff's free exercise of his religion. In denying plaintiff the opportunity to attend his call-out, de-

fendant Ready acted according to the documentation before him. Even if a mistake were made, it was the lack of proper documentation that caused plaintiff to miss his service.FN10 Neither the First Amendment, nor RLUIPA was violated by defendant Ready.

FN10. To the extent that the failure to provide the appropriate call-out sheet was negligent or simply a mistake, defendant Ready was not responsible for that omission, and in any event, negligence is not actionable under section 1983. *Riehl v. Martin,* No. 13–CV–439, 2014 WL 1289601 at *8 n. 14 (N.D.N.Y. March 31, 2014). In his response to the motion for summary judgment, plaintiff asks why, even if defendant Ready did not have the call-out, "did he fail to pick up the phone and just call the Chaplain's Office to verify that the [plaintiff] was on the call-out?" (Pl.'s Mem. at 15). The fact that defendant Ready may or may not have acted correctly or logically, at worst, constitute negligent action, which is not actionable under section 1983 or under RLUIPA. *Id. See also Booker v. Maly,* No. 9:12–CV–246, 2014 WL 1289579, at *25 (N.D.N.Y. March 31, 2014) (mistakes not actionable under the U.S. Constitution) (citations omitted); *Scott v. Shansiddeen,* No.2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (negligent actions that 'impinge to some degree on an inmate's religious practices' are insufficient to support a claim under RLUIPA) (citing 42 U.S.C. § 2000cc, et seq.; *Carter v. Washington Dep't of Corr.,* No. C11–5626, 2013 WL 1090753, at *14 (W.D.Wash. Feb. 27, 2013); *Lovelace v. Lee,* 472 F.3d 174, 194 (4th Cir.2006) (simple negligence does not suffice to meet the fault requirement under section 3 of RLUIPA)).

**2. The March 20, 2011 Incident**

**\*10** The second incident occurred on March 20,

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

2011, when plaintiff claims that defendant Ellis intentionally cut short a visit from Lubavitch Rabbis who had come from Brooklyn to see plaintiff [FN11] at the facility. (Compl.¶ 65). Plaintiff claims that he was scheduled to meet with the Rabbis for one and one half hours in order to celebrate the Purim holiday. (*Id.*) Plaintiff claims that defendant Ellis cut the service to a matter of minutes and sent all of the Jewish inmates back to their housing units.

> FN11. Although the complaint initially states that the Rabbis came to see "the plaintiff," it is clear that there were other Jewish inmates who were scheduled to participate in the Purim Services.

Defendant Ellis has submitted a declaration in support of defendants' motion for summary judgment. (Ellis Decl.) (Dkt. No. 202–5). Kurt Ellis is employed by DOCCS as a Protestant Reverend, and at the time of the declaration, held the position of Chaplain at Mid–State. (Ellis Decl. ¶¶ 1–2). Defendant Ellis states that on March 20, 2011, Rabbi Theodore Max scheduled a Purim celebration in the small chapel at Mid-State with some members of the Lubavtich organization. (*Id.* ¶ 5). The call-out was approved for 2:30 p.m. on March 20, 2011. Defendant Ellis spoke with Corrections Officer ("CO") Backer, the Building 101 main console officer and explained that the call-out was for 2:30, but that the Rabbi might be late because he was making Purim rounds at other facilities, and a delay was possible. (*Id.* ¶¶ 6–7).

Defendant Ellis states that at approximately 1:45 p.m., he noticed that plaintiff was working in the Law Library, which is adjacent to the Building 101 console. (*Id.* ¶ 8). Defendant Ellis mentioned to CO Backer that plaintiff was on the Purim call-out, but Ellis was not sure if plaintiff would need to go back to his housing unit at the 2:15 "go back" and then return for the Purim call-out. (*Id.*) CO Backer told defendant Ellis that plaintiff would have to go back to his housing unit and then return when it was time for the Purim call-out.

(*Id.*)

Defendant Ellis told plaintiff that he knew that plaintiff had "an issue" before, and Ellis wanted to make sure that plaintiff did not have any trouble that day. (*Id.* ¶ 9). Ellis told plaintiff that, because he was currently signed out for the Law Library, he would have to go back to his housing unit at 2:15 p.m. and then return "when they call for the service." Plaintiff responded that he did not have to go back and asked the Law Library officer whether plaintiff could go directly to the service from the Law Library at 2:30. CO Ippolito, the Law Library Officer gave plaintiff permission to do so. Defendant Ellis states that he left, but informed CO Backer what CO Ippolito told plaintiff, and CO Backer agreed that CO Ippolito "should not have said that." (*Id .*)

Reverend Ellis states that he has no authority over the procedure for "inmate movement" at the facility because movement is a matter of security. (*Id.* ¶ 10). At approximately 2:30 p.m., defendant Ellis went to the small chapel to see if the Rabbi had arrived, but the Rabbi was not there yet. Defendant Ellis went to check with CO Backer. Plaintiff also approached the "security bubble" to check with CO Backer. Plaintiff was told by CO Backer and by defendant Ellis that the Rabbi had not arrived, and plaintiff went back to the Law Library. (*Id.* ¶ 11).

**\*11** Defendant Ellis then went to see if Rabbi Max had arrived, but was told that the Rabbi had not been seen. Defendant Ellis did his "weekly rounds in the Visitor's Center, signing into the Log Book at 2:45 p.m." (*Id.* ¶ 12). After a brief conversation with a staff member, defendant Ellis saw the Lubavitch volunteers pulling into the parking lot. Defendant Ellis greeted Rabbi Max and continued on his daily rounds, stopping at the Watch Commander's Office to inform him that Rabbi Max had arrived. (*Id.*)

Defendant Ellis states that he was not involved in

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

calling inmates for the Purim Service, nor did he attend the Service on March 20, 2011.[FN12] Defendant Ellis continued with his daily rounds and did not return to his office until approximately 3:45 p.m ., at which time he noticed the inmates in the small chapel with the Rabbis. (*Id.* ¶ 16). Defendant Ellis states that after the service ended, he spoke to Rabbi Max, who stated that the service went well. (*Id.* ¶ 17). Defendant Ellis states that he was not in charge of the Service, he had no involvement in the time that the Service began or ended, and he did not order the inmates back to their housing units at the conclusion of the Service. (*Id.* ¶¶ 18–20).

> FN12. The declaration says "March 20, 2011." Although plaintiff refers to this as the March 30, 2011 incident, Purim was actually March 19–20, 2011. The discrepancy in the dates is not relevant to this court's decision because it is clear that all parties are referring to the same incident.

Defendants have also submitted the declaration of Rabbi Theodore Max, [FN13] who states that he is a Chaplain who is responsible for leading the primary congregational worship and prayer services for Jewish inmates. (Max Decl. ¶¶ 1–3). He is assigned to multiple correctional facilities, including Mid–State. (*Id.* ¶ 4). Rabbi Max states that he coordinated the Purim celebration, and he was advised to schedule the call-out for 2:30, even though he was not scheduled to arrive until 2:45 that day. The Service was scheduled to last approximately one hour. (*Id.* ¶¶ 6–7). Rabbi Max states that he was on a "very tight" schedule on March 20, 2011 because he was scheduled to visit "at least three correctional facilities" before his visit to Mid–State. (*Id.*) When he and the members of the Lubavitch organization arrived at Mid–State, there was a long line of visitors, which delayed their entrance into the facility, causing the Purim celebration to begin later than 2:45 p.m. (*Id.* ¶¶ 10–11). Rabbi Max states that pursuant to facility rules, the inmates were still required to return to their cells at 3:45 p.m.,

and that the Purim celebration ended at that time. (*Id.* ¶ 12).

> FN13. Rabbi Max is not a defendant in this action.

Plaintiff does not claim that he missed the celebration, only that the celebration was shorter than originally scheduled. Rabbi Max has explained that he arrived late, causing the service to begin later, and run shorter than anticipated. Defendant Ellis had nothing to do with scheduling the event, with Rabbi Max being late, or with shortening the service.

Plaintiff argues that defendant Ellis sent plaintiff back to the law library and the other Jewish inmates back to their housing units, for the purpose of shortening the service. In his response to the motion for summary judgment plaintiff states that during *his* deposition, the defendants "admitted" that defendant Ellis sent the Jewish inmates back to their cells to shorten the service. (Pl.'s Mem. ¶ 19) (citing Deposition Transcript ("DT") at 49). The deposition transcript is not an "admission" by defendants, and does not state that defendant Ellis sent the inmates back to their cells.

**\*12** During his deposition, plaintiff testified that Reverend Ellis allows *Protestant* inmates to come to the chapel before Ellis is ready to conduct the service, but does not allow Jewish inmates to go to their place of worship and wait if the Rabbi is not there. (DT at 49). "Whenever we go to the Jewish services, he sends us all back. 'Go back to your housing unit.' " (*Id.*) Defense counsel then asked plaintiff a question: "even though the rabbis came a little bit late, and even though they sent some of the inmates back to their cells, you were able to meet with the rabbis that day and have a short prayer service." (*Id.*) This *question by counsel* is **not** an *admission by a defendant,* and counsel was making the point that "even if" what plaintiff said were true—that someone sent the Jewish

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

inmates back to their cells because Rabbi Max had not arrived—plaintiff still attended the service, notwithstanding that it was shorter than anticipated.

Rabbi Max's declaration shows that *he* was late beginning the service, and the inmates were required to return to their cells at 3:45. Defendant Ellis had nothing to do with the length of the service.[FN14] Under the appropriate definition, plaintiff's religious rights were not substantially burdened. In order for the defendant's interference to be a "substantial burden" on the inmate's religious exercise, the interference must be more than an inconvenience, and plaintiff must demonstrate that the government's action pressured plaintiff to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr. 22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

> FN14. In his response to defendants' motion for summary judgment, plaintiff has submitted his grievance and the Superintendent's response to plaintiff's grievance regarding this incident. (Dkt. No. 205–3, Pl.'s Exs. R–Z). In this grievance, plaintiff alleged that defendant Ellis "felt the need to answer for the officers in the bubble by stating ... 'The Rabbi is not here so go back to the law library.' " (Pl.'s Ex. R at 2; CM/ECF p. 123). Plaintiff claimed that he complied, after the other officer repeated that plaintiff should go back to the law library. (*Id.*) Plaintiff asked to use the bathroom, and while using the bathroom, "he overheard the 'voice over the mic [sic]' direct the other Jewish inmates back to their housing units because the Rabbis had not arrived." (*Id.* & Ex. Z). The issue in the grievance appeared to be that the in-

mates were not allowed to enter the chapel and wait for the Rabbis. Plaintiff complained that "the Rabbis arrived at approximately 2:43 p.m., and by the time the inmates who were sent back to their units arrived for the second time; the services did not start until 3:15 p.m. *As a result, the Jewish Services were shortened* and they were dismissed at 3:45 p.m." (Pl.'s Ex. Z) (emphasis added). The fact that the inmates were not allowed to enter the chapel prior to the Rabbi's arrival, has nothing to do with shortening the service (which would have been cut short anyway, because it is clear that the Rabbis were late in arriving). Plaintiff seems to speculate that Ellis was responsible for the other officer ordering the inmates back to their units. (Pl.'s Ex. R, Dkt. No. 205–3 at 123). In his declaration, defendant Ellis states that he disagreed that plaintiff should have been allowed to return to the library to wait for the Rabbis, but this did not affect plaintiff's attendance at the Purim celebration.

In addition, although plaintiff may disagree, the shortening of his Purim celebration because the Rabbi was late or because plaintiff had to wait for other inmates to come back from their housing units did not amount to a "substantial burden." This delay may certainly have been "an inconvenience." However, plaintiff admits that the Service did occur, that prayers were said, and that the inmates were allowed to eat the food, albeit too quickly for plaintiff's liking. Thus, neither the Constitution, nor RLUIPA were violated by defendant Ellis. Plaintiff's retaliation claim will be discussed below.

**V. *Mail/Access to Courts/Retaliation***

**A. Legal Standards**

**1. Mail**

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Among the protections enjoyed by prison inmates, subject to appropriate limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed by the First Amendment. *LeBron v. Swaitek,* No. 05–CV–172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (quoting *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003)). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *5 (S.D.N.Y. March 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins,* 297 F.3d 108, 112–13 (2d Cir.2002) (citing, *inter alia, U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996)). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safley,* 482 U.S. 78, 84 (1987)).

**\*13** Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection ... to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351 (citations omitted). Nonetheless, the Second Circuit has held that " 'where good cause is shown, outgoing mail can be read' without violating inmates' First Amendment rights." *Workman,* 80 F.3d at 698 (quoting *Wolfish v. Levi,* 573 F.2d 118, 130 n. 27 (2d Cir.1978), *rev'd in part on other grounds sub nom., Bell v. Wolfish,* 441 U.S. 520 (1979)).

Prison security is a legitimate penological interest that justifies limitations on an inmate's First Amendment rights related to regular mail. *See Cancel v. Goord,* 2001 WL 303713, at *6. "[T]he interception of a prisoner's correspondence does not violate that individual's First Amendment rights 'if prison officials had good or reasonable cause to inspect the mail." *Knight v. Keane,* No. 99 Civ. 3955, 2005 U.S. Dist. LEXIS 18702, at *18 (S.D.N.Y. August 26, 2005) (citing *United States v. Felipe,* 148 F.3d 101, 108 (2d Cir.1998)) (Rep't–Rec.), *adopted* 2006 WL 89929 (S.D.N.Y. Jan. 12, 2006). To establish a claim for interference with regular, non-legal mail, the plaintiff must show " 'a pattern and practice of interference that is not justified by any legitimate penological concern." *Singleton v. Williams,* No. 12 Civ.2021, 2014 WL 2095024, at *3 (S.D.N.Y. May 20, 2014) (quoting *Cancel, supra.*) An isolated incident is generally insufficient to establish a constitutional violation. *Id.* (citing *Davis,* 320 F.3d at 351).

Legal mail is entitled to a higher degree of protection than regular mail, and "prison policies or practices which interfere with legal mail on a regular basis whether incoming or outgoing must be supported by a legitimate penological interest other than mere general security concerns which permit interference with regular mail. *Cancel v. Goord,* 2001 WL 303713, at *6–7 (citing *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)). Plaintiff must still show that prison officials " 'regularly and unjustifiably interfered with the ... legal mail." *Singleton,* 2014 WL 2095024, at *4 (quoting *Cancel, supra.*) As few as two incidents of mail tampering may constitute an actionable violation if the incidents suggest and ongoing practice of censorship that is unjustified by a substantial governmental interest or if the tampering unjustifiably chilled the inmate's right to access to courts as discussed below or impaired legal representation that plaintiff received. *Vega v. Rell,* No. 3:09–CV–737, 2013 WL 6273283, at *10 (D.Conn. Dec. 4, 2013) (citing *Washington,* 782 F.2d at 1139).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

## 2. Access to Courts

**\*14** Legal mail claims are sometimes related to claims that defendants have denied an inmate access to courts by interfering with legal mail. It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828.

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). *See Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). In order to show actual injury, the defendants' conduct must have "hindered [plaintiff's] efforts to pursue a legal claim." 518 U.S. at 351.

## 3. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would

deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id. at 371.* "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

**\*15** The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**B. Application**

**1. Defendant Kupiec**

**a. Relevant Facts—Interference/Retaliation**

In his complaint, plaintiff alleged that after he filed a grievance against defendant Ready, which was denied on January 14, 2011, defendant Kupiec [FN15] began to lose and/or destroy plaintiff's packages that were received in the mail room.[FN16] (Compl.¶¶ 57–64). Plaintiff claims that on January 14, 2011, the same day that the Superintendent rendered a decision on plaintiff's grievance against defendant Ready, plaintiff received a package from Stratford Career Center, to study for his paralegal degree. (Compl.¶ 58). Plaintiff states "Defendant Theda Kupiec 'got word' of the complaint contra the aforesaid officers and started to intentionally lose and destroy the plaintiff's legal packages from said school." (*Id.*) Plaintiff states that the "package" with his text and exams was never recovered, but he did "receive the Paralegal Course from the school on the said date in question." [FN17] (*Id.* & Ex. M).

FN15. Plaintiff originally named Sheila Marlenga, the "Facility Steward," as a defendant in connection with plaintiff's mail claims. The complaint was dismissed with prejudice as against Ms. Marlenga by stipu-

lation, dated January 8, 2014. (Dkt. No. 197). Thus, the complaint has proceeded only as against defendant Kupiec with regard to the remaining issues.

FN16. The court notes that the allegations in plaintiff's complaint relate more to retaliation than simply interference with his mail. However, in his memorandum of law in opposition to defendants' summary judgment motion he has one paragraph in which he discusses both interference and retaliation separately. (Dkt. No. 205–1 at ¶ 34). Because interference with mail may be a separate and independent claim from retaliation, the court will discuss all possible claims that plaintiff may have regarding the alleged interference with his mail.

FN17. The allegations in the complaint are a little unclear. In his deposition, plaintiff states that he ultimately received the package. (DT at 107). A reading of plaintiff's grievance documents indicates that he may have received a replacement package after plaintiff's father contacted the school to explain that plaintiff did not receive the January 2011 package. (Pl.'s Ex. Z(12), Dkt. No. 205–3 at 223). The court also notes that materials relating to a paralegal "course" do not constitute "legal mail." Legal mail is included in the definition of "Privileged Correspondence" and is defined, in relevant part, as correspondence with attorneys, legal representatives, and legal services organizations. *See* DOCCS Directive 4421(II)(A)(2) (citing 7 NYCRR § 721.2).

Plaintiff states that he "was never once called down to the package room or mail room in the entire month of [J]anuary, 2011." (Compl.¶ 58). He then states that "this only indicates that anytime an inmate (in this case the plaintiff) files a grievance against the

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

defendant's [sic]—retaliation takes place." (*Id.*) Plaintiff speculates that retaliation can take the form of missing packages or "planting weapons on the inmate ... to make sure that the inmates [sic] goes to the box (Special Housing Units) where he is limited to legal materials." [FN18] (*Id.*)

> FN18. The court notes that plaintiff's statement about "planting weapons" is irrelevant because there is no such claim in this case.

The complaint also alleges that after he appealed the Superintendent's decision regarding the December 7, 2010 incident against Ready, a "Notice of Intention to File a Claim" ("Notice") was improperly sent "regular" mail, rather than by Certified Mail as is required under New York State Law and notwithstanding that plaintiff paid for certified mail. (Compl.¶¶ 60–63). Plaintiff alleges that on March 15, 2011, his parents sent him a food package that he never received, purportedly due to the retaliation by defendant Kupiec. (Compl.¶ 63). Several paragraphs later, plaintiff states that, on May 17, 2011, defendant Kupiec "slashed open" plaintiff's legal mail, removed the documents outside of his presence, and sent the documents to plaintiff in a coffeestained, "stampless" envelope. (Compl.¶ 82). In plaintiff's response to defendants' motion for summary judgment, he also mentions an incident that is not part of the complaint. Plaintiff alleges that defendant Kupiec opened his mail and ripped up his "law school exam scores." (Dkt. No. 205–1, ¶ 33). This court will not consider this final allegation against defendant Kupiec. [FN19]

> FN19. A plaintiff may not amend his complaint in a memorandum of law or other filing. *Bryant v. Greater New Haven Transit Dist.,* No. 3:12–CV–71, 2014 WL 2993754, at *7 (D.Conn. July 2, 2014) (citation omitted). The court notes that this final incident could not have been included in the complaint because it occurred after plaintiff filed this action, and plaintiff was still exhausting

administrative remedies regarding this allegation, long after this complaint was filed. (*See* Pl.'s Ex. Z(16), Dkt. No. 205–3 at 250) (IGRC's September 22, 2011 response to plaintiff's grievance—this action was filed on May 31, 2011). Plaintiff will not be prejudiced by this court's failure to consider this allegation against defendant Kupiec because he has raised the same claim in a subsequent action that has been assigned to Senior Judge Lawrence E. Kahn and Magistrate Judge Treece. *Guillory v. Fischer,* No. 9:12–CV–280. Magistrate Judge Treece declined to recommend dismissal of this allegation in a Report–Recommendation, noting that notwithstanding my consideration of the issue in recommending denial of plaintiff's motion for summary judgment, the claim was more properly before him. *See id.* at 13–16 (Dkt. No. 46 in 12–CV–280). It is more appropriate for Judge Treece to consider the allegations regarding plaintiff's test scores along with another factual allegation against defendant Kupiec that has not been mentioned in any part of this action and that occurred after the filing of this case.

**\*16** Defendants have filed the declaration of defendant Theda Kupiec, Senior Mail Clerk at Mid–State. (Kupiec Decl. ¶¶ 1–2) (Dkt. No. 202–4). Defendant Kupiec states that her responsibilities include sorting outgoing mail and placing the appropriate postage after verification that the inmate has sufficient funds, in addition to sorting incoming mail for distribution to the housing units. (*Id.* ¶ 6). Defendant Kupiec states that she has no responsibility "whatsoever" with respect to "packages" that are received for inmates. She states that the mail room in which she works is located in Building 20 of the Administration Building, which is located outside of the secure fence around the facility. However, the "package room" is located in Building 101, which is located inside the secure fence. (*Id.* ¶¶ 7–8).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

Defendant Kupiec states that she was not aware of any grievance plaintiff may have filed against defendant Ready, and that she does "not personally know Correction Officer Ready." (*Id.* ¶¶ 11–12). Defendant Kupiec states that "at some point," she became aware of plaintiff's claim that he did not receive the Stratford Career Institute package, but because defendant Kupiec does not work in the package room, and has no responsibility for packages, she has no knowledge of the result of plaintiff's complaint. (*Id.* ¶ 14).

Defendant Kupiec states that she did inadvertently mail plaintiff's Notice via regular mail. (*Id.* ¶ 15). Plaintiff requested that the envelope be sent Certified, and defendant Kupiec first sent the mail to the Business Office to verify that plaintiff had adequate funds for certified mail. When the mail was returned to her with the authorization, defendant Kupiec inadvertently sent the mail with regular postage. Defendant Kupiec states that she realized her mistake when plaintiff filed a grievance, to which she responded by admitting her error and reimbursing plaintiff for the difference in the postage. Defendant Kupiec states that the mistake was hers, and no one "told" her to send the mail out via regular mail rather than certified. (*Id.* ¶¶ 15–16 & Ex. A). Exhibit A to defendant Kupiec's declaration is a copy of the memorandum that she sent to plaintiff apologizing for the error and reimbursing him for the cost of the mailing.[FN20] Defendant Kupiec states that she is completely unaware of plaintiff's missing food package because she does not work in the package room. (*Id.* ¶ 17).

FN20. A review of plaintiff's exhibits shows that, at the time plaintiff filed this action in May of 2011, he had not completed the exhaustion of administrative remedies as to his certified mail claim. He did not receive the CORC denial of his grievance until July 27, 2011. (Pl.'s Ex. Z(24), Dkt. No. 205–3 at 275). Although defendants raised failure to

exhaust as a defense in their answer (Dkt. No. 46, ¶ 12), they have not argued failure to exhaust in their motion for summary judgment. While defendants would not have had the opportunity to argue non-exhaustion for claims that had not been raised prior to the motion for summary judgment (the test score claim discussed above), they would have had the opportunity to argue non-exhaustion as to claims that were in the complaint. Technically defendants have not waived the exhaustion requirement by raising it in their answer. *Castillo v. Rodas,* No. 09 Civ. 9919, 2014 WL 1257274, at *15 (S.D.N.Y. March 25, 2014). This court finds that it may recommend dismissal on the merits and will do so, rather that finding only that administrative remedies were not exhausted because defendants did not argue this in their motion.

Defendant Kupiec also states that on May 18, 2011, she received a manila envelope from the package room with plaintiff's name and DIN number on it, with no indication that it was legal mail.[FN21] She opened the envelope to record the contents, and when she realized that the mail was from a court, she wrote which court the mail came from on the front of the envelope and send the mail to the Legal Officer. (*Id.* ¶ 19 & Ex. B). Exhibit B is the memorandum that defendant Kupiec wrote to the IGRC, explaining what happened with the manila envelope.[FN22] (*Id.*) Defendant Kupiec states that she did not open plaintiff's legal mail intentionally or in retaliation for any grievance, but merely in the "normal course of [her] job duties ...." (*Id.* ¶ 20).

FN21. A review of plaintiff's exhibits also shows that when he filed this action, he had not exhausted his administrative remedies regarding the allegation that defendant Kupiec "destroyed" his legal mail. The document, purporting to be a "grievance," in addition to various other things, was dated

May 23, 2011. (Pl.'s Ex. Z(32), Dkt. No. 205–3 at 291–302, 293). It was addressed not only to the "Complaint Department" at Mid–State, but also to District Court Judge Mordue, Ruth Goldway from the Postal Regulatory Commission, and Anne Gallaudet from the U.S. Postal Service. (*Id.* at 291). The Superintendent's decision was dated June 16, 2011, after plaintiff filed this action. (Pl.'s Ex. Z(33), Dkt. No. 205–3 at 304). However, defendants have not argued non-exhaustion in their motion, and as stated in footnote 20 above, the court will consider the merits of the claim.

FN22. The memorandum explains that the envelope must have been delivered inadvertently to the package room. (Kupiec Decl. Ex. B). An individual working in the package room (defendant Kupiec speculated that it might have been a "fill in"), opened the envelope, realized it was legal mail, put it in a plain manilla envelope with plaintiff's name and number on it, and then sent it "over to the Mailroom for processing." (*Id.*) She noted that this was the "normal procedure for mail received in packages." (*Id.*) The court also notes that this memorandum is further support for defendant Kupiec's statement that the mail room and the package room are in two different locations.

**b. Discussion**

**\*17** These incidents do not show constitutional interference with plaintiff's mail, nor do the facts show that defendant Kupiec was retaliating against plaintiff for his grievances. First, it is clear that defendant Kupiec does not work in the package room, and had no personal involvement in, and would not have been responsible for, either plaintiff's alleged text book "loss" or the alleged loss of his kosher food.[FN23] The court will focus on plaintiff's allegations that defendant Kupiec tampered with his mail on February 25,

2011 (certified mail claim) and on May 17, 2011 (opening of legal mail).

FN23. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

The fact that plaintiff's Notice was sent regular mail, rather than certified is not interference with plaintiff's mail. The mail was sent, it was just sent by a different method of delivery.[FN24] This mistake shows neither intent, nor a "pattern and practice" of interference. At worst, it shows an error by defendant Kupiec in sending out plaintiff's mail, for which plaintiff was reimbursed.[FN25] The incident in which defendant Kupiec sent plaintiff documents in a plain manilla envelope after she realized that the documents were sent by a court also shows an error by facility staff in the package room, that defendant Kupiec attempted to rectify by writing which court the documents came from on the envelope and having it delivered to plaintiff through the proper channels for legal mail.[FN26] Defendant Kupiec states that the court documents were already in the plain manilla envelope when she received them.

FN24. Contrary to plaintiff's implication, there is no indication that defendant Kupiec would have been aware of the effect of her action. Defendant Kupiec is the senior mail room clerk. There is no indication that defendant Kupiec has any legal training or would have known the possible effect of sending plaintiff's Notice by regular mail.

FN25. To the extent that defendant Kupiec's actions could be considered negligent, as stated above, negligence is not actionable under section 1983. *See* n. 10, *supra.*

FN26. Plaintiff's response makes much of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

fact that the "package" went to defendant Kupiec's office when she stated that she had nothing to do with packages. Plaintiff believes that this "admission" proves that defendant Kupiec was also tampering with his packages. Clearly, the item was not a "package," and that is why the package office sent it to defendant Kupiec. Unfortunately someone in the package office had already made a mistake in opening the envelope, placing the documents in another envelope with plaintiff's name and prison number on it. The only contact that defendant Kupiec states that she had with this mail was to place the name of the court on the envelope and have it delivered to plaintiff through the proper channels. This statement is not, as plaintiff claims, inconsistent with defendant Kupiec's statement that she does not work in the package room and has nothing to do with the packages that are delivered for inmates.

Plaintiff claims that defendant Kupiec was retaliating against plaintiff for the grievances that he filed. Plaintiff first mentions the grievance he filed against defendant Ready after the December 7, 2010 incident, which was denied by the Superintendent on January 14, 2011.[FN27] Plaintiff's statement that defendant Kupiec was aware of plaintiff's grievance against defendant Ready because an inmate named "Rogers" told defendant Kupiec about the grievance, is completely conclusory. The first time plaintiff ever mentioned inmate Rogers was at plaintiff's deposition. (Pl.'s Dep. at 61). Plaintiff stated that inmate Rogers worked in the grievance office and knew who was filing grievances against officers, so Inmate Rogers told defendant Kupiec about the decision on plaintiff's grievance against Ready "because [plaintiff] was already putting in paperwork on why my legal mail was being messed with." (Pl.'s Dep. at 62). This statement by plaintiff is not even plausible. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir.2005) (no genuine issue of material fact when

plaintiff's explanation is not even plausible); *Haust v. United States*, 953 F.Supp.2d 353, 361 (N.D.N.Y.2013) (court may discredit plaintiff's self-serving testimony when it is so replete with inconsistencies and improbabilities that no reasonable fact-finder would undertake the suspension of disbelief necessary to credit the allegations made in his complaint) (quoting *Jeffreys, supra* ).

> FN27. (Dkt. No. 1 at 50) (Superintendent's Decision dated 1/14/11). The September 2010 grievance is mentioned in this decision, but that grievance was against defendant Ellis. (*Id.*)

**\*18** Defendant Kupiec states that she does not know defendant Ready, and that plaintiff's allegation that an inmate named "Rogers" informed Kupiec of the grievance against Ready is untrue. (Kupiec Decl. ¶ 13). Although defendant Kupiec is aware that Inmate Rogers works in the grievance office, she could not identify Rogers, nor has she ever had any contact with him. (*Id.*) The grievance against defendant Ready had to do with religion, not mail. The fact that plaintiff may have begun "putting paperwork together" regarding a grievance about his legal mail against defendant Kupiec, which plaintiff did not file until March or April of 2011, would not support Inmate Rogers deciding to tell defendant Kupiec about a grievance filed against a different defendant, coincidentally on the same day that plaintiff claims a package was delivered for him.[FN28] As stated above, defendant Kupiec does not work in the package room and would not have been responsible for the alleged loss of any package delivered to the facility for plaintiff in January of 2011 or any other time.

> FN28. It is also unclear how inmate Rogers would know that plaintiff was contemplating a grievance against Kupiec because plaintiff only stated that he was "putting paperwork together" for a grievance about his mail, not that such a grievance had been filed. The

connection between defendant Kupiec and defendant Ready is non-existent.

In addition, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). *See also Faulk v. Fisher,* 545 F. App'x 56, 58–59 (2d Cir.2013) (temporal proximity to the protected action and excellent disciplinary history prior to the allegedly retaliatory misbehavior reports were insufficient to avoid summary judgment when there was no additional evidence, and neither of the officers were involved in the successful grievance); *Bennett v. Goord,* No. 06–3818–pr, 2008 WL 5083122, at *2 (2d Cir. Dec. 2, 2008) (citing *inter alia McPherson v. N.Y. City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006) (speculation alone is insufficient to defeat a motion for summary judgment)).

**\*19** Plaintiff also may be claiming that defendant Kupiec's subsequent actions were in retaliation for the grievance that plaintiff ultimately filed against de-

fendant Kupiec in March or April of 2011. In her declaration, defendant Kupiec denies ever opening plaintiff's legal mail in retaliation for a grievance filed against her.[FN29] (Kupiec Decl. ¶ 18). In any event, plaintiff suffered no adverse action, as defined by the case law,[FN30] as the result of defendant Kupiec inadvertently opening plaintiff's legal mail that was sent to her from the package room.[FN31] This action would not deter a similarly situated inmate from exercising his constitutional rights. This action also would not deter a similarly situated inmate from asserting his rights.[FN32] It does not show malice or retaliation by defendant Kupiec. Plaintiff's mail interference and retaliation claims may be dismissed.

> **FN29.** Plaintiff filed a grievance against defendant Kupiec on April 22, 2011. (Compl.Ex. Z(23)). The only actions that could have conceivably been in retaliation for grievances against defendant Kupiec herself would have been the May 17, 2011 incident involving the manilla envelope with court documents inside and the inadvertent tearing of plaintiff's test scores (which is not part of this action and apparently occurred in August of 2011, based on the August 22, 2011 memorandum of apology from defendant Kupiec). None of defendant Kupiec's other actions took place subsequent to the March or April grievance against her. (Pl.'s Ex. Z(19), Dkt. No. 205–3 at 256). Plaintiff filed a grievance about his test scores on September 1, 2011. (Pl.'s Ex. Z(18), Dkt. No. 205–3 at 254) (CORC decision dated January 18, 2012). At his deposition, plaintiff testified that he did not think he had filed any prior grievances against defendant Kupiec, and there are no documents in the record reflecting grievances prior to April 22, 2011. (DT at 111).

> **FN30.** *Gill, supra.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN31. Contrary to plaintiff's assertion, this action by an employee in the package room does not prove that all packages go through defendant Kupiec. The legal mail was delivered to the package room in error, someone opened it, determined that it was ***not*** a "package," placed the documents in a plain manilla envelope with plaintiff's name and DIN number on it, and sent it to the mail room where defendant Kupiec works. She determined that the documents were from a court, placed them back in the manilla envelope, together with writing the name of the court from which they came, and sent them through the proper channels for legal mail. (Pl.'s Exs. Z(36); Z(35), Dkt. No. 205–3 at 316, 318) (CORC Determination dated 10/15/11; Memorandum from defendant Kupiec to DSP Phillips). Although plaintiff claimed that his legal mail was "destroyed," that is clearly not true, only the envelope was missing, and defendant Kupiec had nothing to do with that. *See* Pl.'s Ex. Z(32), Dkt. No. 205–3 at 293).

FN32. Even if the court were considering the test score incident, the court would find no adverse action because in a letter, dated November 14, 2011, Acting Commissioner for Program Services Catherine M. Jacobsen wrote to plaintiff, explaining the facility's response to the test tearing incident. (Pl.'s Ex. Z(31)) (Dkt. No. 205–3 at 289). The facility informed Acting Commissioner Jacobsen that "the mail was taped and placed into an envelope with a note of apology explaining the error." (*Id.*)

## b. Access to Courts

Plaintiff claims that defendant Kupiec's failure to send his Notice by certified mail denied plaintiff access to courts because he was forced to withdraw his action.[FN33] Plaintiff's allegation has no basis whatso-

ever. Plaintiff concedes that he withdrew his New York Court of Claims action of his own accord. At his deposition, plaintiff stated "I had to dismiss [the Court of Claims action] because after I found out about these reckless lies, I had to dismiss it." (Pl.'s Dep. at 79). At plaintiff's deposition, the Assistant Attorney General asked why plaintiff did not just send a new Notice if he really believed that his case would be dismissed without a notice sent by certified mail. It was clear that plaintiff would have had time to send a new one, and plaintiff had been reimbursed for the mail that was improperly sent. (*Id.* at 80–82). Plaintiff then stated that the notice covered earlier incidents, and would have been untimely for the "earlier" incidents. (*Id.* at 82).

FN33. Plaintiff claims that the withdrawal of his action constitutes the "actual injury" he needs to establish an access to courts claim.

At the same time, plaintiff stated that he withdrew the action because he "wanted to change his theory" and go to federal court, because plaintiff stated that the "Court of Claims is only [for] negligence and property damage." (*Id.* at 83). Plaintiff then reasserted that the "Court" ***would have*** stricken his "motion" [FN34] because he did not serve the Attorney General with his Notice by certified mail. Plaintiff cannot "create" an access to courts claim by voluntarily withdrawing his action and then speculating what the court would have done if he had not withdrawn the action.

FN34. It is not clear what "motion" would have been stricken.

According to plaintiff, the Notice was required to be served on the Attorney General, not the Court. (T. 81). The court would have no way of knowing that the Notice was not served by certified mail, unless the Attorney General made a motion to dismiss on that basis. Even if the Attorney General made such a motion, plaintiff could have opposed the motion by stat-

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

ing that a mistake was made in mailing the item. There is no way to know that plaintiff's case would have been dismissed. In any event, it is clear from plaintiff's deposition that he would not have stayed in the Court of Claims. At his deposition, he clearly stated that he "wanted to change his theory" and go to Federal Court. (DT at 83). That is not a denial of access to courts "caused" by defendant Kupiec's conduct. Thus, plaintiff's access to courts claim may be dismissed.

## 2. Defendants Ready and Ellis

**\*20** Plaintiff alleges that the actions taken by defendants Ready and Ellis were taken in retaliation for a grievance that plaintiff filed on September 20, 2010 against defendant Ellis and CO Johnston.[FN35] Defendant Ready states that he did not know about the September 20, 2010 grievance on December 7, 2010, because he was transferred to Mid–State in September of 2010. (Ready Decl. ¶ 13). In his response, plaintiff argues that defendant Ready must have known about the September grievance because "it was not until November 24, 2010 that the Grievance Supervisor disciplined the officers including Ready regarding allowing inmates ... to adhere to Jewish memos and callouts." (Pl.'s Mem. at ¶ 24) (Dkt. No. 205–1 at 18).

> [FN35]. CO Johnston is a former defendant who was dismissed from this action pursuant to Judge D'Agostino's September 27, 2011 Order. (Dkt. No. 19).

First, the court notes that there is no indication the Ready, or any other officer was "disciplined." The Superintendent's response states that the facility policies were reviewed and "corrective action taken."[FN36] This does not mean "discipline ." The Superintendent's response also states that the "referenced employees were advised and clarification given with regards to this matter." (Pl.'s Ex. N(1) (Dkt. No. 205–1 at 93). Defendant Ready was not one of the employees referenced in the grievance and was not involved in the September incident.[FN37] Thus, he would not have been disciplined or even "advised" of the incident.

The memorandum cited by plaintiff, dated November 24, 2010 was between C. Tapia, the IGP Supervisor and DSP Phillips.

> [FN36]. The September incident was only tangentially related to the exercise of plaintiff's religious rights. Plaintiff had attended a religious service in the morning of September 9, 2010, and because of the religious holiday, he was excused from all programming on that day. Plaintiff chose to attend the law library in the afternoon because he had been excused from his other program, based upon a memorandum written by DSP Phillips. Plaintiff was prevented from doing so, but the grievance was resolved in his favor. However, plaintiff did not miss a religious service, he was only prevented from spending his free afternoon, pursuing non-religious activities the way he wished.

> [FN37]. In fact, plaintiff was convinced that no "corrective action" was taken. However, he has included a memorandum from Christopher Tapia (IGP Supervisor) to Julie Dennis, dated December 7, 2010, stating that, after receiving a telephone call from DSP Phillips, Director Tapia spoke with CO Johnson the day that Director Tapia received the plaintiff's complaint. (Pl.'s Ex. Z(42), Dkt. No. 205–3 at 341). Director Tapia explained the proper procedure and "clarified" the memo. "The corrective action was that the memo was clarified. All referenced staff are now aware and no other complaints received." (*Id.*) No "discipline" was involved, and there is no reference to defendant Ready in this memorandum and no reason that he would have been advised of the issue because he was not involved in the incident.

The fact that the defendants work in the same facility, or even on the same unit, is not sufficient to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

show that defendant Ready was aware of plaintiff's grievance against two other officers or that he would have retaliated against plaintiff for a grievance in which she was not involved. As stated above, generally, it is difficult to show retaliation for actions taken against another officer. *Hare v. Hayden, supra,* 09 Civ. 3135, 2011 WL 1453789, at *4.

Further, the court finds that neither the action allegedly taken by defendant Ready, nor the action allegedly taken by defendant Ellis rises to the level of an "adverse action" under the case law. Keeping plaintiff out of one service because defendant Ready did not have the correct call-out list, is not an action that would deter a "similarly situated" individual from exercising his rights. With respect to defendant Ellis, even assuming that he had anything to do with shortening the Purim service (which this court has found that he did not), this action would certainly not deter someone similarly situated to plaintiff from asserting his rights.[FN38] Additionally, plaintiff claims that defendant Ellis was responsible for sending *all* the inmates back to their housing unit to wait for the Rabbis. Clearly, even if that were true, plaintiff concedes that he did not return to his housing unit, and defendant Ellis could not have been retaliating against plaintiff by taking action against other inmates.[FN39] Therefore, any retaliation claims against defendants Ellis and Ready may be dismissed.

FN38. In fact, the only adverse action alleged in plaintiff's grievance (aside from the shorter service) was that the inmates were not allowed to wait in the chapel for the rabbi or rabbis to arrive. Clearly, this is not "adverse" within the meaning of a retaliation claim.

FN39. During his deposition, plaintiff testified that Ellis was "taking it out" on all the other Jewish inmates because of a grievance written by plaintiff against him. (Pl.'s Dep. at 54). Plaintiff's complaint was that "Ellis won't even open the door until the last mi-

nute, so we all just hanging out outside the chapel because Ellis won't open the door." (*Id.* at 55). Failure to open a door before services are about to start can hardly be categorized as "adverse action." Once again, the court does not make any findings against defendant Ellis. The court is assuming the facts, hypothetically, for purposes of this particular discussion.

**VII. *Personal Involvement***

**A. Legal Standards**

***21** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

The mere receipt of a letter or similar complaint is insufficient to constitute personal involvement; otherwise, a plaintiff could create personal involvement by any supervisor simply by writing a letter. (*Id.*) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). In order for a letter to suffice to establish personal involvement, plaintiff would have to show that the supervisor conducted a personal investigation or personally took action on the letter or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009); *Bodie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004). However, personal action does *not* include referring the letter to a subordinate for investigation. *Id.* (citing *Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)); *Hartnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008).

**B. Application**

In my April 3, 2013 recommendation, I noted that in Judge D'Agostino's initial order, the allegations of personal involvement against defendants Fischer and Boll were "rather sparse." (Dkt. No. 148 at 24). Notwithstanding these "sparse" allegations, Judge D'Agostino allowed the case to continue as against these supervisory defendants. (*Id.*) In a conclusory fashion, plaintiff claimed that he had so many documents from these two defendants, he could "flood the docket." (*Id.*) (citing Dkt. No. 129 at 22). Plaintiff's response to the defendants' motion for judgment on the pleadings implied that he could make the appropriate showing, perhaps by amending his complaint. Because at that time, I was recommending that this action proceed at least to a properly supported motion for summary judgment, I did not recommend dismissing the action as against defendants Fischer and Boll based on lack of personal involvement. (*Id.*)

**\*22** Plaintiff did not amend his complaint, and he later stipulated to dismissing the action as against Fischer. However, in his response to the motion for summary judgment, he maintains that defendant Boll was personally involved in the alleged constitutional violations because she stated in her response to in-

terrogatories that her "office" became aware of plaintiff's September 9, 2010 grievance when a copy of plaintiff's correspondence to a Deputy Commissioner of Program Services was "forwarded to my office." (Dkt. No. 205–3 at 355). Defendant Boll states that she had no personal knowledge or recollection of the grievance itself because the Office of Counsel is not the appropriate department to file a grievance. (*Id* . at 355–56). Defendant Boll also states that "upon receipt of your letter, the matter was investigated by the Office of Counsel, and I responded to you on December 2, 2010. (Exhibit B attached hereto)." (*Id.* at 356). Plaintiff seizes upon this statement, and accuses defendant Boll of lying to the court because she "admits" that she responded to plaintiff.

First, it is unclear whether plaintiff's September 9, 2011 grievance against defendant Ellis has anything to do with the facts of this case.[FN40] Plaintiff has seen fit not to include the letter that defendant Boll said that she wrote to him in response.[FN41] However, defendant Boll has included the letter as an attachment to her declaration in support of the summary judgment motion. (Boll Decl. Ex. A) (Dkt. No. 202–6). In her declaration, defendant Boll states that as Deputy Commissioner and Counsel for DOCCS, she serves as legal counsel for the Commissioner of DOCCS and oversees DOCCS Office of Legal Counsel which is responsible for all of the legal services necessary for the day-to-day operation of the DOCCS Central Office and the correctional institutions that make up the department. (Boll Decl. ¶ 5).

> **FN40.** Plaintiff's interrogatory asks when defendant Boll became "aware" of plaintiff's September 9, 2010 grievance against defendant Ellis. (Dkt. No. 205–3 ¶ 7). However, none of the claims in this law suit relating to defendant Ellis occurred in September of 2010. Thus, any information in the September 9, 2010 grievance would not have even made defendant Boll aware of the claims in this action.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

FN41. Clearly plaintiff received a copy of the letter as indicated in the response to the interrogatory. The letter is not supportive of plaintiff's claim, and it is disingenuous of plaintiff to omit the letter and cite only parts of defendant Boll's response to the interrogatories. Plaintiff's accusations that defendant is "lying" to the court are completely unfounded, and apparently plaintiff did not read the defendant's affidavit or see the letter that was attached. Plaintiff is constantly accusing others of nefarious conduct, while omitting important facts himself.

Defendant Boll states that her office routinely received hundreds of letters per year from inmates or on behalf of inmates. (*Id.* ¶ 6). When the Office receives one of these letters, one of the defendant's support staff reads it and determines which of the attorneys on her staff or other staff person should address the issues in the letter. The letter is then forwarded to the attorney or other staff person to investigate and prepare a response, if warranted. The response may be prepared for the attorney's signature, a Deputy Counsel's signature, or defendant Boll's signature "depending on the circumstances." (*Id.*)

Contrary to plaintiff's accusations that defendant Boll is somehow trying to hide her involvement, defendant Boll admits responding to three letters received from the plaintiff. (*Id.* ¶ 7). The letter that plaintiff apparently believes is the "smoking gun" which shows that defendant Boll was personally involved in whatever constitutional violation the plaintiff alleged, is actually a letter reminding plaintiff that he had filed a grievance, and that his grievance had been appealed to the Central Office Review Committee ("CORC"), and a decision was pending. (*Id.* ¶ 8). In the letter, plaintiff was advised that the CORC would conduct a thorough investigation, and that plaintiff would be notified of its decision. (*Id.* & Ex. A). Defendant Boll states that she did not take any

action to "investigate the claims contained in plaintiff's Inmate Grievance Complaint that [she] referenced in [her] December 2, 2010 letter to plaintiff." FN42 (*Id.* ¶ 9).

FN42. The court must point out that the incident with defendant Ready did not occur until December 7, 2010, and the incident with defendant Ellis did not occur until March of 2011, so the plaintiff's first letter and defendant Boll's December 2nd response could not have been related to an incident that had not yet occurred and could not have "created" any personal involvement in any event.

**\*23** A reading of defendant Boll's letter supports her declaration. Her office's "investigation" was not an investigation of the "merits" of the grievance, it was merely an "investigation" of the status of plaintiff's grievance and a reminder that the "Inmate Grievance Program was instituted to handle issues such as yours." (*Id.* Ex. A). Defendant Boll was reporting to plaintiff that an investigation had been conducted by other officials of DOCCS. Defendant Boll then stated:

The CORC will conduct a thorough investigation to assure that your rights are observed and your issues are addressed. If any corrective action is needed, you will be notified. As your appeal to the CORC is still pending, it is recommended that you await the decision.

(*Id.*) If an individual were able to create "personal involvement" by simply writing a letter to a superior, who was good enough to answer with a explanation such as this, it would eviscerate the well-settled principle that respondeat superior does not apply in civil rights cases. Clearly, defendant Boll did not conduct a "personal investigation" of the religious issue outlined in plaintiff's grievance.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant Boll wrote another letter, dated January 28, 2011, in response to a new letter from plaintiff, dated December 20, 2011. (Boll Decl. ¶ 10 & Ex. B). Defendant Boll's letter merely stated that she had already written to plaintiff on December 2, 2010, and noted that the CORC had completed its review by correspondence dated December 8, 2010, accepting plaintiff's grievance in part. (Boll Decl. Ex. B). Defendant Boll further stated that plaintiff had been told "to bring further concerns to the attention of area supervisory staff, at [his] facility, at the time of the incident, for any remedial action deemed necessary." (*Id.*)

By the time of plaintiff's second letter to defendant Boll, the December 7th incident had occurred, and defendant Boll noted the "reoccurrence," stating that Superintendent William Hulihan had investigated the incident, "and advised you of his findings and actions on January 14, 2011." (*Id.*) Defendant Boll's explanatory letter does not create personal involvement as it is clear from the letter that she did not have anything to do with investigating the incident. She just determined that an investigation had taken place and was advising the plaintiff that he "should continue to follow the Directive for any further incidences that [h]e may have." (*Id.*)

Finally, plaintiff wrote to defendant Boll again, and she responded on March 3, 2011. (Boll Decl. ¶ 12 & Ex. C). Plaintiff claimed that no corrective action had been taken with regard to one of his grievances, and defendant Boll merely advised plaintiff that her office had contacted the staff at the correctional facility, who advised defendant Boll that plaintiff's claims had been properly investigated and corrective action had been taken. Defendant Boll took no further action. (Boll Decl. ¶¶ 12, 14). Defendant Boll states that she took no investigative action on any of plaintiff's letters. (Boll Decl. ¶ 15). She merely inquired into the status of plaintiff's grievances and reported her findings to plaintiff. Defendant Boll's letters support her

assertions, and plaintiff's attempt to create personal involvement by citing portions of one of the defendant's letters, without the entire letter must fail.

**\*24** Plaintiff may not understand the above-cited law and may be under the misapprehension that the simple fact that defendant Boll responded to his letters made her personally involved in the subject matter of the letter. The cases cited above show that this is not the law. Plaintiff is confusing the difference between a letter, telling him that someone else did an investigation, with a personal investigation of the merits after receipt of the letter. The former is not personal involvement, while the latter is personal involvement. Thus, the complaint may also be dismissed as against defendant Boll on this basis as well.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 202) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 23, 2014.

N.D.N.Y.,2014.
Guillory v. Ellis
Slip Copy, 2014 WL 4365274 (N.D.N.Y.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4365274 (N.D.N.Y.)
**(Cite as: 2014 WL 4365274 (N.D.N.Y.))**

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Christopher ROSS, Plaintiff,
v.
WESTCHESTER COUNTY JAIL, Westchester
County Department of Corrections Medical Depart-
ment, Warden Anthony Amicucci, Captain Ray
Rhodes, Captain Soychek, Sergeant Martinez, Ser-
geant Schmidt, Sergeant Del Treste, Sergeant Bell,
Sergeant Woods, Sergeant Coley, Sergeant MaCca-
bee, Officer Burges, Medical Liaison June Yozzo,
Defendants.

No. 10 Civ. 3937(DLC).
Jan. 11, 2012.

Christopher Ross, Valhalla, NY, pro se.

Christine Lynne D'Alessio Assistant County Attorney
Westchester County Attorney's Office, White Plains,
NY, for defendants.

*OPINION & ORDER*
DENISE COTE, District Judge.

**\*1** Plaintiff Christopher Ross ("Ross"), proceed-
ing *pro se,* brings this action pursuant to 42 U.S.C. §
1983 for injunctive relief and compensatory damages
against the Westchester County Jail ("Jail"), the
Westchester County Department of Corrections
Medical Department ("Medical Department") and
twelve officers and employees at the Jail. Ross prin-
cipally alleges that the defendants failed to provide
adequate medical care for his sleep apnea; denied his
Freedom of Information Law ("FOIL") requests; fal-
sified documents; retaliated against him for the filing

of grievances and this action; and violated his right to
medical privacy under the Health Insurance Portabil-
ity and Accountability Act of 1996 ("HIPAA"), 29
U.S.C. § 1182, the Fourteenth Amendment, and state
law.[FN1]

> **FN1.** Ross's allegations of violations of his
> right to medical privacy and HIPAA are
> contained in his opposition to the defendants'
> motion.

The defendants have filed a motion under
F.R.C.P. 12(b)(6), to dismiss Ross's amended com-
plaint. For the following reasons, the motion is
granted in part. The claims against all the individual
defendants are dismissed.

BACKGROUND
The following facts are taken from Ross's Feb-
ruary 24, 2011 amended complaint or his opposition to
the motion to dismiss and assumed to be true for the
purposes of this motion. On August 14, 2009, Ross
arrived at the Jail and informed a Nurse Practitioner
that he had recently been released from Greenwich
Hospital and suffered from cardiomyopathy, high
blood pressure, hypertension and sleep apnea. Ross
explained that he had had a catheterization procedure
to inspect the left side of his heart for blockage be-
cause he had cognitive heart failure. Ross provided the
medical staff with a list of prescribed medications.

*December 2009 Grievance and Lack of Treatment for
Sleep Apnea*
On December 5, Ross filed a grievance ("De-
cember 2009 Grievance") requesting a continuous
positive airway pressure machine ("CPAP") for his
sleep apnea. Later that day, he was examined by a
Nurse Practitioner who told him that he should see a
doctor. On December 7, Ross was seen by Dr. Gold-
berg and transferred from the Special Housing Unit

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

("SHU") to the infirmary where he was given access to an outdated bi-level positive airway pressure machine ("Bi–PAP").

On December 8, Sgt. Schmidt ("Schmidt") rejected Ross's December 2009 Grievance as unsubstantiated. Ross asserts that this decision was based on a report by Medical Liaison June Yozzo ("Yozzo") that falsely stated that Ross had previously refused to be housed in the infirmary and to use the CPAP machine on August 14 and December 5, 2009.

On December 11, Sgt. Martinez ("Martinez") delivered to Ross a memorandum from Warden Anthony Amicucci ("Amicucci") answering the December 2009 Grievance. The next day, however, Martinez came back to retrieve the memorandum, stating that Amicucci needed it back. Ross asked Martinez about a statement in the memorandum suggesting that he had previously refused the SHU.[FN2] Martinez told him not to worry about it because he had won his grievance.

> FN2. The memorandum stated, "[o]ddly the CPAP machine was offered to you again on the same day you filed your grievance. It would seem that the reemergence of your condition has coincided with your disciplinary problem that landed you in the SHU. It now seems that you are accepting the offer because you get relocated to the infirmary."

**\*2** After Martinez retrieved the original memorandum decision on the December 2009 Grievance, Ross requested a copy of the memorandum and was instructed by Martinez to fill out a FOIL request for copies of the grievance file. On December 11, Ross filed a FOIL request for the grievance file and on December 22, three dollars were deducted from his inmate account for the FOIL request.

On December 18, Sgt. Woods ("Woods") brought the appeal portion of the December 2009 Grievance to

Ross and asked him if he still wanted to appeal. Ross indicated that he would like to appeal. Later that day, Sgt. Burligham brought back a copy of the memorandum but the language in it had been changed and Amicucci's initials were now omitted ("Altered Memorandum"). Ross was told that the Altered Memorandum had come from Captain Rhodes ("Rhodes").

On January 12, 2010, Captain Soychek ("Soychek") approached Ross and called him a "scammer" in the presence of Correction Officer Mack, who is not a member of the medical staff, and other prisoners, and "threaten[ed][him] in a hostile manner." Soychek told him that he had faked his medical condition to get out of SHU "but he was going to make it his business to have [Ross] back in the SHU."

On January 17, Ross filed a grievance, number J–14–10 ("January 2010 Grievance") claiming that the memorandum responding to the December 2009 Grievance had been altered. Ross later accused Rhodes of tampering with the memorandum.

On January 20, Ross filed a FOIL request for his medical records. The fee was deducted from his inmate account on January 22, and he received the records on January 27.

That same day, Amicucci stated in response to Ross's appeal of the December 2009 Grievance, that he had been placed in the infirmary because of the medical staff's assessment of his medical condition, not because of the grievance he had filed. Ross claims that the defendants only provided him with treatment for his sleep apnea because he filed the December 2009 Grievance.

*February 2010 Grievance*

On February 16, 2010, Ross filed a grievance, number J–29–10 ("February 2010 Grievance"), con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

cerning the denial of his FOIL request for copies of the file of the December 2009 Grievance. On February 22, Sgt. Del Treste ("Del Treste") informed Ross that his February 2010 Grievance was denied because he had not filed it within five days of the act or occurrence giving rise to the grievance. Ross told him that the February 2010 Grievance was based on a letter he had written to the cashier about not receiving the copies of the December 2009 Grievance.

Later that day, Ross had a conversation with Rhodes, who was accompanied by Yozzo, about the February 2010 Grievance. Rhodes asked why Ross was complaining, as he had already received his medical records. Ross explained that his February 2010 Grievance was not about the medical records, but about not receiving copies of the December 2009 Grievance file that he paid for. Ross also asked Rhodes why he had altered the decision on the December 2009 Grievance, at which point Rhodes became hostile, started screaming and left.

**\*3** On February 23, Del Treste gave Ross an "addendum" stating that copies of his medical records were being provided to him as a courtesy. Ross informed him that the February 2010 Grievance did not concern the medical records and that he wanted a refund because he had been refused copies of his December 2009 Grievance file. Ross then asked Del Treste to read to him what the February 2010 Grievance was about, but Del Treste became extremely hostile and said "I don't have to do this shit I am not your Mother or Father." When Ross informed him that Ross's parents were deceased, Del Treste said he didn't care and called Ross a "dumb nigger." On February 24, Amicucci denied Ross's FOIL request. Ross asserts that this was an attempt to cover-up the creation of the Altered Memorandum.

*March 2010 Grievance Concerning Bi–PAP*

On March 18, Ross filed another grievance stating that he was experiencing difficulty breathing and sleeping at night in the infirmary ("March 2010

Grievance"). Ross claimed that the Bi–PAP machine was outdated and the pressure setting, which had not been set by a medical technician or doctor during the three months he had been using the machine, was not working properly. Ross requested that his sleep apnea be tested with a Nocturnal Polysomnography, Oximetry or Portable Cardiorespiratory, and sought a referral to an otolaryngologist and a sleep study specialist to get a proper prescription for adjustment of the Bi–PAP machine. Ross's grievance was denied.

*May 2010 Davis Visit*

On May 8, Ross's fiancée, Caroline Davis ("Davis"), attempted to visit Ross at the Jail. When she arrived at the entry point, she was harassed by Correction Officer Burges ("Burges"), who told her that Ross did not have a scheduled visit. When she informed him that the visit had been switched, Burges replied "Oh Ross that's the guy who hit the guy in the head with a chair. He is in I–Block (Infirmary) faking like he got sleep apnea." When Davis attempted to leave money for Ross, she was told she could not leave money because Ross did not have a scheduled visit.

On May 12, Ross filed a grievance ("May 2010 Grievance") with Bell and wrote a formal complaint to the Department of Health and Human Services about the incident with Davis. On May 18, Sgt. Bell ("Bell") made false statements in his report about the incident with Davis. When Ross tried to submit a statement from Davis stating that she was harassed by Burges, Bell refused to accept it. Bell informed Ross that he had spoken to Sgt. Maccabee ("Maccabee"), who stated that Davis had refused to make a statement. Ross told Bell that was a "bold face lie" and that Davis had made several attempts to call someone at the Jail to complain but that she had been "given the run around." On May 20, Ross submitted a letter about these false statements to the Westchester County Executive's Office, the Westchester County Department of Health, the New York State Commission of Correctional Services, and the Department of Health and Human Services.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

*June 2010 Efforts to Review Medical Records*

**\*4** On June 28, Ross attempted to file another grievance concerning the refusal to allow him to review his medical records, but Woods refused to take it. Ross was also told that he could not review his medical records or get a sleep study number from the doctor's office. Ross complained to Block Officer Freeman, who filed the grievance in the infirmary log book.

On June 29, Ross filed another grievance with Sgt. Coley ("Coley") about the continuing failure to adjust the Bi–PAP machine ("June 2010 Grievance"). Ross also complained that Yozzo had told him that he could not review his medical records without first paying for the entire medical file. Coley told him that he would take the June 2010 Grievance so that he would not get suspended. The next day, however, Coley returned the June 2010 Grievance and stated that Ross had previously grieved the same issue. Ross tried to explain that although the medical issues were the same, the Bi–PAP machine was different and that he had the right to review his medical file. Coley became hostile and verbally abused Ross, saying he was a "fat piece of shit, who thinks [he's] a lawyer and that he would kick [Ross's] ass if their [sic] were not camera's [sic] watching."

*Ross Files Federal Lawsuit in May 2010*

On May 12, 2010, Ross commenced this lawsuit. The complaint was first served on several of the defendants on June 17. In an August 16 letter to the defendants, Ross requested permission to amend his complaint. Ross was directed to file an amended complaint by November 19. Ross did not file an amended complaint, and on January 13, 2011, the defendants moved to dismiss all claims in the complaint. On February 4, a pre-trial conference was held, and Ross was permitted to file an amended complaint. Ross filed the amended complaint ("Complaint") on February 24. The defendants then renewed their motion to dismiss, which became fully submitted on July

26.

DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citation omitted). Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC,* 570 F.3d 471, 475 (2d Cir.2009). Moreover, pleadings filed by *pro se* plaintiffs are to be construed liberally. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (citation omitted). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 146 (2d Cir.2002). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949–50.

**\*5** Accordingly, a court may disregard "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 1940. In determining the adequacy of a complaint "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

In their motion to dismiss, the defendants identify four reasons why Ross's Complaint should be dismissed. They are that the Complaint fails: (1) to state a claim; (2) to allege that the defendants were personally involved in the alleged violations; and (3) to allege that Westchester County promulgated a policy or custom resulting in the violation of Ross's rights. They also assert that the individual defendants are entitled to qualified immunity.

A. Deliberate Indifference to Serious Medical Needs

Ross asserts a claim against Westchester County [FN3] for deliberate indifference to his serious medical needs in violation of his Eighth and Fourteenth Amendment rights.[FN4] "There are two elements to a claim of deliberate indifference to a serious medical condition: [t]he plaintiff must show that [he] had a 'serious medical condition' and that it was met with 'deliberate indifference .' " *Caiozzo,* 581 F.3d at 72 (citation omitted); *see also Hill v. Curcione,* 657 F.3d 116, 122–23 (2d Cir.2011); *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). Deliberate indifference is a mental state akin to "recklessness," and is measured using a "subjective test" that discerns whether the defendant was "actually aware of an excessive risk to an inmate's health or safety," *Caiozzo,* 581 F.3d at 69, and therefore "act[ed] with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).[FN5]

FN3. Ross named the Jail and the Medical Department as defendants. These defendants do not, however, have legal identities separate and apart from the County and, therefore, cannot be sued. *Jones v. Westchester Cty. Dep't of Corr. Med. Dep't,* 557 F.Supp.2d 408, 416 n. 4 (S.D.N.Y.2008).

FN4. The defendants represent that Ross was a pretrial detainee during the events in question. The Eighth Amendment does not apply to a pretrial detainee. *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). Nonetheless,

"[c]laims for deliberate indifference to a serious medical condition ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Id.* at 72.

FN5. In his opposition to this motion, Ross asks the Court to consider the U.S. Department of Justice Investigation Report issued on November 19, 2009, regarding conditions at the Jail. "In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 192 (2d Cir.2006). Therefore, the report will not be considered in deciding this motion.

"As the Supreme Court has noted, the prison official's duty is only to provide reasonable care." *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 844–47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). An inmate is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Furthermore, a "mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Hill,* 657 F.3d at 123 (citation omitted). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984).

Ross's allegations are sufficient to state a claim against the County for deliberate indifference to a serious medical need. *Sleep apnea* may be a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

life-threatening disorder. Ross alleges that it causes him to stop breathing while he sleeps. Ross also alleges that although the medical staff was informed about his sleep apnea when Ross arrived at the Jail on August 14, 2009, Westchester County failed to provide him any treatment for over three months and that the Bi–PAP machine he was given on December 7, 2009, was not properly adjusted for his prescription. Ross does not seek to hold any individual defendant liable for these medical claims, rather he seeks to hold the County responsible for the deliberate indifference to his medical needs.

**\*6** Ross's remaining allegations regarding his medical treatment at the Jail, however, must be dismissed. His complaints that the Bi–PAP machine he was given to use on December 7 was not a state-of-the-art machine, that he was not referred to an otolaryngologist or a sleep study specialist, and that his illness was not tested with specific kinds of tests, constitute mere disagreements with a course of treatment and fail to state a claim. *See Hill,* 657 F.3d at 123.

**B. Retaliation Claims**

Ross alleges that the defendants retaliated against him for filing grievances and this § 1983 lawsuit by verbally threatening him on several occasions, harassing Davis when she attempted to visit him, and interfering with his ability to file further grievances. Ross has not alleged a retaliation claim.

To establish a First Amendment claim of retaliation, a plaintiff must show:

(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.

*Espinal v. Goord,* 558 F.3d 119, 128 (2d

Cir.2009) (citation omitted). Because of the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which these claims of retaliation may be fabricated," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted).

In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citation omitted). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Id.* (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). When considering a prisoner's retaliation claims, the court must bear in mind that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation omitted).

In order to satisfy the causation requirement, a plaintiff must allege facts suggesting that the protected conduct "played a substantial part in the adverse action." *Dawes,* 239 F.3d at 492. "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 558 F.3d at 129.

**\*7** It is undisputed that Ross has satisfied this first prong of a retaliation claim. The First Amendment protects prisoners from retaliation for the filing of grievances and lawsuits.[FN6] *See id.* As described below, however, Ross's pleadings do not allege conduct

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

on the part of individual defendants that rises to the level of adverse action.

> FN6. To the extent any of Ross's retaliation claims are premised solely on the filing of this lawsuit, however, all those acts of retaliation that are alleged to have occurred before June 17, 2010, must be dismissed. Ross alleges multiple acts by the defendants that occurred between January 12, 2010 and June 30, 2010. Ross filed this action on May 12, 2010, and first served it on a defendant on June 17, 2010, well after most of the alleged retaliatory acts had taken place.

The threats and hostile comments that Ross alleges were made by Soychek, Del Treste and Coley are insufficient to establish a constitutional violation. FN7 Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim. *Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (calling prisoner a "stoolie" in the presence of fellow inmates), *abrogated on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Dawes,* 239 F.3d at 493 (calling a prisoner a "rat" or "informant"); *see also Davis,* 320 F.3d at 353; *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (rudeness and namecalling). Ross does not allege threats and comments by these three defendants that were direct and specific enough to deter a prisoner from exercising his First Amendment rights. *See Gill,* 389 F.3d at 381.

> FN7. Although Ross claims that Rhodes was hostile and screamed at him, Ross does not allege that Rhodes did so with a retaliatory intent.

Ross's claims of retaliatory conduct by Burges also fail to satisfy the adverse action standard. Ross alleges that Burges divulged his sleep apnea condition

to Davis, "harassed" her when she attempted to visit Ross at the jail, and prevented her from seeing him or making deposits in his commissary account asserting, erroneously, that her visit was unscheduled. Burges's alleged disclosure of Ross's sleep apnea condition does not constitute an adverse action because, as discussed below, sleep apnea is not an intimate or shameful condition whose disclosure is likely to result in acts of discrimination or intolerance. Likewise, even if Burges's alleged harassment of Davis could be construed as an indirect effort to deter Ross from exercising his First Amendment rights, as noted above, such stray remarks do not satisfy the adverse action requirement. *See Morales,* 278 F.3d at 131–32. Nor can it be said that the one occasion on which Burges prevented Davis from visiting Ross or making deposits into his commissary account constituted conduct "that would deter a similarly situated individual of ordinary firmness from exercising his [ ] constitutional rights." *Davis,* 320 F.3d at 353. Ross does not allege that Burges regularly denied him visitations or that the isolated incident involving Davis resulted from bad faith rather than from an innocent misunderstanding regarding the date for which her visit had been scheduled.

Ross's retaliation claim against Bell fares no better. Ross asserts that Bell authored a report that falsely stated that Davis never sought to make a complaint. It is true that the filing of a false report may be actionable if made in retaliation for a prisoner's exercise of his constitutional rights. *Gill,* 389 F.3d at 380; *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997). Bell's alleged actions, however, are simply *de minimis* and fall outside the ambit of constitutional protection. *Davis,* 320 F.3d at 353. Ross does not articulate any particular harm that he suffered as a result of Bell's actions that would likely deter a similarly situated person of ordinary firmness from continuing to file grievances.

*8 Ross's remaining retaliation claim FN8 is against Woods for refusing to file a grievance that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

Ross submitted to him on June 28, 2010. [FN9] The refusal to file a single grievance is, without more, insufficient to constitute an adverse action. A refusal to file a single grievance is not the kind or retaliatory act which deter a prisoner of "ordinary firmness" from filing other grievances. *Id.*

> **FN8.** Although Ross alleges that Yozzo denied him his right to review his medical file and Sgt. Coley returned his June 2010 Grievance, Ross does not allege that Yozzo and Coley acted with retaliatory intent.

> **FN9.** Ross asserts in his opposition to the motion to dismiss that the Jail has failed to maintain an adequate detainee grievance system. To the extent Ross seeks to raise a standalone claim based on the prison grievance process and its failure to properly investigate his grievances, it must be dismissed. A claim of violation of a state grievance procedure is not cognizable under § 1983 because prison grievance procedures are not constitutionally mandated. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991) (per curiam).

**C. False Statements in Documents**

Ross alleges that defendants Amicucci, Rhodes, Yozzo, Bell and Maccabee created documents containing false accusations and statements. A prisoner has no "general constitutional right" to be free from false accusations. *Boddie,* 105 F.3d at 862. To violate a plaintiff's constitutional rights, "[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right." *Id.* The claims based on the assertion that certain defendants created reports with false statements are therefore dismissed.

**D. Denial of FOIL Request**

Ross claims that the defendants improperly denied his FOIL request for copies of the December 2009 Grievance. This is construed as a claim that Ross was deprived of property without due process of law. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation omitted).

Ross does not have a property interest in obtaining documents under FOIL. *See Papay v. Haselhuhn, No. 07 Civ. 3858(LAP), 2010 WL 4140430, at *7 (S.D.N.Y. Oct.21, 2010); O'Bradovich v. Village of Tucahoe,* 325 F.Supp.2d 413, 432 (S.D.N.Y.2004). FOIL documents are not produced as of right but only after request and investigation by the state entity. *See* N.Y. Pub. Off. Law §§ 84–89. A plaintiff therefore has only an expectation of receipt of such documents. *See O'Bradovich,* 325 F.Supp.2d at 432–33. Because Ross has no property interest in the FOIL documents, the defendants' failure to provide the requested documents does not constitute a violation of Ross's constitutional rights.

Even if Ross had a constitutionally protected interest in obtaining documents pursuant to FOIL, his due process claim would still fail. Whether or not the denial of his FOIL request is considered "random and unauthorized," *Rivera–Powell v. New York City Bd. Of Elections,* 470 F.3d 458, 465–67 (2d Cir.2006), New York's Article 78 procedures constitute an adequate postdeprivation remedy for an alleged FOIL violation. *See Harris v. Mills,* 572 F.3d 66, 76 (2d Cir.2009).

**E. *HIPAA and Medical Privacy Claims***

Ross alleges that the defendants violated HIPAA and his right to medical privacy by improperly disclosing his medical information. Ross bases his claims on three alleged disclosures: Soychek's discussing his medical condition in the presence of another correction officer and other prisoners and calling him a "scammer"; Rhodes's and Yozzo's discussing his medical condition; and Burges's assertion to Davis

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

that Ross was "faking like he got sleep apnea."

**\*9** Although HIPAA generally provides for the confidentiality of medical records, 42 U.S.C. §§ 1320d–1 to d–7, an individual cannot sue for its enforcement or for damages caused by disclosures. *See Acara v. Banks,* 470 F.3d 569, 571 (5th Cir.2006); *Warren Pearl Constr. Corp. v. Guardian Life Ins. Co. of Am.,* 639 F.Supp.2d 371, 377 (S.D.N.Y.2009) (collecting cases). Only the Secretary of Health and Human Services or other government authorities may bring a HIPAA enforcement action. *See* 42 U.S.C. § 300gg–22. Therefore, Ross's HIPAA claim against Soychek, Rhodes, Yozzo and Burges is dismissed.

Nor can Ross convert this claim into a claimed violation of his constitutional rights. The Fourteenth Amendment Due Process Clause protects prisoners from the unwanted disclosure of certain medical information. *See Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y.,* 631 F.3d 57, 63–64 (2d Cir.2011). A prisoner's right of privacy varies depending on the medical condition. Greater protection is afforded to conditions that are "excruciatingly private and intimate in nature," such as HIV status and transsexualism. *Id.* at 64 (citation omitted).

Ross's claims regarding the disclosure of his sleep apnea do not state a constitutional violation. Sleep apnea is not an intimate or shameful condition that may expose those who suffer it to discrimination and intolerance. Ross's medical privacy claim against Soychek, Rhodes, Yozzo and Burges is therefore dismissed.

Finally, Ross alleges that the defendants violated Public Health Law § 2780 by disclosing his medical condition. N.Y. Public Health Law §§ 2780–2787 sets forth a comprehensive scheme for dealing with HIV and AIDS related information. Because Ross does not bring a claim based on those conditions his Public Health Law § 2780 is dismissed.

**F. Personal Involvement**

The defendants further argue that Ross fails to provide sufficient factual support showing the defendants' personal involvement in any constitutional wrongdoing. "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone,* 634 F.3d 642, 644 (2d Cir.2011) (citation omitted). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Accordingly, it is "well settled" that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (citation omitted). When it comes to claims of deliberate indifference to serious medical needs, a plaintiff must show such indifference on the part of a "particular defendant." *Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003).

**\*10** The only claim that has survived the motion to dismiss is the claim against Westchester County for deliberate indifference to Ross's medical needs. Ross does not allege that any of the individual defendants had any part in the failure to provide him medical treatment for his sleep apnea for three months and the improper calibration of the Bi–PAP machine he was given on December 7, 2009. The claims against each of the individual defendants are therefore dismissed.

**G. Municipal Liability**

Finally, the defendants argue that Ross has failed to allege a municipal policy or custom to support the remaining deliberate indifference to medical need claim against Westchester County. "Section 1983 'imposes liability on a government that, under color of some official policy, causes an employee to violate another's constitutional rights.' " *Okin v. Village of*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)
**(Cite as: 2012 WL 86467 (S.D.N.Y.))**

*Cornwall–on–Hudson Police Dep't.,* 577 F.3d 415, 439 (2d Cir.2009) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

> *Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.

*Id.* (citation omitted). Municipal liability may spring from a single action. *See, e.g., Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir.2004).

Ross has alleged facts sufficient to state a claim of municipal liability. He alleges that the Westchester Department of Corrections medical staff does not have an adequate system to identify prisoners with medical needs and make sure they are properly treated. Ross has asserted that this defendant did not treat his sleep apnea for over three months and that the Bi–PAP machine he was given on December 7, 2009, was not properly adjusted for his condition. These are plausible claims of deliberate indifference to his serious medical needs. Ross's allegations are therefore sufficient to sustain his claim of deliberate indifference to his medical needs against Westchester County.

CONCLUSION

The defendants' June 6, 2011 motion to dismiss is granted in part. All of the claims against the individual defendants are dismissed. Ross's claims based on retaliation, the creation of documents with false statements, the denial of FOIL requests, and HIPAA and medical privacy are dismissed. The motion to dismiss Ross's claim of inadequate medical care against Westchester County is denied to the extent described herein. The Clerk of Court will amend the caption to add Westchester County and remove Westchester County Jail and Westchester County Department of Corrections Medical Department as defendants.

    SO ORDERED:

S.D.N.Y.,2012.
Ross v. Westchester County Jail
Not Reported in F.Supp.2d, 2012 WL 86467 (S.D.N.Y.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Andre SMITH, Plaintiff,
v.
THE CITY OF NEW YORK, Captain Kennedy # 425,
Corrections Officer Bennett # 12929, Warden Mark
Farsi, Defendants.

No. 03 Civ. 7576(NRB).
May 3, 2005.

Andre Smith, Southport Correctional Facility, Pine
City, NY, Plaintiff pro se.

Michael Chestnov, Assistant Corporation Counsel,
New York, NY, for Defendants.

MEMORANDUM AND ORDER
BUCHWALD, J.

**\*1** Plaintiff Andre Smith, presently incarcerated
at the Southport Correctional Facility in Pine City,
New York, brings this action *pro se* under 42 U.S.C. §
1983 against the City of New York, Captain Anthony
Kennedy ("Captain Kennedy"), Corrections Officer
Dwayne Bennett ("C.O.Bennett"), and Warden Mark
Farsi ("Warden Farsi"). Plaintiff claims that defend-
ants destroyed his personal property and legal papers
in retaliation for his filing a federal lawsuit against
another corrections officer, thereby interfering with
his right of access to the courts and depriving him of
his property without due process. Plaintiff brings suit
under 42 U.S.C. § 1983 seeking compensatory and
punitive damages for violations of his First, Fourth,
and Fourteenth Amendments constitutional rights.

Plaintiff filed his initial complaint against de-
fendants on July 11, 2003, and an amended complaint
("Am.Compl.") on September 28, 2003. On October
20, 2004, defendants moved for summary judgment
pursuant to Fed.R.Civ.P. 56. For the reasons discussed
below, defendants' motion is granted in part and de-
nied in part.

BACKGROUND [FN1]

FN1. This factual statement is based on the
plaintiff's amended complaint and deposition
testimony except where noted.

At all times relevant to this complaint, plaintiff
was incarcerated in the Central Punitive Segregation
Unit at the Otis Bantum Correction Center on Rikers
Island. On the morning of July 8, 2003, plaintiff left
Rikers Island for arraignment in a criminal proceed-
ing. *See* Pl.'s Dep. at 86. When he returned to his
housing area ("2-South") at approximately 6:00 p.m.,
plaintiff's cell and locker were open and C.O. Bennett
informed plaintiff that his property had been moved
from Cell 14 to Cell 15. *Id.* at 91, 93. Plaintiff claims
that prison regulations required him to be present
when his property was moved. When plaintiff asked
why his property was taken, C.O. Bennett replied with
something to the effect of, "I don't like you, I'm pretty
sure you know why." *Id.* at 94-95.

After learning that C.O. Bennett had moved his
belongings, plaintiff demanded to speak with Captain
Kennedy, C.O. Bennett's supervisor. When Captain
Kennedy arrived, he allegedly told plaintiff "things
happen, this is our house." Am. Compl. ¶ 19.[FN2]
Eventually, plaintiff requested to see the property
removed from his cell and locker. Pl.'s Dep. at 113-14.
When C.O. Bennett retrieved plaintiff's property,
several items were missing. *Id.* at 118. In addition to
approximately nine hundred dollars worth of personal

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

property, [FN3] plaintiff was missing a substantial amount of his legal materials from his cell and locker. Am. Compl. ¶¶ 15-16.

> FN2. At his deposition, however, plaintiff testified that Captain Kennedy stated that he did not know where plaintiff's belongings were because C.O. Bennett had packed them. Pl.'s Dep. at 132.

> FN3. The missing personal property included personal photographs, hygiene products, clothing, books and magazines. *See id.* at 192-93.

At the time of the incident, plaintiff had one criminal case [FN4] and two civil lawsuits pending in this district. Both of plaintiff's civil lawsuits involved incidents at plaintiff's prison facility, and both named Rikers Island corrections officers as defendants.[FN5] One of plaintiff's cases named a corrections officer Jordan ("C.O.Jordan"), another corrections officer assigned to plaintiff's housing unit, as a defendant. Plaintiff's complaint alleges that C.O. Jordan and C.O. Bennett are friends from working together in 2-South, and that C.O. Bennett's actions were in retaliation for plaintiff naming C.O. Jordan in the lawsuit. All of the corrections officers named by plaintiff in his two lawsuits were served copies of plaintiff's complaints by U.S. Marshals on July 8, 2003, the date of the current incident.[FN6]

> FN4. It is unclear from the record where the criminal case against plaintiff was filed.

> FN5. Plaintiff's lawsuits concerned an alleged assault by a corrections officer, and an earlier incident of destruction of plaintiff's property by corrections officers. *See Smith v. Benston, et al.,* No. 03 Civ 3979(MBM) (S.D.N.Y. filed June 2, 2003)("No. 03 Civ 3979"); *Smith v. Robertson,* No. 03 Civ.

3989(KMW) (S.D.N.Y. Oct. 16, 2003)(order dismissing the action with prejudice due to settlement) ("No. 03 Civ 3989").

> FN6. While it does not appear that the individual defendants were served directly by U.S. Marshals, other corrections officers at Rikers Island accepted service on their behalf on the morning of July 8, 2003. Defs.' Exs. C, D.

*2 The specific legal materials allegedly destroyed varied for each case. In his criminal case, plaintiff lost his copies of numerous motions drafted by his lawyer, along with his copy of his grand jury minutes. Pl.'s Dep. at 119. Through his lawyer, plaintiff was able to secure replacement copies of the legal documents within approximately three weeks, well before the case went to trial in November of 2003. *Id.* at 120, 204-05.

In the two civil cases, both filed on June 2, 2003, the plaintiff lost copies of his complaints, docket sheets, a *pro se* book, a jailhouse lawyer's manual, and different motions that he was "supposed to be looking over and studying because [he] was pro se." *Id.* at 121. In one case, No. 03 Civ. 3989, plaintiff was able to replace the destroyed documents within one week, but plaintiff complains that "instead of [the parties] settling the case at a specific time, [they] had to wait." *Id.* at 123-24. In the other case, No. 03 Civ. 3979, plaintiff allegedly lost copies of various documents sent by defendants' counsel. *See id.* at 124. Plaintiff does not elaborate how the loss has impacted that case, and concedes that he is not certain that he even possessed these documents on July 8, 2003, the date of the alleged incident. *See id.* at 128. As of the date of this opinion, case No. 03 Civ. 3979 remains pending before Chief Judge Mukasey.

DISCUSSION

Between his complaint and deposition testimony,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

plaintiff has alleged three constitutional claims under § 1983:(1) retaliation for the exercise of a constitutionally protected right; (2) denial of access to the courts; and (3) deprivation of property without due process.[FN7] These claims are discussed in turn below.

> FN7. To the extent plaintiff makes a claim for violation of his Fourth Amendment rights, plaintiff's claim fails because he does not have a right to be free from searches and seizures of the property in his cell. *See Hudson v. Palmer,* 468 U.S. 517, 525-27, 528 n. 8 (1984) (; *Bell v. Wolfish,* 441 U.S. 520, 537 (1979)("Loss of freedom of choice and privacy are inherent incidents of confinement...."); *Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

## I. Standard for Summary Judgment

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Frito-Lay, Inc. v. LTV Steel Co. ( In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993).

In order to defeat such a motion, the nonmoving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, (1986). An issue is

"genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (internal quotation marks omitted). In addition, when deciding a motion for summary judgment, a district court may only consider evidence that would be admissible at trial. *See Nora Beverages v. Perrier Group of America, Inc.,* 269 F.3d 114, 123 (2d Cir.2001).

## II. First Amendment Retaliation

**\*3** Plaintiff alleges that the defendants deprived him of property in retaliation for his filing federal lawsuits against other corrections officers at Rikers Island. Such actions are prohibited under the Constitution because "retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU v. Wicomico County,* 999 F.2d 780, 785 (4th Cir.1993).

Courts approach such retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To survive summary judgment, a plaintiff alleging retaliation must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes,* 239 F.3d at 492. *See also Winthrow v. Donnelly,* 356 F.Supp.2d 273, 275 (W.D.N.Y.2005) (applying *Dawes* standard to summary judgment motion); *Contes v.. Porr,* 345 F.Supp.2d 372, 377-78 (S.D.N.Y.2004) (same). Since access to the courts is an established constitutional right, *Bounds v. Smith,* 430 U.S. 817, 821 (1977), we turn to the second and third prongs of the retaliation test.

Adverse action is conduct "that would deter a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes,* 239 F.3d at 493. What constitutes adverse action is context specific, and "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before [retaliatory] action taken against them is considered adverse." *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (2d Cir.1999). *De minimis* acts of retaliation do not chill the exercise of constitutional rights, and thus are insufficient to support a First Amendment retaliation claim. *See Davidson v. Chestnut,* 193 F .3d 144, 150-51 (2d Cir.1999).

The adverse action alleged by plaintiff involves the destruction of his legal papers and his personal property. This action was specifically directed against plaintiff, was in violation of prison regulations, and deprived him of a substantial amount of personal property. Such retaliatory destruction of a prisoner's personal property has previously been found substantial enough to qualify as an adverse action. *See Soto v. Iacavino,* No. 01 Civ. 5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003). In addition, the retaliatory conduct alleged here involves more than just the destruction of personal property. Instead, the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights through the destruction of his legal papers. Accordingly, we find that plaintiff has established an adverse action substantial enough to satisfy the second prong of the retaliation test. *See Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002).

**\*4** For the third prong, plaintiff must establish a casual connection between the filing of his lawsuits and the retaliatory event. "The causal connection must be sufficient to support the inference 'that the speech played a substantial part' [in the adverse action]." *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000) (quoting *Ezekwo v. NYC Health & Hosps. Corps.,* 940 F.2d 775, 780-81 (2d Cir.1991). With respect to C.O. Bennett, plaintiff has provided direct

evidence of the connection between the two events as well as a temporal connection. First, plaintiff alleges that C.O. Bennett's statement "I don't like you, I'm pretty sure you know why" is evidence that plaintiff's property was destroyed because of his lawsuit against C.O. Bennett's co-worker, C.O. Jordan. Taken alone, this statement might not provide sufficient evidence to survive summary judgment, as C.O. Bennett has provided an affidavit that he had no knowledge of plaintiff's lawsuit against Officer Jordan. *See* Defs.' Notice of Motion for Summ. J., Ex. F (Aff. of Dwayne Bennett). However, when this alleged statement is combined with circumstantial evidence regarding the timing of the incident, plaintiff has established genuine issues of material fact regarding the reason for the destruction of his property. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995) ("In light of the combination of circumstantial and direct evidence of retaliation that [plaintiff] presents, we conclude that his claim, however valid it may ultimately prove to be, is sufficiently strong to defeat the motion for summary judgment.").

First, plaintiff has established that his property was destroyed on the very same day that the other Rikers Island corrections officers were served with the plaintiff's complaints in his civil suits. Defs.' Ex. C, D.[FN8] Although plaintiff had filed his lawsuits in early June, it is quite likely that July 8, 2003, is the first date that the individual corrections officers learned they had been named in plaintiff's lawsuits. Second, plaintiff alleges that C .O. Jordan had been working in 2-South immediately prior to C.O. Bennett's shift on the day of the incident, providing C.O. Jordan with an opportunity to discuss with C.O. Bennett plaintiff's lawsuits. Pl.'s Dep. at 95. In light of this highly suspicious timing and C.O. Bennett's alleged statement, a reasonable jury could find a causal connection between the destruction of plaintiff's property and plaintiff's protected action. Accordingly, defendants' motion for summary judgment on the retaliation claim is denied as to C.O. Bennett.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
(Cite as: 2005 WL 1026551 (S.D.N.Y.))

FN8. While a U.S. Marshal did not directly serve C.O. Jordan, the proof of service filed by plaintiff establishes that another corrections officer at Rikers Island, C.O. Houston, accepted service on C.O. Jordan's behalf on the morning of July 8, 2003.

With respect to the other named individual defendants, Captain Kennedy and Warden Farsi, plaintiff must establish their personal involvement in the retaliation in order to sustain a claim under section 1983. *See* Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). The Second Circuit has described the personal involvement of a supervisory defendant that is required to sustain a claim under section 1983:

**\*5** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff does not claim either defendant actually destroyed his property. Instead, plaintiff cites two statements by Captain Kennedy and Warden Farsi as evidence of their complicity in the retaliatory action, implying either that they directly ordered the retaliation, or at least were aware of it and failed to act as C.O. Bennett committed the constitutional violation. With respect to Captain Kennedy, plaintiff alleges in his complaint that Captain Kennedy told him "things

happen, this is our house" after the incident. Am. Compl. ¶ 19. During his deposition, plaintiff further argued that "[Captain Kennedy] is a supervisor, he had-has to know everything that's going on," and reasoned it was "possible" that Captain Kennedy ordered the retaliation. Pl.'s Dep. at 134. As for Warden Farsi, plaintiff states that C.O. Bennett told plaintiff that Warden Farsi had said to C.O. Bennett "this inmate has been bringing too much attention to this jail. Eventually he's going to find out whose house this is." Am. Comp. ¶ 20. At his deposition, plaintiff further stated that "one of his officers is being sued; you would think that this warden would know about it." *Id.* at 163.

Plaintiff's evidence of both defendants personal involvement is minimal, and it is quite possible that plaintiff merely assumes Captain Kennedy's and Warden Farsi's involvement based on their respective positions within the prison. If so, plaintiff's claim against the defendants will ultimately be unsuccessful. *See* Colon, 58 F.3d at 874. When ruling on a summary judgment motion, however, the Court must view the evidence in the light most favorable to the nonmovant. Given the alleged statements as well as the circumstantial evidence, a reasonable jury could believe that the defendants were personally involved in the violation. Moreover, the defendants have not submitted any evidence that Captain Kennedy and Warden Farsi were not involved in the incident, failing to obtain affidavits from either regarding their alleged involvement. As we have stated before, "[t]he Court is not so sanguine about its ability to identify a plaintiff's false assertions that it will grant summary judgement to defendants who are unwilling to swear that they did not make the incriminating statements alleged." Allah v. Greiner, No. 03 Civ. 3789, 2004 WL 1713811, at \* 5 (S.D.N.Y. July 29, 2004).

**\*6** Accordingly, the motion for summary judgment on plaintiff's retaliation claim against Captain Kennedy and Warden Farsi is also denied. If the defendants can present the Court with affidavits or other

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

evidence refuting plaintiff's allegations, the Court will consider another summary judgment motion on these claims.

We caution plaintiff that our denial of defendants' summary judgment motion does not reflect an opinion about the ultimate merits of plaintiff's case. At trial, plaintiff will likely be faced with direct testimony from C.O. Bennett denying any knowledge of plaintiff's lawsuits, and from Captain Kennedy and Warden Farsi denying any personal involvement in the alleged retaliation. [FN9] A reasonable jury might chose to believe such testimony rather than the primarily circumstantial evidence of retaliation that plaintiff has provided so far. Unlike the present motion, plaintiff's evidence will not be viewed in its most favorable light at trial, and the burden will be on him to prove his case against the defendants. Weighed equally against defendants' evidence, plaintiff's retaliation claim might very well fail.

> FN9. Assuming that these defendants are not successful in any renewed motion for summary judgment they might make after submission of the required affidavits.

Whether or not plaintiff will be ultimately successful in convincing a jury, however, is not for this Court to decide by motion. *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 54 (2d Cir.1998) ("[S]ummary judgment may not be granted simply because the court believes the plaintiff will be unable to meet his or her burden of persuasion at trial."). Based on the current record viewed in the light most favorable to the plaintiff, a reasonable jury could find that the defendants retaliated against him for the filing of lawsuits against Rikers Island corrections officers. Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is denied.

### III. Denial of Access to the Courts

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977). Prisoners must have a "reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* at 825. The active interference of prison officials in the preparation or filing of legal documents may constitute denial of access to the courts. *See Lewis v. Casey,* 518 U.S. 343, 350 (1996). However, a prisoner must show an actual injury in order to sustain a claim for denial of access to the courts. *Id.* at 349. Actual injury occurs only when "the loss of [plaintiff's] materials prejudiced his ability to pursue a legal claim." *Santiago v. N.Y.C. Dep't of Corr.,* No. 97 Civ. 9190, 2003 WL 1563773, at *5 (S.D.N.Y. Mar. 6, 2003); *see also Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). Accordingly, to survive summary judgment, plaintiff must introduce evidence to establish that his ability to pursue his criminal and civil cases was hindered by the destruction of his legal papers. *See, e.g., Thomas v. Thomas,* No. 97 Civ. 4541, 2000 WL 307391, at *3 (S.D.N.Y. Mar. 23, 2000).

### A. The Criminal Case

**\*7** A prisoner who is represented by counsel on criminal charges suffers no actual injury to his access to the courts if he is able to present his legal claims through his attorney. *See Perez v. Metro. Corr. Ctr. Warden,* 5 F.Supp.2d 208, 211-12 (S.D.N.Y.1998); *Santiago,* 2003 WL 1563773, at *5; *Shepherd v. Fraisher,* No. 96 Civ. 3283, 1999 WL 713839, at *5 (S.D.N.Y. Sept. 14, 1999). Despite the loss of plaintiff's personal copies of his criminal papers, plaintiff's was afforded a full opportunity to pursue his criminal defense through his legal representative. Plaintiff's counsel was able to move on plaintiff's behalf and ultimately took plaintiff's case to trial in November of 2003. Pl.'s Dep. at 205. Plaintiff has not alleged that his attorney's ability to present his claims was fundamentally impeded by the loss of plaintiff's copies of the documents, just that it was an "inconvenience" to replace them. Pl.'s Dep. at 120. Accordingly, plaintiff had a reasonably adequate opportunity to present his

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

claim via counsel, and has not established any actual impact on his defense in his criminal case from the destruction of his legal documents. *Perez,* 5 F.Supp.2d at 211.

B. The Civil Cases

With respect to his civil cases, plaintiff has also failed to establish any actual injury from the destruction of his legal papers. First, both cases were only in their initial stages when plaintiff's legal mail was destroyed. As discussed above, plaintiff's complaints had just been served on defendants on the day of the incident. As such, it is highly unlikely in either case that there were any documents, either from the court or from defendants, that required plaintiff's response or immediate consideration when his legal papers were destroyed. Second, plaintiff was able to replace most of the documents within a relatively short period, and has articulated nothing more than minor delays from the loss of the documents. In case No. 03 Civ. 3989, plaintiff received a favorable settlement, and claims only that the case might have settled earlier if not for the destruction of the documents. Plaintiff's other case alleging assault by a corrections officer, No. 03 Civ. 3979, is still active and awaiting disposition nearly two years after the alleged incident.

The constitutional right of reasonable access to the courts is not violated by "[i]nterferences that merely delay an inmate's ability to work on a pending cause of action or to communicate with the courts." *Jermosen v. Coughlin,* No. 89 Civ. 1866, 1995 WL 144155, at *5 (S.D.N.Y. Mar. 30, 1995). Plaintiff has not established any injury to his legal claims from the destruction of his papers other than the alleged delays. Accordingly, there are no genuine issues of material fact regarding plaintiff's claim of denial of access to the courts, and we grant summary judgment to the defendants on this issue.

IV. Deprivation of Property Without Due Process

A quintessential aspect of due process is "that an individual be given an opportunity for a hearing *before*

he is deprived of any significant property interest." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)). However, when the deprivation is based upon the "random and unauthorized" act of a state employee, an adequate post-deprivation remedy is sufficient to satisfy due process. *Parratt v. Taylor,* 451 U.S. 527, 541 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327 (1986); *see also Hudson v. Palmer,* 468 U.S. 517, 533 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of procedural requirements of Due Process Clause if a meaningful postdeprivation remedy for the loss is available"); *Hellenic American Neighborhood Action Comm. v. The City of New York,* 101 F.3d 877, 880 (2d Cir.1996). In *Parratt,* the Court recognized the impracticability of providing predeprivation hearings for tortious deprivations of property as "the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Id.* Accordingly, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing meaningful, the State satisfies its constitutional obligations by providing the latter." *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984).

**\*8** However, not all unauthorized deprivations of property can be remedied by postdeprivation hearings. The Second Circuit has distinguished between the random and unauthorized acts of low-level state employees and certain unauthorized deprivations caused by high-level state officials. *Dwyer v. Regan,* 777 F.2d 825, 832-33 (2d Cir.1985). Recognizing that high-level policymakers have "final authority over the decision-making process," a high-ranking official's "ability to anticipate the actions that he intended [is] ... fairly attributable to the State itself." *Id.* at 833. As such, the acts of high-ranking officials, even if in violation of state procedures, are not "random and unauthorized" withing the meaning of *Parratt* and *Hudson.* Because the State can reasonably be expected

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

to foresee the actions of its high-ranking senior officials, due process will not be satisfied by postdeprivation remedies for their actions. *Id.*

In the instant case, it is difficult to imagine how the State could have anticipated defendants' actions, or what type of predeprivation hearing the State could have provided plaintiff. Moreover, plaintiff has offered no evidence that the actions was anything other than "random and unauthorized" within the meaning of both *Parratt* and *Hudson.* Even assuming *arguendo* that Captain Kennedy and Warden Farsi were somehow involved in the deprivation, they are not the type of high-level policymakers whose actions are fully attributable to the State. *Mejia v. New York City Dep't of Corr.,* No. 96 Civ 2396, 1999 WL 138306, at *2 (E.D.N .Y. Mar. 5, 1999)* (assistant warden and captain named in action do not qualify as policymakers). Accordingly, the availability of postdeprivation remedies is a defense to plaintiff's due process claim.

It is well established that New York provides inmates with the opportunity for a meaningful post-deprivation hearing by way of state law causes of action for "negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss ." *Cook v. City of New York,* 607 F.Supp. 702, 704 (S.D.N.Y.1985); *see also Dove v. City of New York,* No. 99 Civ. 3020, 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000); *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995). "[P]laintiff's failure to take advantage of the state [law] does not convert his cause of action into a constitutional due process claim." *Smith,* 901 F.Supp. at 647; *see also Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987) ("[S]ection 1983[can]not be made a vehicle for transforming mere civil tort claims into constitutional injuries.").

Because the deprivation of plaintiff's property was random and unauthorized and plaintiff had access to meaningful postdeprivation remedies, due process was not violated. As such, defendants are entitled to summary judgment on this claim.

**V. Plaintiff's Claims Against the City of New York**

**\*9** In order to hold a municipality liable as a "person" under section 1983, the plaintiff must "first prove the existence of a municipal policy or custom to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection-an 'affirmative link'-between the policy and the deprivation of his constitutional rights." *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985).

Plaintiff has failed to establish that the alleged constitutional violations were a result of any city policy or practice. Plaintiff's complaint alleges only that the city "hired unqualified people and failed to adequately train them." Am. Compl. ¶ 25. First, plaintiff has offered no evidence to show that the City of New York has a policy of hiring unqualified individuals, nor has he identified any specific deficiencies in its supervision or training of its corrections officers. *See Board of the County Comm'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 409-10 (1997) (liability may attach if "violation of federal rights may be a highly predictable consequence of a [municipality's] failure [to train officers] ... to handle recurring situations"). Second, such a theory can only be the basis of section 1983 liability if the municipality's deficient conduct was the cause of plaintiff's injury. *See Morrissey v. City of New York,* 963 F.Supp. 270, 273-74 (S.D.N.Y.1997). As plaintiff has not established that any "identified deficiency in a city's [training or hiring] program" caused the his injury, *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989), we grant the defendants' motion for summary judgment on all of plaintiff's claim against the City of New York.

**CONCLUSION**

For the aforementioned reasons, defendants' motion for summary judgment is denied with respect to the plaintiff's First Amendment retaliation claim against C.O. Bennett, Captain Kennedy, and Warden

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)
**(Cite as: 2005 WL 1026551 (S.D.N.Y.))**

Farsi, and granted with respect to the other claims against the individual defendants, and granted with respect to all claims against the City of New York.

IT IS SO ORDERED.

S.D.N.Y.,2005.
Smith v. City of New York
Not Reported in F.Supp.2d, 2005 WL 1026551 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent; Joseph
R. Belarge, Captain; G.J. O'Donnell, Sergeant; F.S.A.
Antonelli; and Wayne Holt, Correction Officer, De-
fendants.

No. 9:03-CV-480.
April 24, 2006.

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany,
NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Re-
port-Recommendation dated March 17, 2006, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motion for
summary judgment be granted, and that plaintiff's
motion for partial summary judgment be denied.
(Docket No. 51). The plaintiff has filed objections to
the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the por-
tions of the report and recommendations to which the
plaintiff has objected, the Report-Recommendation is
accepted and adopted in whole. *See* 28 U .S.C.

636(b)(1). Accordingly, it is ORDERED that

1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accord-
ingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.
### REPORT-RECOMMENDATION

This matter has been referred to me for Report
and Recommendation by the Honorable David N.
Hurd, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of
Practice for this Court. In this *pro se* civil rights action
brought under 42 U.S.C. § 1983, Jeff Smith ("Plain-
tiff") alleges that five employees of Upstate Correc-
tional Facility-Deputy Superintendent Robert K.
Woods, Captain Joseph R. Belarge, Sergeant G.J.
O'Donnel, Food Service Administrator Richard An-
tonelli, and Correction Officer Wayne Holt ("De-
fendants")-violated his rights under the First, Fourth,
Eighth, and Fourteenth Amendments by (1) retaliating
against him for having previously filed a complaint,
(2) subjecting him to an unreasonable search and
seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Fa-
cility Special Housing Unit, and (4) taking away his
"good time" credits without affording him due pro-
cess. (Dkt. No. 5 [Plf.'s Am. Compl.].) FN1

FN1. Given my duty to liberally construe a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

*pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to

establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving ty. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam)* *(pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146,

148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN3] and are not specifically controverted by the plaintiff.[FN4]

> FN3. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

> FN4. *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically con-*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

*troverted by the opposing party.*").

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [FN5]

> FN5. Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment).[FN6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [FN7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8]

> FN6. *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

> FN7. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom. Ferrante v. U.S.,* 516 U.S. 806 (1995).

FN8. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [FN9] Of course, an affidavit may be conclusory because its assertions are too general.[FN10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place,

persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

FN9. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN10. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN11. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and ver-

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

ified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]."[FN12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials.[FN13]

> **FN12.** (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

> **FN13.** (*See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same

as the papers ***I have here"];*** Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to ***hold a copy of the complaint"*** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents ***being in my possession ...*** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail."[FN14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters.[FN15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail.[FN16]

> **FN14.** (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

> **FN15.** (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

> **FN16.** (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are sup-

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

ported by evidence in the record, and are not specifically controverted by Plaintiff:

## Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F.").[FN17]

> FN17. (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F.[FN18]

> FN18. (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198).[FN19]

> FN19. (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37,

Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit.[FN20] At the time, Plaintiff was not an inmate law clerk.[FN21]

> FN20. (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

> FN21. (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[FN22]

> FN22. (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[FN23] In pertinent part, the letter stated,

> FN23. (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he

should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him.[FN24]

> [FN24]. (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[FN25]

> [FN25]. (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[FN26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[FN27] In addition, the last page of the letter states:

> [FN26]. (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN27. (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[FN28]

FN28. (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[FN29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

FN29. (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[FN30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in

person at your earliest convenience. Thank you for your professional attention to this request." [FN31]

FN30. (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

FN31. (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[FN32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [FN33]

FN32. (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

FN33. (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [FN34]

FN34. (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[FN35] The note stated, in pertinent part:

> **FN35.** (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself.[FN36]

> **FN36.** (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff.[FN37] That memorandum stated, in pertinent part:

> **FN37.** (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to

Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately.[FN38]

> **FN38.** (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum.[FN39]

> **FN39.** (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents.[FN40] Plaintiff denied having such documents.[FN41]

> **FN40.** (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

> **FN41.** (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact];

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note.[FN42]

> FN42. (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers).[FN43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters).[FN44]

> FN43. (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge

had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

> FN44. (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[FN45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[FN46]

FN45. (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

FN46. (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[FN47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[FN48]

FN47. (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

FN48. (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [FN49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [FN50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

member without the consent or approval of the Superintendent or his designee.[FN51]

FN49. (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

FN50. (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14][v].

FN51. (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli.[FN52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits .[FN53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made cer-

tain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube").[FN54]

FN52. (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

FN53. (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

FN54. (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002.[FN55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint.[FN56]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN55. (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

FN56. (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence.[FN57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days.[FN58] However, Plaintiff's good time loss was unaffected by the discretionary review.[FN59]

FN57. (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

FN58. *(Id.)*

FN59. *(Id.)*

Meetings Between Defendants Woods, Belarge and

O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff.[FN60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff.[FN61]

FN60. (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

FN61. (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F.[FN62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules.[FN63]

FN62. (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

FN63. (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [FN64]

FN64. (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [FN65]

FN65. (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [FN66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [FN67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [FN68]

FN66. (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

FN67. (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

FN68. (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits

(which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitu-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

tional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers.[FN69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

> FN69. *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not pro-

tected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing.[FN70] Plaintiff's letter did not mention Defendant Antonelli.[FN71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing.[FN72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing.[FN73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision).[FN74]

> FN70. (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

> FN71. (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of

complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

**FN72.** (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

**FN73.** (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

**FN74.** *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

**B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim**

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction.[FN75]

**FN75.** (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

anything else in your second cause of action ...'' other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint.[FN76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [FN77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...."[FN78]

FN76. (*See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22,

26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

FN77. (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ...'' other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

FN78. (Dkt. No. 5, ¶ 14 [Am. Compl.].)

*11 The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984).[FN79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube."[FN80] Indeed, Plaintiff appears to recognize this point of law.[FN81]

FN79. *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

FN80. *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

FN81. (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory.[FN82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar).[FN83] I fail to see how any search and confiscation of such contraband would have vio-

lated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program).[FN84]

FN82. (Dkt. No. 5, ¶ 12 [Am. Compl.].)

FN83. I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

FN84. *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 're-strictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an ex-

cessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

**1. Sufficiently Serious Deprivation**

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [FN85] in September of 2002 as a result of sleeping on a defective bed.[FN86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[FN87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint, [FN88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[FN89]

> FN85. "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

> FN86. (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff de-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

scribes his injury generally].)

FN87. *See Villante v. N.Y. State DOCS,*
96-CV-1484, 2002 U.S. Dist. LEXIS 26279,
at *4, 8-9 (N.D.N.Y. March 28, 2002)
(Mordue, J.), *adopting re-
port-recommendation,* 2002 U.S. Dist.
LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001)
(Homer, M.J.); *Rowland,* 1993 U.S. Dist.
LEXIS 10233, at *13-16, 30; *Smith v. Umar,*
89-CV-6988, 1989 U.S. Dist. LEXIS 14170,
at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

FN88. (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am.
Compl., alleging that Defendants-who are
non-medical personnel-violated Plaintiff's
Eighth Amendment rights by placing him in,
and keeping him in, SHU, despite knowing
of the allegedly substandard conditions there,
which included his allegedly defective
bunk].)

FN89. (Dkt. No. 37, Part 23 at 42-43, 53, 58
[Munkowitz Decl., attaching transcript of
Plaintiff's deposition testimony, in which
Plaintiff testifies that he was not asserting
any claim regarding the medical treatment
that he received, or that the medical staff was
deliberately indifferent to a serious medical
need].)

This is apparently why Defendants, in their mo-
tions papers, do not challenge Plaintiff's allegation
that he suffered from "spondylolisthesis," but do
challenge his allegation that he was assigned a bunk
bed that was in any way defective.[FN90] In support of
that argument, Defendants submit evidence that none
of the bunk beds to which Plaintiff was assigned while
in SHU (1) showed any visible defects (much less the
defect that Plaintiff alleges, i.e., being "twisted") at or
after the time in question, and (2) were either com-
plained about by other inmates or repaired at or after

the time in question.[FN91]

FN90. (Dkt. No. 37, Part 25 at 14 [Defs.'
Mem. of Law, arguing that "plaintiff cannot
demonstrate that his bunk was 'damaged' in
any manner," citing record evidence in an
attempt to support that argument].)

FN91. *(See, supra,* Statement of Fact No.
29.)

**\*13** More convincing, however, is the temporal
disconnect between the onset of Plaintiff's back injury
and his assignment to the allegedly defective bunk bed
in question. Although Defendants do not appear to
argue that the onset of Plaintiff's injury pre-dated his
assignment to the allegedly defective bunk bed,[FN92]
there is evidence indicating that Plaintiff's back injury
existed *before* he was assigned to the allegedly defec-
tive bunk bed (i.e., Bunk Number "OS-A1-20(b)") on
September 23, 2002.[FN93] There is even evidence in-
dicating that Plaintiff's back injury existed before he
was admitted to SHU on September 6, 2002.[FN94]

FN92. (Dkt. No. 37, Part 25 at 11, 13-14
[Defs.' Mem. of Law].)

FN93. *(Compare* Dkt. No. 42, Part 1, ¶¶
10(a), 11 [Plf.'s Response to Belarge Aff.,
swearing that he was assigned to the alleg-
edly "dilapidated" bunk in question-Bunk
Number "OS-A1-20(b)"-on **9/23/02,** after
having been assigned to two different SHU
cells, i.e., first in Cell "SH-0013" and then in
Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27
[Plf.'s Am. Compl., containing a sworn al-
legation that the onset of his back injury was
on or before **9/13/02,** and that the date of
diagnosis was **9/20/02]** *and* Dkt. No. 42, Part
1, ¶ 15 [Plf.'s Response to Belarge Aff.,
swearing that he orally complained to Bel-
arge about the bunk on **9/18/02]** *and* Dkt. No.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

FN94. (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. FN95 For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

FN95. *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim prem-

ised on complaint that his mattress was uncomfortable).

**2. Deliberate Indifference**

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. FN96 More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. FN97 Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

FN96. (Dkt. No. 5, ¶ 38 [Am. Compl.].)

FN97. *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare*

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.FN98 Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk.FN99

FN98. (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony,

in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

FN99. *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

*14 In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace.FN100

FN100. (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days).FN101 Under the cir-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

cumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

> FN101. (See, supra, Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim**

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has made available a well-established three-step grievance program:

First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** White v. The State of New York, 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. Rodriguez v. Hahn, 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); Reyes v. Punzal, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. See Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." Hemphill, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or pre-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

serve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[FN102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question.[FN103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

FN102. (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

FN103. *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37,

Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[FN104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[FN105]

> **FN104.** *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

> **FN105.** (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's

reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[FN106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F.[FN107] Indeed, he had filed grievances immediately before and during this very time period.[FN108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

> **FN106.** (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

> **FN107.** (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

> **FN108.** (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

his Eighth Amendment claim be dismissed.

**E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim**

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[FN109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[FN110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[FN111]

FN109. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

FN110. *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

FN111. *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

**F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy**

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not

provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[FN112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [FN113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

FN112. *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

FN113. *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' " ) (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or An-

tonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Smith v. Woods
Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.